1    My name is Delvan Neville.  I am the owner of Amaragh Associates, LLC, and the

2    creator of EUPSC2k, a BitTorrent monitoring suite.

3    Plaintiff purports (ECF No. 87) that my earlier Declaration, originally filed in First

4    Time Videos v. Paul Oppold, is untrue and baseless on numerous grounds.  Here I will address each of

5    these complaints.  Plaintiff complains (*Id. p6*) that I lack the requisite background for this topic,

6    though offers no explanation of how I could simultaneously program a BitTorrent monitoring suite yet

7    not know "anything about computers or BitTorrent technology".  To address these fears, I endeavor

8    where possible to use Plaintiff's exhibits (B, C from *Id.*) and the testimony of their own expert, Peter

9    Hansmeier (ECF No. 4-1), to explain the errors in Plaintiff's reasoning.[1]

10    Plaintiff asserts that my ultimate conclusion is baseless.  This may arise from

11    Defendant's prior filing not including the supplementary exhibits I reference (originally K-1 through

12    K-18) which included the logs produced by EUPSC2k of their activities, the activities of sharkmp4 on

13    The Pirate Bay, the links between the IPs involved in these activities and those used by Plaintiff both

14    to manage John Steele's GoDaddy Account and to make incendiary comments on notable anti-

15    copyright-troll blogs, and finally their convenient website finally making their copyrighted works for

16    sale, which was clearly thrown together haphazardly, to the extent that they appear to have committed

17    copyright infringement themselves through the use of a non-commercial version of Angilla Tattoo[2].  I

18    will agree that these facts should be readily available in this court, and will endeavor to ensure they

19    will be provided to the court.  However, as counsel for Plaintiff is also the principal of the firm in

20    charge of litigation for First Time Videos in the case where my declaration was originally filed, it

21    seems unlikely Plaintiff was not aware of the evidence in these exhibits.  It is *especially* surprising

---

1   It is worth mentioning, however, that Mr. Hansmeier's qualifications on the subject are presented similarly to my own:
    both as working at an LLC performing BitTorrent forensics, using specialized software, with no attempt at presenting
    outside credentials.  The only differences are that a) I am the original designer of my software, whereas Mr. Hansmeier
    is merely a technician, and b) Mr. Hansmeier testified on behalf of Plaintiff.
2   As noted in my original declaration and demonstrated in exhibit K-12 pages 1 through 4, Plaintiff's haphazardly built
    commercial website, Naughty-Hotties.com, uses a copyrighted font (Angilla Tattoo) that is for personal use only.  The
    commercial license for this font is $59.00 USD.

1  that Plaintiff would choose to attempt to argue the merits of the declaration in this court without

2  making *any* of these arguments in the case for which I was originally contracted.

3      4.      Plaintiff conflates tracker communication and swarm communication.  They assert

4  (ECF No. 87 at 7) that my software gained no real evidence because, as it was doing a passive soak, it

5  was allegedly only relying on indirect communication.  Plaintiff even attaches an exhibit detailing the

6  problems with using torrent trackers as the basis for determination of guilt (ECF No. 87-2).  Plaintiff

7  is mistaken as the operation mode of EUPSC2k, even though I detailed the nature of this mode in my

8  original declaration: a passive soak is one in which EUPSC2k will not attempt to download pieces of

9  the work, but it is still an active swarm participant and still communicating *directly* with members of

10  the swarm.  Although I also included the tracker communication relating to 6881 in Exhibit K-1 in my

11  original declaration, Exhibit K-2 details communication made directly between 6881 and EUPSC2k.

12  They contend that the University of Washington authors were able to place their printer in a BitTorrent

13  swarm, which they did not.  They got their printer listed on the *trackers,* but it was *not* in the swarm:

14  this distinction is the entire basis of the UW author's argument of this flaw![3] I wholeheartedly agree

15  with the exhibit: being listed on a tracker is something that can be easily falsified, and trackers will

16  maintain a listing for a peer for some time after the peer has left the swarm.  I even noted this

17  discrepancy in my declaration in paragraph 13: there were two *other* Mullvad IPs listed on the

18  trackers for those swarms, *who were not actually participants in the swarm*.  Even if Plaintiff did not

19  observe the logs showing direct communication between 6881 and EUPSC2k, I would hope that their

20  forensics provider has advised them of the difference between a tracker and a fellow peer (ECF No. 4-

21  1 at 19).

22      5.      Plaintiff's own exhibit B concurs with questions I have raised in this document at 6.

23  "There are challenges to associating the endpoint of that communication directly to a specific physical

---

3  Metaphorically, they got the printer's name listed on the clubhouse door, even though the printer never (and couldn't)
   enter the clubhouse.

1   machine, let alone a specific user. For example, suppose the IP address corresponds to a family's

2   home cable-modem or DSL connection, and suppose the family has an open wireless access point (or

3   an insecurely-protected access point) on their internal network. It may be challenging to determine

4   whether the machine participating in the P2P network belongs to the family or a neighbor. To address

5   this challenge, monitoring agents may in the future collect data about not only the IP addresses of

6   potentially infringing parties but also operating system [8, 10, 12] and physical device [5] fingerprint."

7   (ECF No. 87-2 at 7)

8          6.     Plaintiff has filed countless cases and issued orders of magnitude more settlement

9   demands to subscribers without exposing any sort of data supporting the claim besides a "hit date" for

10  a given IP.   There is a need for copyright monitoring and enforcement to be done in a fashion that is

11  transparent enough that it is clear what evidence forms the basis of any given infringement claim.

12  This is, in fact, one of the founding principles of the EUPSC2k process, and why logs of the activities

13  of Plaintiff's agents were included voluminously with my original declaration. This, too, is something

14  which the Plaintiff's own exhibit concurs upon, "These observations call for increased transparency

15  and openness in the monitoring and enforcement process and build our understanding of current

16  challenges and potential next steps for all parties involved in P2P file sharing: enforcement agencies,

17  ISPs, and users." (*Id* at 8)

18         7.     Beyond Plaintiff's conflation of trackers and peers, they contend that EUPSC2k did not

19  detect their file-sharing activity because it did not attempt to download any pieces.  Operating in a

20  passive soak is an important component in any P2P monitoring suite: investigating the activities of an

21  individual pirate frequently requires monitoring swarms for copyrighted works that are not owned by

22  a client.  Further, investigating distribution of illegal materials like child pornography demand

23  operation in a passive soak without explicit legal authority to do otherwise.  Essentially, Plaintiff

24  argues that EUPSC2k could not have caught them until it sprang the trap, arguing that I *should* have

1   been infringing on their copyright while investigating their actions.  However, there is strong evidence

2   to support their seeding activities without springing the trap.  6881 repeatedly and aggressively

3   offered to give pieces of the copyrighted work to EUPSC2k.  Their frequent use of the *allowed_fast*

4   message would provide them no forensic benefit, as sharing via that method earns them no tit-for-tat

5   benefit. Neither would these be an important step in cloaking their software's status, as this is an

6   optional extension message rather than a core BitTorrent message, one which countless real peers do

7   not send.

8          8.      Plaintiff contends that 6881 utilizes the principles of BitStalker (ECF No. 84-3).  They

9   contend that their software merely mimics a swarm member by sending a specific series of messages

10  before terminating their connection: Handshake, Bitfield, Block request.  This conflicts with the

11  declaration of Peter Hansmeier (ECF No. 4-1): here he points out that their software collects "granular

12  level data" (*Id.* at 16) and that they can determine among other things "the times and dates when a

13  portion of the file was successfully downloaded to the infringer's computer" and "the time and date

14  the infringer was last successfully connected to [sic] BitTorrent network".  The BitStalker method,

15  however, only provides updates on file completion via the Bitfield sent following the handshake

16  process (ECF No. 84-3 at 3).  To know each time an infringer downloaded a new piece, 6881 would

17  need to repeat their BitStalker routine on every peer, and do so at minimum as frequently as those

18  peers download new pieces.  The torrent for this case,

19  6C10F2DCFF52961B876AA592183103BAC958E989, has 930 pieces.  The author's conclusion of

20  $12.40 to monitor the entirety of The Pirate Bay includes no necessity of probing every peer every

21  time they complete a piece download, raising Plaintiff's cited cost to $11,532 provided they had

22  perfect timing and only ever sent one new probe per piece downloaded[4].  Additionally, since they do

---

4   This figure assumes that 930 pieces is a representative number for any torrent on The Pirate Bay, since the authors of
    the exhibit were quoting $12.40 based only on the estimated number of peers associated with a torrent found on that
    site.

1    not download an entire piece from a given infringer, they cannot validate it as a valid chunk until they

2    have downloaded at minimum that entire piece so that they can compare what they received "If the

3    investigator has the remaining blocks of that piece, then they can verify the hash to ensure that the

4    block is valid" (*Id* at 3).  Note that, however, Peter Hansmeier claims to identify an infringer as a

5    "verified peer *before* he has downloaded the actual work being distributed in the swarm (ECF No. 4-

6    1 at 25). Although BitStalker is a viable method to identify participation in a swarm, it is not meant

7    for collecting "granular level data" nor is it meant to establish if a peer completes the download.

8    However, Plaintiff's claims are inconsistent with a user employing BitStalker.

9           9.      The 6881 peer sends a variety of other messages besides those they cite in the

10   BitStalker example.   The *allowed_fast* message, detailed in my original declaration as well as this

11   one, serves no purpose in the BitStalker mentality nor does it provide a forensic benefit *unless they*

12   *want the peer to download the file from the investigator.*  This message indicates pieces are available

13   from 6881 regardless of whether the peer will be sending pieces back.  The decision on what pieces to

14   offer is calculated from a specialized algorithm to ensure all sources will select the same piece

15   numbers to offer to any specific peer, and the 6881 peer always offered the appropriate set of pieces

16   based on EUPSC2k's peerID (as confirmed by similar offers from other swarm members).  What

17   purpose would accurately selecting the pieces to include in an already optional message serve to a

18   forensic investigator?  They also include the LibTorrent extension handshake: how would this serve

19   the BitStalker probe technique?  They purport to send these messages to cloak their client: they send

20   LT handshakes (a LibTorrent protocol) but not AZ handshakes (Azureus/Vuze protocol), the latter

21   being supported by default for the software they claim to be using in handshakes (Vuze 4.7.1.2).

22          10.     Far more likely, 6881's software is a modified BitTorrent client.  This is no shame in

23   this on principle: messages sent do not cost more bandwidth to send via a BitTorrent client than they

24   do via BitStalker, as these messages are the same.  Using a modified BitTorrent client, 6881 could in

1   theory gather the sorts of granular level data they claim to have, as they could maintain connections

2   with other peers and receive updates (via BT Have messages) every time a peer completes a download

3   rather than sending new probes.  BT Have messages are also much more bandwidth friendly: rather

4   than repeating an exhaustive bitfield that details their status for all 930 pieces (in this case) every time,

5   a peer sending a BT Have message uses far less bandwidth to notify an update on their status for a

6   single piece.

7        11.    That Plaintiff chose instead to apparently misrepresent the technology they are using

8   rather than providing an honest reply seems especially telling of both the nature of the evidence they

9   truly have, and of the nature of the operation of their software.

10       12.    In a misguided attempt to demonstrate their innocence, Plaintiff cites ECF No. 84-2 at

11  2 "Crucially, querying the tracker for a set of bootstrapping peers allowed us to determine

12  membership in swarms and advertise our presence as a potential replica without uploading or

13  downloading any file data whatsoever".  However, note that this is not from the exhibit for BitStalker,

14  it is in fact the exhibit denouncing the use of trackers to determine guilt! The quote is explaining how

15  a peer listed on a tracker doesn't necessarily need to be exchanging messages with the actual swarm.

16  Obviously no file data is transferred while querying the tracker: that is the very nature of

17  communicating with them.  Even a full-fledged pirate does not upload or download file data while

18  querying the tracker.

19       13.    Plaintiff claims the reason they simulate messages is because of the tit-for-tat nature of

20  BitTorrent.  Again, there is a complete misunderstanding of the mechanisms of BitTorrent.  The tit-

21  for-tat nature is handled on a peer-by-peer basis, and is based solely on actual pieces transferred

22  between peers.  Although there is a secondary tit-for-tat system in place, wherein trackers will

23  selectively prefer to hand out the IPs of peers who are more generously sharing files, this is handled

24  only by transfer data reported to the tracker by that very peer, and requires no special messages sent to

1   other peers.  No simulated messages will address the peer-to-peer tit-for-tat limitation: the options are

2   a) simply share nothing and accept a slower download rate[5] b) send actual pieces c) send fake pieces,

3   but only very few, as repeatedly sending fake pieces typically results in a ban or d) change the IP or

4   peerID to appear to be a fresh peer with no tit-for-tat debt.  Neither LT handshakes nor allowed_fast

5   messages gain them any benefit in regards to this tit-for-tat nature.

6        14.    Plaintiff claims that seeding their own works would not make sense.  It is again telling

7   that Plaintiff is claims ignorance of the straightforward profit potential for a law firm operating a

8   "lawsuit factory" honeypot that would continuously grant them the materials for further suits.  Since

9   Plaintiff has all of its settlements go to the law firm's trust accounts to pay for even further litigation,

10  such a "lawsuit factory" seems a perfect fit to Plaintiff's stated strategy of "buy worthless copyrights,

11  and litigate until the copyright becomes valuable again."

12       15.    Plaintiff further contends that they simply could not afford to seed files on BitTorrent.

13  Yet their own expert, Peter Hansmeier, explains that (ECF No. 4-1 at 13) "The BitTorrent protocol is

14  particularly well suited to transferring large files, such as the audiovisual works produced by Plaintiff,

15  as it allows even small computers with low bandwidth to be capable of participating in large data

16  transfers across a peer-to-peer network."  Even if they were under such hard financial woes that they

17  could not continue to seed, their prior efforts are significant: "Since the entire swarm began with a

18  single seed, the initial seeder and peers have long lasting effects on the swarm." (*Id.* at 12)  How

19  Plaintiff and counsel have managed to sue thousands of defendants accused of sharing their works

20  using nothing but a home internet connection without admitting that it is inexpensive to seed files in

21  BitTorrent is staggering.

22       16.    Peter Hansmeier's testimony goes on to state that after verifying a peer, they "download

---

5   This is the usual method EUPSC2k typically employs while running an active soak, as b is only aiding in the
    infringement, c can get the client banned by other peers, and d makes EUPSC2k's status as an investigator abundantly
    clear (if done using changing peerIDs) or utilizes exceptional network resources (if done using changing IPs as well).

1   and retain both the torrent files and the actual digital reproductions being offered for distribution",

2   which conflicts with Plaintiff's claim that they simply cannot afford to spend more bandwidth beyond

3   the occasional 16Kb chunks from the BitStalker routine.

4       17.     Finally, Plaintiff quickly scans through my original declaration, taking quotes out of

5   sequence and context in an attempt to throw doubt upon my testimony (ECF 87 at 8).  The original

6   declaration is presented in chronological order, from one investigation topic to the next.  Of course my

7   conclusions about the likelihood of Plaintiff's self-seeding behavior would not be as firm following

8   the first investigation ("Such inquiry concluded with a finding that it is  likely") through to the end of

9   all of the investigations.  Given that Plaintiff chose not to object to any of the conclusions or evidence

10  presented in all other investigations in the declaration beyond the first, it is understandable that

11  Plaintiff did not appreciate the significance of each sequential investigatory conclusion.

12      18.     My use of probabilities rather than absolutes is due to my scientific background.  To

13  use absolutes would certainly be more striking in testimony, and may be appropriate for a lay person,

14  but I cannot state such absolutes when I know there is some small probability of error.  In the event

15  that there is such an error, it seems it would be quite simple for Plaintiff to deflect these accusations

16  with facts rather than doubt: What is the actual software being used, or at least demonstrate the logs

17  produced, especially in regards to any defendant they have accused as well as during the time of the

18  soak when they offered to share the file with EUPSC2k. What is the nature of their partnership with

19  sharkmp4?  While the activities of this user are originating from IPs associated with John Steele, I of

20  course couldn't conclude that I knew the identity of the individual involved, and if this is simply a

21  pirate they have hired rather than the direct actions of Plaintiff I couldn't know without inside

22  information.

23      19.     Plaintiff provided no rebuttal against the majority of my original declaration.  Although

24  they oppose the claim that 6881 is providing their works to members of the swarms, they do not

1   address:

2   • Evidence that sharkmp4 has been given access to Master copies of the works

3   • That sharkmp4 acquired works in 2011 and 2012 that were not available for purchase until

4   2013

5   • That 6881 claims to have detected infringing swarm activity before the swarm existed

6   • Whether John Steele or his agents maintain authoritative control of 6881 Forensics, AF

7   Holdings, Ingenuity 13 and Prenda Law

8

9   Defendant's motion for award of attorney's fees (ECF No. 84) alleges that AF Holdings is

10   distributing its works online to monetize copyright infringement through litigation.  My declaration

11   concludes that it is John Steele or his agents that are engaged in this activity.  Given that counsel for

12   Plaintiff has previously plead the Fifth when asked to address activities and controlling interests in AF

13   Holdings, and that Plaintiff likewise has omitted refutation of all of these points, it seems fair to

14   conclude that they are either true, or that counsel for Plaintiff would need to incriminate himself to

15   refute any of these points.

16   20.   Plaintiff alleges that Defendant should not be awarded attorney's fees because, among

17   other reasons, there are no issues of "frivolousness, motivation, objective unreasonableness (both in

18   factual and legal components of the case) and the need in particular to advance considerations of

19   compensation and deterrence."  My investigation, however, demonstrated that their claims are

20   frivolous, as the copyrighted works are made freely available online by the copyright owner or their

21   agents.  Their motivation appears to be to monetize copyright infringement through litigation, not to

22   protect their valuable copyrights.  There is a clear need to deter such future activities.  Finally, there

23   are several points of factual objective unreasonableness that I will address further in this document.

24   21.   Plaintiff "has little doubt Defendant committed the acts alleged in the complaint."  The

1  evidence of these acts presented, however, amount to a single "hit date" connecting an IP to some

2  undefined activity in a BitTorrent swarm.  It is disturbing for Plaintiff to argue that they have little

3  doubt when they seem to have no evidence to lead them to that conclusion, only a "hit date" and

4  Defendant's status as a computer literate individual.  Plaintiff recognizes the Defendant's assertion that

5  their investigation was inadequate (ECF No. 87 at 9), but yet offer nothing as to the basis of their

6  conclusion or what investigation they did perform that would refute this.  How did they characterize

7  the activity of the IP in the swarm beyond a "hit date"?  The Declaration of Peter Hansmeier claims

8  their software can identify many things about an infringer (ECF 4-1 at 20), but all of this identifying

9  information is still absent from this case after a year of litigation.  What means did they employ to

10  gather identifying characteristics of the computer behind said IP, such as operating system and

11  software version?  Was the IP associated with forum activity on pro-piracy websites?  Was there

12  instant messaging software running on that computer that would permit contacting the suspected

13  infringer directly? Do any of the above provide a pseudonym linked to a real name?

14      22.      Plaintiff purports to "further the goals of the Copyright Act by reversing the 'disdain for

15  copyright protection brought about by mass-digital piracy'" (*Id.* at 11).  On the contrary, "copyright

16  trolling" is greatly *increasing* the disdain for copyright protection, and the degree of this disdain is

17  evident in the reports among the public and in the press on the questionable activities of Plaintiff.

18  Copyright trolling does not further the goals of the Copyright Act, it subverts and twists it.

19      23.      As to the complaint that I will not be available for cross-examination, I am certainly

20  amenable to making an appearance.  Given the contents of my declaration and the general nature of

21  Plaintiff's reply, I would hope that Peter Hansmeier would likewise be made available for cross-

22  examination to address these apparent contradictions.

23      24.      In summary, Plaintiff has not even attempted to refute the majority of the conclusions

24  from my original declaration.  The only arguments presented have been those relating to whether 6881

1  could (and has) seeded the copyrighted works they claim to protect; these arguments have been rife

2  with contradictions with testimony by their own expert and with the actual BitTorrent specifications.

3  Upon their omission of refutation, it appears clear that John Steele or his authorized agents are the

4  entities in control of 6881 Forensics and the user sharkmp4 on The Pirate Bay.  Sharkmp4 has been

5  granted access to master copies of copyrighted works *years* before any commercial release, and to the

6  extent of my investigation no complaint has been filed citing this single user for infringing on so

7  many copyrights (the most extreme example being Ingenuity13 LLC, where all of their works save

8  one have been uploaded by sharkmp4).  As John Steele is also the owner of the Prenda Law domains

9  (wefightpiracy.com, wefightpiracy.org, prendalawfirm.com) as well, it comes as no surprise that no

10  litigation has been brought against him by AF Holdings or Prenda Law for his (or his authorized

11  agents) infringing on these copyrights.

12  **Technical Issues Unrelated to EUPSC2k**

13       25.     Despite no testimony that Plaintiff knows anything about computers or how CCleaner

14  works, Plaintiff continues to assert that the use of CCleaner to remove unwanted temporary files and

15  malware from Defendant's computer amounts to spoliation.  As Defendant has noted that CCleaner is

16  run on a weekly basis, this argument falls flat.  The infringing download was alleged to have occurred

17  on January 12, 2012 (ECF No. 1), but the complaint was not even filed until nearly four months later

18  on May 10, 2012. Any temporary internet files that might have been relevant to the alleged incident

19  would have been deleted by CCleaner no later than January 19, well before Defendant had been

20  notified of any expectation to retain hard drive contents.  As CCleaner only removes temporary files

21  related to web browsers & unused registry entries, it bears no relevance to the original media alleged

22  to have been downloaded, as no BitTorrent client defaults to putting completed downloads in volatile

23  temporary folders.

24       26.     Plaintiff asserts that Defendant is the only member of his household who possesses the

1   computer savvy required to use BitTorrent.  This computer savvy means a person must be capable of

2   1) clicking on a "download" link on any site offering a BitTorrent client, 2) clicking yes/next/finish to

3   install it, just as they would install any software.  While some degree of computer literacy is required,

4   it is no more complicated than installing Microsoft Office or Adobe Acrobat. Selectively targeting the

5   *most* computer literate individual connected to an IP is problematic: especially savvy computer users

6   would also know that BitTorrent is an especially conspicuous method of committing copyright

7   infringement since they communicate not just with a single source providing the download, but with

8   any participant in the swarm who initiates a connection.

DECLARATION OF DELVAN NEVILLE

1  FURTHER DECLARANT SAYETH NAUGHT

2      I declare under penalty of perjury under the laws of the United States of America that the

3  foregoing is true and correct.

        Executed this _23rd_ day of June, 2013

                                    X_____

                                    Delvan Neville, Manager

                                    AMARAGH ASSOCIATES, LLC

4