Paul Duffy (Bar No. 224159)
2 N. LaSalle Street, 13th Floor
Chicago, IL  60602
E-mail: pduffy@pduffygroup.com

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AF HOLDINGS LLC,                    ) | No. 3:12-CV-02396-EMC |
| ) | |
| ) | **PLAINTIFF'S SURREPLY IN** |
| ) | **OPPOSITION TO** |
| Plaintiff,          ) | **DEFENDANT'S MOTION FOR** |
| ) | **SANCTIONS** |
| ) | |
| v.                                  ) | |
| ) | |
| ) | |
| JOE NAVASCA,                        ) | |
| ) | |
| ) | |
| Defendant.          ) | |

Defendant's Reply in support of its motion for sanctions is an astonishing display of mendacity difficult to conceive of in a typical Federal lawsuit.  But this case is now being driven by counsel who, emboldened by a compliant ex-counsel for Plaintiff --- who for reasons clear only to him is actively taking positions adverse to his own client in litigation that he initiated ---  is presenting scenarios that he knows, or should know, are at odds with the facts.  This case has been dismissed with prejudice, and the Court should not allow Defendant's counsel to continue to seek monetary gain by continuing to present demonstrably false and irrelevant conspiracy theories.

Defendant in his reply now offers yet another declaration from the ex-counsel for Plaintiff, Mr. Gibbs, which marks at least the fourth declaration that he has offered to Federal courts since December 2012. At a minimum, counsel's affidavits are self-contradictory, and after the first one, appear to reflect what defense attorneys want him to say. For example, in December 2012 he stated (correctly) that he was "not an employee" of Prenda; now, he declares that he was its employee. He

filed no declaration with this this Court, despite the Court's April 2013 Order requiring him to do so, as to the whereabouts of the original signed version of the ADR statement that he filed; but he now states in his newest (and fourth) declaration that he felt he owed an "obligation" to the Court to correct the declaration that Mr. Lutz filed.  This newly-discovered "obligation" is one that he did not fulfill; he never informed the Court of his concerns regarding Mr. Lutz's declaration, and Defendant's counsel only did so after it was unable to leverage Mr. Gibbs' "discomfort" into an illegal settlement.  While Defendant's counsel objects to Plaintiff's characterization of Mr. Gibbs' declaration as a *quid pro quo* for financial relief in the Central District of California case, it is impossible to deny that the timing of those events shows that both Defendant and Gibbs stood to gain financially from Mr. Gibbs' third declaration. Again, it is clear that the third Gibbs declaration would not have seen the light of day if Defendant's counsel had succeeded in using it to leverage a settlement demand.

The contradictory evolution of Mr. Gibbs' testimony over time justifies the Court disregarding his third and fourth declarations in their entirety.  Furthermore, the Defendant's claims that "Alan Cooper" did not sign the copyright transfer form, their claims that a third-party "seeded" the copyright-protected work in order to allow Mr. Navasca to infringe on it, and the other arguments of Defendant (or more appropriately, his counsel) in support of his efforts to recover "sanctions" are factually baseless and the Court should disregard them as well.  While Plaintiff did not address certain of these arguments in its Response, because they were far astray of any matter considered by the Court to date, Plaintiff now files this sur-reply to address them in accordance with the instruction of Judge Chen at the July 18, 2013 hearing on Defendant's motion to recover attorney fees, that Plaintiff should respond to Defendant's additional arguments, presented after the case was dismissed with prejudice.

**ARGUMENT**

Defendant's counsel has presented, for the first time in its reply, new evidence that goes beyond what was presented in their Motion.  As such, Plaintiff should have the opportunity to respond to this and other new information in this sur-reply.

The tactic of Defendant's counsel has been to throw as many unsupportable accusations into their briefs as possible, in an effort to see if any will have an impact. In this particular case, Defendant has strayed far from those matters that were at issue in the underlying litigation, by (i) presenting two declarations from Mr. Gibbs (Gibbs 3 and Gibbs 4) which contradict an earlier declaration in another proceeding (Gibbs 1) in what was clearly a *quid pro quo* to benefit both sides financially; (ii) re-visiting the "Alan Cooper" hoax, without disclosing evidence they are aware of that there is a clear factual dispute over whether Mr. Cooper signed the copyright assignment; and (iii) presenting the "opinion" of a witness whom they have not sought to qualify as an expert, who accuses a non-party, John Steele, of "seeding" the BitTorrent swarm from which Mr. Navasca stole Plaintiff's copyrighted work.

I. **THE COURT SHOUD DISREGARD MR. GIBBS' DECLARATIONS AS NOT CREDIBLE.**

The centerpiece of Defendant's latest effort is yet another declaration from former Plaintiff counsel Mr. Gibbs, in which Mr. Gibbs flatly contradicts statements that he made in other federal proceedings. (True and correct copies of (4) declarations of Mr. Gibbs, filed in Federal Court proceedings between December 2012 and July 2013 (referred to herein sequentially as "Gibbs 1" through "Gibbs 4") are attached as **Exhibits "A"** through **"D",** respectively, hereto and made a part hereof.) The factual inconsistencies in Mr. Gibbs' declarations are clear, and suggest that at a minimum, the Court should disregard them. Plaintiff highlights five of the more striking inconsistencies that establish that his statements should be given no weight.

*First,* Mr. Gibbs claims now that he was an employee of Prenda Law.[1] (Gibbs 3 and Gibbs 4, Exs. A and B.) However, before the U.S. District Court for the Middle District of Florida in December, 2012, Mr. Gibbs stated that he was "I am not an employee or partner" of Prenda Law. (Gibbs 1 at Ex. A.) *See* December 2012 affidavit of Mr. Gibbs ("Gibbs 1"), a true and correct copy of which is attached at **Exhibit "B"** hereto and made a part of.). He made the statement in Gibbs 1 before the defendant in the Florida brought a motion for sanctions; he changed his conclusion after

---

[1] Mr. Gibbs' new "employee" narrative is ostensibly an effort on his part to delegate to his "employer" the responsibility of maintaining an original signed copy of documents containing electronic signatures.

he was threatened with motions for sanctions. (The latter statement is true; Mr. Gibbs was not an employee or partner of Prenda.) *Second,* Mr. Gibbs, asserts that he did not oversee and supervise other attorneys in connection with AF Holdings cases outside of California. Gibbs 3. But in Florida in December, Gibbs stated that in his "of counsel" role, he acted "as an advisor and educator, … help[ing] Prenda Law, as well as their clients … and consult[ing] with the lead counsel on those cases as the case progresses. I occasionally help lead counsel prepare documents including motions and responses to facilitate lawsuits…" (Gibbs 1 at 8.) Furthermore, individuals whom Gibbs directed in litigation have submitted declarations in other proceedings stating that Gibbs directed and controlled their litigation of cases on behalf of AF Holdings. (True and correct copies are attached at ***Exhibits "E"*** and ***"F"*** hereto and made a part hereof.) Furthermore, the retainer agreement that AF Holdings executed with Prenda also firmly establishes that Gibbs was the main point of contact with respect to all litigation on its behalf[2]. His statements that he was merely a "secretary" acting at the behest of others is plainly false.

*Third,* Gibbs states now that he prepared his June 2013 declaration because he felt he had a "responsibility" to inform the Court to correct what he felt were false statements in the Lutz affidavit. (Gibbs 3, Ex. D at 6.) Yet, when this Court in April 2013 allowed him the opportunity to submit a declaration as to the whereabouts of the ADR statement that he filed in the court (ECF NO. 76), he failed to do so. And while he now claims that he submitted his June 2013 declaration out of an "obligation" to the Court to correct what he believes was an incorrect Lutz affidavit (Gibbs 3), he never filed it with the Court. That declaration only saw the light of day after (i) Defendant's counsel assisted him in efforts to avoid financial liability for the joint and several sanction imposed upon him in the U.S. District Court for the Central District of California; and (ii) Defendant's counsel used the threat of filing it as a way to coerce a settlement offer from Plaintiff. If Mr. Gibbs in fact believes that he had an "obligation" to inform the Court that the Lutz affidavit was incorrect, he did not discharge it himself.

---

[2] Because those agreements are privileged, Plaintiff does not attach them here (which will no doubt spawn a new generation of conspiracy theories by Defendant's counsel). Plaintiff will gladly present them to the Court for its *in camera* review and inspection at any time.

4
SUR-REPLY TO MOTION FOR SANCTIONS     No. 3:12-CV-02396-EMC

*Fourth,* Mr. Gibbs' explanation as to why he filed a document purporting to be on behalf of a person named "Salt Marsh" is nonsensical[3]. As set forth in Plaintiff's Response, Local Rule 5.1(i)(3) of the Northern District of California requires among other things that "The filer shall maintain records to support his occurrence for subsequent production for the Court, if so ordered, or for inspection upon request by a party, until one year after the final resolution of the action (including appeal, if any)." Mr. Gibbs makes no attempt to explain why he failed to comply with this rule, instead seeking to blame others for his conduct. He claims that (i) a non-party, Paul Hansmeier, told him that there was a natural person named "Salt Marsh" who owned AF Holdings; and (ii) he believed the original signature was somewhere in Chicago. Neither is a valid explanation under Local Rule 5.1(i)(3), and neither is plausible. If Mr. Gibbs did take it as an article of faith that a natural person by the name "Salt Marsh" owned AF Holdings, he should have been disabused of that notion when, while he was defending Plaintiff's 30(b)(6) deposition in February 2013, the deponent repeatedly testified that there was not such a person. Mr. Gibbs' obligation to inform the court that the ADR statement he filed was incorrect should have arisen at that time, well before his deal with Defendant's counsel in June 2013. And the claim that he thought the original signature was somewhere in Chicago is not credible either, particularly since he attributes his belief in that claim to Mr. Hansmeier, who works and resides in Minnesota. Mr. Gibbs made no attempt to contact undersigned counsel about the ADR certification when the Court asked him to explain its whereabouts in April 2013; he never forwarded such a document to undersigned counsel, and he cites to no action to confirm what he claimed to have been told about its whereabouts.

*Fifth,* Mr. Gibbs' attempts to explain away the obvious *quid pro quo* in which he offered Gibbs Declaration #3 to Defendant's counsel at virtually the same time Defendant's counsel assisted him in requesting that the Judge in the U.S. District Court for the Central District of California add his name to a bond that he did not obtain, fails. Mr. Pietz's affidavit, suggesting that his acquiescence to that stipulation was an act of mercy, is belied by the personal acrimony between himself and Mr. Gibbs displayed in their amateurish exchange of meet-and-confer communications

1 in this and other cases throughout the time they appeared in the same cases. Exhibit G. And despite
2 Pietz's attempts to argue that his stipulation with Mr. Gibbs means other than other than what is
3 contained in it, it is beyond any reasonable question that Pietz assisted Mr. Gibbs in seeking a
4 financial windfall by participating in the stipulation, in exchange for assistance with the sanctions
5 motion here.

6 Mr. Gibbs' statements over time are materially inconsistent, and have changed in direct
7 relation to whether opposing counsel is threating to seek sanctions against him. As set forth in the e-
8 mail chain attached at Exhibit E to Plaintiff's Response to this Motion, Mr. Gibbs agreed to
9 substantially and substantively change his Florida declaration, Gibbs #1, as part of a "deal" in which
10 the Defendant's attorney would drop a claim for sanctions against him if he changed his written
11 testimony to suit the defendant's liking. While Defendant and the declarant object to the term
12 "deal," that is the term those parties chose themselves to describe their arrangement. Indeed, the
13 Defendant's attorney described his agreement to drop a claim for sanctions in exchange for the
14 contradictory declaration Gibbs 2 as his "wedding gift."

15 **II.    NEVILLE "OPINIONS" ARE UNSUPPORTED AND FALSE.**

16 Plaintiff initially did not respond to the declaration of Delvan Neville submitted with
17 Defendant's motion because Defendant failed to show pursuant to the requirements of the Federal
18 Rules of Civil Procedure that he was entitled to provide an "expert" opinion on any matter, and
19 because it did not relate to any matter that was the subject of this litigation. Among other things,
20 Defendant has failed to disclose who paid Mr. Neville, who retained him, how he came to offer his
21 declaration, what opinions (if any) he has given in other cases, or other matters required to present
22 an opinion. However, Judge Chen informed Plaintiff at the July 18, 2013 hearing on Defendant's
23 motion for attorneys' fees that it should have presented a counter-declaration to rebut the Neville
24 declaration.

25 Mr. Neville's chief claim is that a PirateBay user, "sharkmp4" created a swarm that Mr.
26 Navasca joined to steal Plaintiff's copyrighted work, and that the user "might be" non-party John
27 Steele. There are two problems with Mr. Neville's claim. First, the hash value of the torrent file
28 used by Mr. Navasca was: 6C10F2DCFF52961B876AA592183103BAC958E989. (ECF No. 1 at ¶ 24.) Yet, the hash

6

value of the torrent file associated with the "sharkmp4" account is: 96D3F116657D8723EFE8DC6F0ADD398A68D421A8.[4] Put bluntly, Mr. Navasca did not steal a file that was uploaded by Pirate Bay user "sharkmp4." Mr. Navasca stole a file that was uploaded by Pirate Bay user "FluxXxu." As Mr. Neville's declaration makes abundantly clear, a hash value is a unique identifier for a file. If two files have different hash values, they are different files. This most-obvious of oversights on Mr. Neville's part suggest that Mr. Neville is, at best, grossly incompetent or, at worst, actively misleading the Court.

Further, Plaintiff submits the attached affidavit of John Steele (a true and correct copy of which is attached at *Exhibit "H"* hereto and made a part hereof), in which he emphatically denies that he had anything to do with Mr. Navasca's infringement. The Court should disregard the Neville declaration because Defendant has failed to even attempt to qualify him as an expert, and because the factual allegations in it are plainly false.

Mr. Neville amateurish error underscores the importance of the federal courts' gate-keeping function with respect to "experts." Mr. Neville's credentials establish that he is not qualified to offer expert testimony. Plaintiff respectfully requests this Court to disregard Mr. Neville's unqualified suspicions.

### III. THE ALAN COOPER THEORY FAILS.

The Court should also disregard the Defendant's incantation of the Alan Cooper argument that it has presented in this and other Courts across the nation. As with the Gibbs declaration, the story of Alan Cooper by EFF panel attorneys has evolved substantially over time. Initially, panel attorneys first claimed that he was falsely portrayed as the CEO of AF Holdings. Failing to produce any evidence of that claim the story evolved through several iterations and has settled upon the claim that Mr. Cooper was unaware that his signature appeared on the AF Holdings copyright transfer form. Mr. Cooper testified at a March 11, 2013 hearing in the U.S. District Court for the Central District of California that the signature on the document was not his, that he uses a middle initial.

---

[4] *See* http://thepiratebay.sx/torrent/6598197/___New_Release____Nina_Mercedez_-_Popular_Demand_(2011 . (visit page and scroll down to "info hash"). Last visited July 25, 2013. Note that the page contains adult content.

But the dispute between Mr. Cooper and John Steele (whom Cooper alleges procured the signature) is a classic he-said, he-said argument and Mr. Steele's counsel has not had opportunity to cross-examine Mr. Cooper. Furthermore, Defendant's counsel is aware of evidence introduced in other proceedings that show that Mr. Cooper is intensely hostile to Mr. Steele, and that he was aware of his signature on the copyright assignment to AF Holdings for approximately a year, until he repudiated it when he was contacted by an EFF counsel just as Mr. Steele was evicting Mr. Cooper from Steele's property. (*See* the attached declarations of Mr. Steele and two others (true and correct copies of which are attached at **Exhibits "G," "H,"** and **"I"** hereto and made a part hereof.) As set forth in those declarations, Mr. Cooper was aware, and bragged about, his involvement with AF Holdings long before he repudiated his signature on the copyright assignment form. Indeed, it was only after Mr. Steele informed Mr. Cooper that he would be evicted from Steele's property that Mr. Cooper (who acknowledged EFF counsel solicited him out of the blue to provide evidence against Mr. Steele) repudiated his signature. Mr. Cooper also threatened Mr. Steele's realtor with a gun when he showed the property, and threatened Mr. Steele he would make Steele regret evicting him if he carried through on it.

Finally, Mr. Cooper's repudiation hits many of the same notes as Mr. Gibbs' recent 180-degree turnaround. In both cases, panel attorneys for the EFF reached out to someone they thought they could turn out to testify against Plaintiffs' counsel. Through a combination of threats and inducements, they managed to turn out Gibbs, and it is reasonable to believe they did the same with Cooper. In Mr. Gibbs' case, the evidence is there for everyone to see: in exchange for a 180-degree turnaround in his testimony, Mr. Gibbs received a "wedding present" deal in the form of a sanctions motion withdrawal. In Mr. Cooper's case, while his handlers have kept him hidden from discovery, there is still the inescapable fact that he was recruited via text message by attorney Paul Godfread.

At a minimum, there is substantial evidence that Mr. Cooper is highly biased against Mr. Steele personally, and that he had significant personal motivation to repudiate his signature. Defendant was well aware of the evidence reflecting upon Mr. Cooper's motivations and bias, but failed to present it to this Court.

///

### IV. THE "SALT MARSH" RED HERRING.

Defendant's counsel also seeks to parlay the fact that the trust which owns AF Holdings is called the "Salt Marsh" trust into a controversy by claiming that the name of the trust is not the same as the name of an actual person.

Defendant's argument in this regard reflects a desire to keep controversy alive for future bogus sanctions motions. Defendant's counsel took the Rule 30(b)(6) deposition of Plaintiff in February 2013. Their purpose in taking it was improper; as soon as a draft transcript was available, they published it on dozens of websites, adulterated to suit their purposes without even redacting the home address of the deponent, and used it in dozens of matters unconnected with this lawsuit. Furthermore, Defendant's counsel and his colleague Mr. Pietz, repeatedly asked over and over during that deposition whether "Salt Marsh" was the name of an actual person. The deponent replied "no" repeatedly. Mr. Gibbs defended that deposition and, had he been paying attention, those answers would have disabused him of the notion that "Salt Marsh" was not the name of an actual person, and triggered his obligation to apprise the Court of that fact; he did not do so.

But as Defendant's counsel is well aware, the trust that owns AF Holdings is named the "Salt Marsh" trust. So there is nothing there. A trust has to be named something; that the organizers called it the "Salt Marsh" trust does not have significance other than the fact that it has to be named something and that was a name chosen. The efforts to concoct a conspiracy theory based upon the name chosen for the trust therefore fails.

### CONCLUSION

The Court should deny Defendant's motion, and grant any and all further relief that the Court deems to be reasonable and appropriate under these circumstances.

Respectfully Submitted,

AF Holdings, LLC

DATED: August 28, 2013

1
2
3
4

By: /s/ Paul Duffy
Paul Duffy (Bar No. 224159)
2 N. LaSalle Street, 13th Floor
Telephone: (312) 952-6136
E-mail: pduffy@pduffygroup.com
*Attorney for Plaintiff*

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 28, 2013, all individuals of record who are deemed to have consented to electronic service are being served a true and correct copy of the foregoing document, and all attachments and related documents, using the Court's ECF system.

                                      /s/  Paul Duffy