John Steele
1111 Lincoln Road Suite 400
Miami Beach, FL 33139
Telephone: (786) 571-8131
johnlsteele33140@gmail.com

*Pro se*



# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AF HOLDINGS LLC, | CASE NO. 3:12-CV-2396 EMC |
| *Plaintiff,* | |
| v. | **RESPONSE OF JOHN STEELE TO THE COURT'S OCTOBER 16, 2013, ORDER TO SHOW CAUSE** |
| JOE NAVASCA, | |
| *Defendant.* | |

## MEMORANDUM

The Court should not amend the judgment against AF Holdings, LLC ("AF Holdings") to add John Steele ("Steele") as a judgment debtor for three reasons: (1) Steele is not an alter ego of AF Holdings under the Nevis Limited Liability Company Ordinance; (2) Steele is not an alter ego of AF Holdings under California law; and (3) the issue is not properly before the Court. Further, the Court should not sanction Steele pursuant to its inherent powers because: (1) the Court's order to show cause does not provide Steele with notice of the possible grounds for sanctions; (2) the Court's inherent power does not reach Steele; and (3) the Defendant has not established by clear and convincing evidence that Steele has engaged in misconduct.

## I. THE COURT LACKS PERSONAL JURISDICTION OVER STEELE

As a preliminary matter, the Court lacks personal jurisdiction because the Court's exercise of personal jurisdiction over Steele is incompatible with Due Process. Ordinarily, federal courts do not have nationwide personal jurisdiction. With few exceptions, they have no broader power over persons outside the state in which they sit than do the local state courts. *Omni Capital Int'l, Ltd. v. Rudolph Wolff & Co., Ltd.*, 484 U.S. 97, 104-05 (1987). Here, the only alleged connection between Steele and this forum is that he spoke with Brett Gibbs on the telephone. Yet, these contacts are patently insufficient to subject Steele to this Court's personal jurisdiction. *See, e.g., Sybartic, Inc. v. Interport Int'l, Inc.*, 957 F.2d 522, 525 (8th Cir. 1992) (finding that due process prevented jurisdiction where the foreign actor's contract with the foreign resident was "negotiated, drafted, presented and executed" out of the forum, even though the foreign actor visited the forum resident once and communicated with the forum resident by telephone and mail).

## II. THE COURT SHOULD NOT AMEND THE JUDGMENT TO ADD STEELE AS A JUDGMENT DEBTOR

The Court ordered Steele to show cause why he should not be added as a judgment debtor under California Code of Civil Procedure Section 187. (*See* ECF No. 120 at 15) (adopting report and recommendations of ECF No. 116 at 18.) Under California Code of Civil Procedure Section 187, a judgment creditor may move to amend a judgment to add a nonparty. *See, e.g., Jack Farenbaugh & Son v. Belmont Const., Inc.*, 194 Cal. App. 3d 1023, 1027 (1987). To prevail on a Section 187 motion, a judgment creditor must bring a motion, establish that the nonparty is an alter ego of the judgment debtor and establish that the nonparty controlled the litigation. *See id.* None of these events occurred here. Because the judgment creditor in this case—Navasca—has not: (1) submitted evidence sufficient to show that Steele is an alter ego of AF Holdings under the Nevis Limited Liability Company Ordinance (1995); or (2) submitted evidence sufficient to show that Steele is an alter ego of AF Holdings under California law (or controlled the litigation, for that matter), the Court should not amend the judgment to add Steele as a judgment debtor. At a bare minimum, the Court

RESPONSE TO ORDER TO SHOW CAUSE                    CASE NO. 3:12-CV-2396 EMC

1  should await a motion from Defendant Navasca before deciding the hypothetical case and

2  controversy.

### A. CHOICE OF LAW

4  If a Section 187 motion were pending before the Court—and none is—the Court would first

5  be presented with a choice of law issue regarding alter ego liability. There are three possible sources

6  of law: (1) state statutes; (2) state common law; and (3) federal common law. The latter source does

7  not apply when the Court is acting pursuant to its pendant jurisdiction, as it is here with respect to

8  the Section 187 issue. *See, e.g., Baltimore Orioles v. Major League Baseball Players*, 805 F.2d 663,

9  682 (7th Cir. 1986) (holding that Illinois state law governed master-servant issues in a federal

10  copyright case). Further, Steele is unaware of an instance where the test set forth in *United States v.*

11  *Kimbell Foods, Inc.*, 440 U.S. 715 (1979) has been satisfied in the context of a Section 187

12  proceeding.

### 1. Section 17450(a) of the California Corporations Code

14  When a state statute governs choice of law, a court need not apply a common law choice of

15  law analysis. *Barclays Discount Bank Ltd. v. Levy*, 743 F.2d 722, 725 (9th Cir. 1984). Section

16  17450(a) of the California Corporations Code provides: "the laws of the state or foreign country

17  under which a foreign limited liability company is organized shall govern its organization and

18  internal affairs and *the liability and authority of its managers and members*." Cal. Corp. Code §

19  17450(a) (emphasis added). Section 17450(a) mirrors the relevant provision of the Restatement of

20  Conflicts of Laws, which provides: "The local law of the state of incorporation will be applied to

21  determine the existence and extent of a shareholder's liability to the corporation for assessments or

22  contributions and to its creditors for corporate debts." Restatement (Second) of Conflicts of Laws

23  Section 307. Both of these sources of authority make clear that the laws of the place of incorporation

24  govern alter ego issues.

25  Section 17450(a) reflects the majority rule. *See, e.g., Kalb, Voorhis & Co. v. American Fin.*

26  *Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (holding that "[b]ecause a corporation is a creature of state law

27  whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has

28

RESPONSE TO ORDER TO SHOW CAUSE        CASE NO. 3:12-CV-2396 EMC

the greater interest in determining when and if that insulation is to be stripped away[]") (citation omitted); *U.S. S.E.C. v. Levine,* 671 F.Supp.2d 14, 33 (D.D.C. 2009) (noting that Nevada law controlled the alter ego analysis, because the entity at issue was incorporated in Nevada); *In re Am. Intern. Refinery,* 402 B.R. 728, 743 (W.D. La. Bkrtcy. Ct. 2008) (applying law of Nevada, where debtor and subsidiary were incorporated); *Tomlinson v. Combined Underwriters Life Ins. Co.,* 684 F.Supp.2d 1296, 1298, 1300 (N.D. Okl. 2010) (holding that the law of the state of incorporation applied to issues of piercing the corporate veil); *Rual Trade Ltd. v. Viva Trade LLC,* 549 F.Supp.2d 1067, 1077 (E.D. Wis. 2008) (the general rule was that a plaintiff's alter-ego theory was governed by the law of the state in which the business at issue was organized).

The choice of law issue facing the Court was recently decided by now-Chief District Judge Claudia A. Wilken in *Wehlage v. EmpRes Healthcare, Inc.,* 821 F. Supp. 2d 1122 (N.D. Cal. 2011). In that case, the defendants invoked Section 17450(a) for the proposition that Washington's alter ego laws applied to limited liability companies organized under the laws of Washington. In support of their position, the defendants cited to *Rubbermaid, Inc. v. Robert Bosch Tool Gp.,* 2010 U.S. Dist. LEXIS 100650, *15 (C.D. Ill.), in which the court held that a similar law mandated that Delaware law govern alter ego issues with respect to a company organized in Delaware. The defendants also cited to *Kalb, Voorhis & Co.,* 8 F.3d at 132, which applied the alter ego law of the state of incorporation to determine the liability of shareholders to a third party. The plaintiff, on the other hand, argued that Section 17450(a) does not govern claims brought by third-parties.

The court ruled that the defendants' reasoning was more persuasive. In so holding, the court focused on two key points. First, the court noted that, on its face, nothing in Section 17450 limited the statute's application to disputes among members and managers of a limited liability company. Second, the court reasoned that although alter ego liability involves law suits brought by third parties, it determines, "based on the structure of the corporation, whether the shareholders are liable in lieu of the LLC, which is an internal affair." In sum, the court held that the scope of Section 17450 is broader than the internal affairs doctrine, and that irrespective of that point, alter ego liability is an

RESPONSE TO ORDER TO SHOW CAUSE      CASE NO. 3:12-CV-2396 EMC

1  internal affair. Accordingly, the court held that Washington law governed the alter ego question. This

2  Court, too, should apply the laws of Plaintiff's place of incorporation—Nevis—to the alter ego issue.

3         **2.**     **California's Governmental Interests Test**

4       If no California statue governed choice of law, the Court would apply California's

5  governmental interests test to determine what law governs the alter ego liability question. The result

6  under this test is ultimately the same as it is under Section 17450(a): Nevis law governs. California

7  applies a three-step "governmental interest" analysis to choice-of-law questions. *Abogados v. AT&T,*

8  *Inc.*, 223 F.3d 932, 934 (9th Cir. 2000). First, the court examines the substantive law of each

9  jurisdiction to determine whether the laws differ as to the relevant transaction. *Id.* Second, if the laws

10  do differ, the court must determine whether a "true conflict" exists in that each of the relevant

11  jurisdictions has a legitimate interest in having its law applied. *Id.* If more than one jurisdiction has a

12  legitimate interest, the court must move on to the third stage of the analysis, which focuses on the

13  comparative impairment of the interested jurisdictions. *Id.*

14       The alter ego liability laws of Nevis and California are different. In relevant part, the Nevis

15  Limited Liability Company Ordinance states:

16      Notwithstanding any other law, unless liability for limited liability company
17      debts, obligations or liabilities has been assumed by the person against whom
    liability is asserted pursuant to subsection (3) by such person, no manager, officer,
18      member, employee or agent of a limited liability company, or other person, shall
    be liable for (i) limited liability company debts, obligations or liabilities, whether
19      arising in contact, tort or otherwise, solely by reason of being a manager, officer,
    member, employee or agent of the limited liability company or (ii) the acts or
20      omissions of any other manager, officer, member, employee or agent of the
    limited liability company. The failure of a limited liability company to observe the
21      usual company formalities or requirements relating to the exercise of its powers or
    management of its business is not a ground for imposing personal liability on the
22      members or managers for liabilities of the company.

23

24  Nevis Limited Liability Company Ordinance § 19(2). Under Nevis law, accordingly, a person may

25  become an alter ego of a limited liability company only with his or her consent. In contrast, under

26  California law a person may be deemed an alter ego if: (1) there is such a unity of interest and

27  ownership between the corporation and its equitable owner that the separate personalities of the

28

5

corporation and the shareholder do not in reality exist; and (2) there must be an inequitable result if the acts in question are treated as those of the corporation alone. *See F. Hoffman-La Roche v. Superior Court*, 130 Cal. App. 4th 782, 796 (2005). Thus, the first prong of the governmental interest test is satisfied.

As for the second prong, there is no "true conflict" present here because Nevis has an interest in applying its alter ego law to businesses formed under its laws, whereas California has no legitimate interest in controlling the corporate governance, organization and liability of foreign business entities. *Compare CTS Corp. v. Dynamics Corp. of Amer.*, 481 U.S. 69, 91 (1987) ("[A]n accepted part of the business landscape in this country [is] for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A state has an interest in promoting stable relationships among parties involved in the corporation it charters …"); *with Edgar v. Mite Corp.*, 457 U.S. 624 (1982) (holding states have "no interest in regulating the internal affairs of foreign corporations."). Thus, to the extent that California's interests are implicated by the alter ego question, it is not for the purpose of regulating the internal affairs of Nevis-formed entities.

The only other interest that has arisen in this litigation is California's interest in protecting its citizens against suits from foreign plaintiffs, which can be difficult to enforce judgments against. Yet, this interest has been mitigated—and indeed eliminated—via the Defendant's motion for an undertaking pursuant to Cal. R. Civ. P. § 1030. (*See* ECF No. 20.) In his motion for an undertaking, the Defendant quoted from Judge Breyer's order granting a similar undertaking request, "The Court is also mindful that it could be difficult for Defendant, should he prevail in this case, to collect from Plaintiff, a foreign corporation (hence the policy behind section 1030)." (*Id*. at 22) (quoting *AF Holdings v. David Trinh*, 2012 U.S. Dist. LEXIS 161394 (N.D. Cal. Nov. 9, 2012).

This Court, too, recognized the policy behind Section 1030. (*See* ECF No. 51 at 2:6-9) ("The purpose of [§ 1030] is to … enable a California resident sued by an out-of-state resident to secure costs in light of the difficulty of enforcing a judgment for costs against a person who is not within the court's jurisdiction….) (quoting *Alshafie v. Lallande*, 171 Cal. App. 4th 421, 428 (9th Cir.

RESPONSE TO ORDER TO SHOW CAUSE      CASE NO. 3:12-CV-2396 EMC

1  2009).) It would patently unjust for the Court to require AF Holdings to post an undertaking "in light
2  of the difficulty of enforcing a judgment for costs against a person who is not within the court's
3  jurisdiction," only to turn around and *sua sponte* assist the Defendant by adding domestic judgment
4  debtors. In any event, California's interests regarding foreign plaintiffs are fully addressed by
5  Section 1030. For these reasons, under the California governmental interests' test, Nevis law
6  governs.[1]

7  **B.  STEELE IS NOT AN ALTER EGO UNDER NEVIS LAW**

8  Steele has not and does not consent to alter ego liability on behalf of AF Holdings, and
9  nothing in the record demonstrates otherwise. Under Nevis law, the Court cannot amend the
10  judgment to add Steele as a judgment debtor because he is not an alter ego of AF Holdings.

11  **C.  STEELE IS NOT AN ALTER EGO UNDER CALIFORNIA LAW AND DID NOT CONTROL**
12      **THIS LITIGATION**

13  If California law governed the alter ego prong of the Section 187 analysis, Steele would still
14  not properly be considered AF Holdings' alter ego. Further, Steele did not control this litigation.
15  Therefore, the judgment against AF Holdings cannot be amended to add Steele as a judgment debtor
16  under Section 187.

17  At the outset, Steele notes that the circumstances present in this case require a traditional
18  alter ego analysis. In a narrow subset of cases, courts have eschewed the alter ego analysis and
19  allowed *plaintiffs* to substitute the names of *defendants* when: (1) the plaintiff sued the right party
20  under the wrong name; (2) the defendant actively defended on the merits; and then (3) attempted to
21  bootstrap the ministerial error into a defense on the merits at 11th hour. *See, e.g., Carr v. Barnabey's*
22  *Hotel Corp.*, 23 Cal. App. 4th 14, 21 (1994) (allowing plaintiff to amend a judgment to add the
23  actual employer at the end of the case, notwithstanding that the traditional alter ego elements were
24  not met). None of these circumstances are present here.

25

26

---

27  [1] Even if the Court decided to reach the third prong of the governmental interests test, Nevis'
    interests in governing the internal affairs of entities organized under its laws would far outweigh any
28  interests of California.

7

## 1. Alter Ego Under California Law

The two basic elements of an alter ego analysis are: (1) a unity of ownership; and (2) inequity arising from maintenance of the corporate shield. *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837 (1962). In *Associated Vendors*, the court set forth twenty nondispostive factors that a court examines in analyzing "unity of ownership." *Id.*

At the Fed. R. Civ. P. 30(b)(6) deposition, which consisted entirely of cross-examination, Paul Hansmeier testified that: (1) Steele has no interest in any trust accounts of AF Holdings; and (2) that Steele was never a manager, owner, or employee of AF Holdings; (*See* ECF No. 84-3 at 93:6-127:16.) He further testified that no money ever went directly from AF Holdings to Steele. (*Id.*) The only other witness with knowledge about AF Holdings who has appeared in this case is Brett Gibbs. Nothing in Mr. Gibbs' testimony or declarations could possibly be construed as suggesting that Steele had an ownership interest of any kind in AF Holdings or otherwise is implicated in any of the *Associated Vendors* factors. Mark Lutz, the manger of AF Holdings, supplied an affidavit that reinforced Mr. Steele's testimony. (*See* ECF No. 106-1 at ¶¶ 2-4, 18.) (stating, *inter alia*, that Steele has no ownership interest in AF Holdings, that Steele has never held a position with AF Holdings and that the proceeds of settlements were deposited in AF Holdings' accounts with AF Holdings' attorneys.)

For his part, Defendant has presented no evidence that contradicts any of these statements. Indeed, in its order to show cause the Court acknowledged as much. (*See* ECF No. 120 at 11:16-18) ("[D]eeming Mr. Steele and Mr. Hansmeier de facto owners or officers of AF seems fair given that there was never any evidence as to how funds that Prenda Law obtained from settlement went to AF....) While Steele takes exception to the Court's sense of "fairness", and would note that when money is deposited into a client's trust account it becomes the client's property (thus the entire point of trust accounts), the burden of proof is not on Steele to demonstrate the flow of funds from a third-party law firm (which he does not own) to a third-party company (which he does not own). There is simply no evidence on which to form a conclusion that there is a unity of interest between Steele and AF Holdings.

RESPONSE TO ORDER TO SHOW CAUSE                                    CASE NO. 3:12-CV-2396 EMC

1    As for the inequity prong, case law suggests that "inequity" must be that of the "party against

2    whom the doctrine is invoked, and such party must have been an actor in the course of conduct

3    constituting the abuse of corporate privilege, or must be seeking some inequitable advantage based

4    upon the [corporate structure]." *United States Fire Ins. Co. v. National Union Fire Ins. Co.,* 107

5    Cal.App.3d 456, 472 (1980). Further, "inequity" has no relation to ability to collect—courts are not

6    to invoke their equitable powers for the sole purpose of helping someone collect.

7    Here, no showing of inequity can be made. The only action that AF Holdings has taken in

8    this case relative to its corporate privilege was the filing of its lawsuit. This case was not allowed to

9    proceed beyond the undertaking stage. Further, as set forth below, Steele was not even referenced

10   with particularity (or otherwise culpable) with respect to Defendant's spurious allegations of fraud.

11   Thus, even if Defendant could satisfy the unity of interest prong—and he cannot—he cannot

12   plausibly satisfy the inequity prong. For these reasons, Steele is not an alter ego of AF Holdings

13   under California law.

14   **2.    Controlling The Litigation**

15   Even if Steele was an alter ego of AF Holdings under California law, there is no basis to

16   conclude that he controlled Plaintiff's litigation—namely, because there was no litigation to control.

17   In *NEC Electronics v. Hurt*, 208 Cal. App. 3d. 772 (1989), the plaintiff filed a Section 187 motion to

18   add third-party Porter Hurt as a judgment debtor. After concluding that Hurt was an alter ego, the

19   court determined that amendment was improper on the grounds that Hurt did not control or have an

20   opportunity to present a defense in the underlying litigation. *Id.* at 778. In forming this conclusion,

21   the Court noted that, "[T]here was not defense for Hurt to control." *Id.* at 781. The Court stated,

22   "clearly, some defense of the underlying claim is contemplated." *Id.*; *see also Minton v. Cavaney*, 56

23   Cal.2d 576, 581 (1961).

24   Just as in *NEC Electronics*, there was no litigation to control in this matter. Due to the

25   Defendant's successful undertaking motion, Plaintiff's efforts to prosecute its infringement claim did

26   not advance beyond the filing of its complaint. Notwithstanding Defendant's counsel's prodigious

27

28

9

1  effort in racking up over $20,000 in legal fees for filing a perfunctory answer and a cookie-cutter

2  motion for an undertaking, there was no litigation for Steele to control.

3          **3.     Steele has no Authority to Obtain What the Court Seeks**

4       If, as the incorporation documents from both Nevis and Illinois attest to, John Steele does not

5  control Prenda Law and AF Holdings, then this Court has thrust the responsibility to explain the

6  relationship between a third party law firm and one of their clients to Steele.  In other words, Steele

7  is obligated to somehow obtain confidential trust account information from Prenda Law, which

8  according to the Illinois Secretary of State, is owned 100% by Paul Duffy.  Then Steele has to

9  convince Prenda Law and AF Holdings to allow that trust account information to be made public.

10  Then Steele has to somehow analyze these trust records and explain them to this Court.  It would

11  appear that if Steele is not able to convince AF Holdings to make its finances public, or convince

12  Paul Duffy to violate attorney client privilege, then Steele will be found liable for AF Holdings'

13  debts.  This hardly seems appropriate, given this entire investigation is predicated on unsubstantiated

14  claims made by a judgment debtor of AF Holdings.

15      **D.    THE SECTION 187 ISSUE IS NOT PROPERLY BEFORE THE COURT**

16       No motion to amend the judgment against Steele is currently pending before the Court.

17  Instead, the issue was raised by the Court *sua sponte* via an order to show cause. This procedure

18  constitutes an abuse of discretion for several reasons.

19       *First*, the Court lacks the power to *sua sponte* order Steele to defend a Section 187 issue.

20  "Courts do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to

21  come to us, and when they do we normally decide only questions presented by the parties." *United*

22  *States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (R. Arnold, J., concurring in denial of reh'g

23  en banc). As it relates to judgments in the appellate context, "it is inveterate and certain" that "an

24  appellate court may not alter a judgment to benefit a nonappealing party." *Greenlaw v. U.S.*, 128 S.

25  Ct. 2259, 2564 (2008). Although district courts have the authority to depart from traditional

26  adversarial principles to, for example, recharacterize as justice requires motions brought by *pro se*

27  litigants, *Castro v. United States*, 540 U.S. 375, 381 (2003), Steele is unable to identify any basis in

28

RESPONSE TO ORDER TO SHOW CAUSE             CASE NO. 3:12-CV-2396 EMC

1    caselaw for the Court's departure here; nor, after diligent research, is he able to find another example

2    of a district court raising a Section 187 issue *sua sponte*.

3        *Second*, even if the Court possessed the power to *sua sponte* order Steele to defend a Section

4    187 issue, prudential concerns would weigh against doing so; by raising the issue itself, the Court

5    creates an appearance of partiality. 28 U.S.C. § 455(a). First, the Court's procedure creates the

6    appearance that Steele is litigating against the Court, instead of the Defendant. Second, the Court's

7    procedure creates the appearance that the Court is assisting the Defendant with his litigation strategy.

8        *Third*, raising the Section 187 issue *sua sponte* improperly shifts the burden of proof to

9    Steele, and denies Steele basic due process rights. As the should-be proponent of the Section 187

10   issue, the Defendant should be required to "go first" and put on his case for why he should prevail.

11   Yet, the Court's procedure has Steele "going first" and forces Steele to anticipatorily rebut the

12   arguments that the Defendant might make. It is impossible, though, for Steele to divine what

13   arguments or "evidence" the Defendant will assert.

14   **III.    THE COURT SHOULD NOT IMPOSE SANCTIONS UNDER ITS INHERENT**

15   **AUTHORITY**

16       The Court should not impose sanctions on Steele under its inherent authority for at least three

17   reasons: (1) the Court's order to show cause fails to apprise Steele of the particular conduct for

18   which the Court is considering sanctions; (2) the Court's inherent power does not reach Steele; and

19   (3) the Defendant has not established by clear and convincing evidence that Steele was culpable in

20   any misconduct.

21       **A.    THE COURT'S ORDER TO SHOW CAUSE DOES NOT IDENTIFY POSSIBLE GROUNDS**

22       **FOR SANCTIONS**

23       The Court ordered Steele, "to show cause as to why sanctions against [him] should not be

24   issued pursuant to the Court's inherent authority." (ECF No. 120 at 15:22-24.) While the order to

25   show cause notifies Steele of the legal basis on which it is considering imposing sanctions, it does

26   not identify the conduct the Court is concerned about. (*See generally id.*) The Ninth Circuit has

27   instructed district courts that "a notice regarding sanctions must specify the authority for the

28

RESPONSE TO ORDER TO SHOW CAUSE                              CASE NO. 3:12-CV-2396 EMC

1 sanction, as well as the sanctionable conduct." *In re Deville*, 280 B.R. 483, 496 (9th Cir. B.A.P.
2 2002). "The purpose of the particularized notice is to put counsel on notice as to the particular
3 factors that he must address if he is to avoid sanctions." *Nuwersa v. Merrill Lynch, Fenner & Smith,*
4 *Inc.*, 174 F.3d 87 (2nd Cir. 1999).

5     In *Nuwersa,* the district court's written order to show cause stated, "[t]he court will be
6 awarding attorney's fees based on one or more of the following provisions: 42 U.S.C. § 12205; 28
7 U.S.C. § 1927; Rule 11(c)(1)(B) F.R.C.P.; and the inherent power of the district court to award
8 attorney's fees." *Id*. at 92. In reversing the district court's imposition of sanctions, the Second Circuit
9 criticized the district court's order to show cause on the grounds that "it failed to apprise [the
10 respondent] of the particular conduct for which the court was considering imposing sanctions." *Id*.

11     As in *Nuwersa,* the Court's order to show cause does not put Steele on notice of what
12 conduct he must address if he is to avoid sanctions. (*See* ECF No. 120.) The resulting due process
13 concerns are particularly acute here, given that Navasca has leveled dozens of accusations of
14 misconduct from the time of his very first filing in this case. At a minimum, Steele is entitled to
15 notice of which of these of accusations relating to Steele is of concern to the Court.

16     **B. THE COURT'S INHERENT AUTHORITY DOES NOT REACH STEELE**

17     Under persuasive case law, this Court's inherent sanctioning authority does not extend to
18 Steele. A district court's sanctioning authority is limited to three classes of persons or entities: parties
19 and their counsel, persons who violate an existing court order and real parties in interest. *Helmac*
20 *Products Corp. v. Roth Plastics Corp.*, 150 F.R.D. 563, 565-66 (E.D. Mich. 1993). Steele does not
21 fall within any of these categories.

22     A District Court's inherent authority to impose sanctions is plainly not unlimited. *Am. Civil*
23 *Liberties Union v. Holder,* 673 F.3d 245, 256 (4th Cir. 2011); *Natural Gas Pipeline Co. of Am. v.*
24 *Energy Gathering, Inc.*, 2 F.3d 1397, 1406-07 (5th Cir. 1993). In the seminal case of *Helmac*
25 *Products Corp. v. Roth Plastics, Corp.*, *supra*, the court pioneered a two-part test to gauge whether a
26 district court's inherent sanctioning authority extends to an individual who is neither a litigant nor an
27 attorney who has appeared in the case. In that case, the owner of the defendant corporation had

28

12

1    ordered the destruction of relevant documents, thereby rendering it impossible to conduct a trial on

2    his corporation's liability. However, the owner was not a party to the case and was not subject to any

3    court order at the time that he directed the document destruction.

4        In finding that the court's inherent sanctioning authority extended to the owner of the

5    defendant corporation, the court held that its "inherent power to sanction [is limited] to those

6    individuals [who] were either (1) parties, (2) subject to a court order, or (3) real parties in interest."

7    150 F.R.D. at 568. Finding that the owner of the defendant corporation was, for all practical

8    purposes, the real party in interest, the court imposed sanctions.

9        Since its development, the *Helmac* standard has been widely applied by federal courts in

10   determining whether, and to what extent, a District Court's inherent sanctioning authority extends to

11   a non-party and non-attorney (*i.e.*, an individual who has neither filed an appearance nor otherwise

12   appeared before the court in the case as counsel).

13       Within the past two months, the test and principles underlying *Helmac* were echoed in

14   *United States v. Henry*, 2013 U.S. Dist. LEXIS 133148 (E.D. Va.) at *108-09, in which, partially

15   quoting *Helmac*, the court stated:

16       Although the federal courts may certainly sanction disruptive or disobedient bad faith
         conduct, "the Court's power to sanction cannot possibly extend to everyone who

17       interferes with litigation before the court. Otherwise the power to sanction would be
         so wide that it would be unenforceable."

18

19       *See also Anz Advanced Techs., LLC v. Bush Hog*, LLC, 2012 U.S. Dist. LEXIS 29534 (S.D.

20   Ala.) at *34; *Barton v. Pennsylvania*, 2010 U.S. Dist. LEXIS 43937 (M.D. Pa.) at *18; *Advance

21   Books Are Fun, Ltd. v. Rosenbrough*, 239 F.R.D. 532, 555 (S.D. Iowa 2007).

22       The prior decisions of Ninth Circuit are in accord with the *Helmac* standard. In *Caldwell v.

23   United Capital Corporation*, 77 F.3d 278 (9th Cir. 1996), the court held that a district court's

24   inherent sanctioning authority extended to a person who had a controlling interest in the debtor and

25   who, through the debtor, had implemented a fraud on the district court. Such a result is consistent

26   with *Helmac*'s extension of the District Court's inherent power to real parties in interest. However,

27   diligent research has not shown a single case in which the district court's inherent authority to

28

13

1    sanction has been extended to persons who are neither parties, attorneys of record, persons subject to
2    an existing court order or real parties in interest.

3          Steele did not appear as a party or counsel in this case.  Further, Steele was not subject to any
4    order of the Court in this case.  Under the *Helmac* standard, the Court's inherent sanctioning
5    authority can extend to Steele if and only if he was a real party in interest in this case.  Under the
6    case law cited above, to be real parties in interest, Steele must have a controlling ownership interest
7    in AF Holdings.

8          There was no evidence from which the Court could reasonably infer that Steele has an
9    ownership interest in AF Holdings, much less a controlling interest.  At the Fed. R. Civ. P. 30(b)(6)
10   deposition, which consisted entirely of cross-examination, Paul Hansmeier testified that: (1) Steele
11   held no position with AF Holdings; (2) that Steele was not a member of AF Holdings; (3) that Steele
12   had no ownership interest in the entity whatsoever; and (4) that AF Holdings was owned by a trust
13   and that Steele had no beneficial ownership in the trust. (*See* ECF No. 84-3 at 9:18-13:5.) The only
14   other witness with knowledge about AF Holdings who has appeared in this case was Brett Gibbs.
15   Nothing in Mr. Gibbs' testimony or declarations could possibly be construed as suggesting that
16   Steele had an ownership interest of any kind in AF Holdings. Mark Lutz, the manger of AF
17   Holdings, supplied an affidavit that reinforced Mr. Hansmeier's testimony. (*See* ECF No. 106-1 at ¶¶
18   2-4, 18.) (stating, *inter alia*, that Steele has no ownership interest in AF Holdings, that Steele has
19   never held a position with AF Holdings and that the proceeds of settlements were deposited in AF
20   Holdings' accounts with AF Holdings' attorneys.) There is no evidence in the record that contradicts
21   any of these statements. Indeed, in its order to show cause the Court acknowledged as much. (*See*
22   ECF No. 120 at 11:16-18) ("[D]eeming Mr. Steele and Mr. Steele de facto owners or officers of AF
23   seems fair given that there was never any evidence as to how funds that Prenda Law obtained from
24   settlement went to AF....) While Steele takes exception to the Court's sense of "fairness", the
25   burden of proof is not on Steele to demonstrate the flow of funds from a third-party law firm to a

26
27
28

14

1  third-party company. There is simply no evidence on which to form a conclusion that Steele is a real

2  party in interest.[2] Therefore, the Court lacks power to sanction Steele under its inherent power.

3         **C.**    **THE DEFENDANT HAS NOT MET HIS BURDEN OF ESTABLISHING MISCONDUCT ON**

4                **STEELE'S PART**

5        Steele is not on notice of the conduct giving rise to the Court's order to show cause regarding

6  sanctions, but he is aware of the Defendant's motion for sanctions. (ECF No. 93.) In it, the

7  Defendant asserts three theories of fraud: (1) the "Alan Cooper" issue; (2) the "Salt Marsh" issue;

8  and (3) the "sharkmp4" issue. Defendant's motion for sanctions does not make any particularized

9  allegations as to Steele in relation to any of these theories; indeed, each of these theories is entirely

10 vacant as to Steele. Steele addresses each of the theories briefly here, but reserves his right to

11 respond to an order to show cause that identifies specific conduct.

12       As a preliminary matter, Steele would urge the Court to reject the Defendant's tactic of

13 lumping everyone together without making specific showings as to particular individuals.

14       **1.**    **The Assignment Agreement**

15       Steele acknowledges that there are conflicting accounts of how the assignment agreement

16 filed by Attorney Gibbs in this case originated. However, there is absolutely no conflict is in regards

17 to the attorney of record in this case: Brett Gibbs. As such, it would seem the best person to answer

18 for the assignment agreement would be the attorney who filed it, appeared before this court, and who

19 has a duty to review the pleadings before he files them. All of the safeguards instituted to protect

20 this Court from fraud would be useless if the person designated by the California Supreme Court to

21 be responsible for the pleadings could simply say, "Someone else told me to". Such a *Nuremburg*

22 defense cannot possibly work here. Particularly since Attorney Gibbs and his partner Ranallo have

23 not shown any evidence—other than Gibbs self-serving testimony—to prove this supposed

24 supervisory role Steele and others had.

25       Steele has denied any role in preparing, filing, or using the document in question. And no

26 one has rebutted Steele's claim he had nothing to do with the document. Cooper himself does not

27

28

RESPONSE TO ORDER TO SHOW CAUSE                CASE NO. 3:12-CV-2396 EMC

1 claim to know who signed the document. No one has testified, or provided evidence that Steele had
2 any role in the document. As discussed above, the only person who had any obligation regarding the
3 maintenance of the document was Gibbs.

### 2. Steele's relationship with Alan Cooper regarding VPR Inc.

5 Steele has known Alan Cooper since 2006. Steele allowed Cooper to live at his rural cabin in
6 exchange for watching over the property. Steele spent significant time with Cooper over the next
7 few years and they became friends. Steele assisted Cooper with various matters, and both Steele and
8 Cooper assisted each other frequently over the years. In late 2010, Cooper expressed an interest in
9 developing his own adult content company in an effort to have another revenue stream after Steele
10 described certain new clients of his. Steele assisted in setting up a company for Cooper. Cooper
11 discussed his interest and new endeavor with neighbors and family members of both Steele and
12 Cooper.

13 Steele also helped register a website for Cooper, but did not perform any creative function or
14 assist in the actual site development. Steele used an account under his own name on the website
15 www.godaddy.com to register the name for Cooper, and transferred it to Cooper shortly thereafter. It
16 quickly became clear to both Steele and Cooper that Cooper did not have the time or the aptitude to
17 set up a properly functioning corporate entity and market it. Steele and Cooper agreed that it would
18 be best to shut down his nascent project and look for other ways that Cooper could break into the
19 adult content market. Steele offered to help turn off the website since he had been the one who set it
20 up in the first place. Between the time Steele set up the website and he called into Godaddy to turn
21 off the site, the account had been transferred from Steele's name to Cooper's name. So Steele—with
22 the authority of Cooper—called into Godaddy as an agent of Cooper to do nothing more than shut
23 the site down. The pro-piracy community would have this Court believe that turning off a website
24 that had never even went live is somehow proof that Steele owns Prenda Law or AF Holdings.

### 3. Steele's role with Prenda Law

26 This Court should not ignore the undisputed facts that Attorney Ranallo—and his associate
27 Gibbs—conveniently fails to mention. First, it is undisputed that Steele has never appeared as

28

16

1    counsel in a single case in California. This Court can take judicial notice that Steele has never filed
2    an appearance in any case in Clifornia according to the ECF system. Steele has also testified to this
3    fact, and he is not aware of any evidence that exists to show otherwise.

4         Second, California attorney Brett Gibbs was the attorney of record in this case. He drafted
5    and signed every pleading on behalf of his client, AF Holdings. Attorney Gibbs stated on the record
6    in front of this Court that he was the attorney of record and that he represented AF Holdings.
7    Certainly if Steele owned AF Holdings, Mr. Gibbs would have complied with California law and
8    have a retainer agreement between himself and Steele. There is none. But there is a retainer
9    agreement between Gibbs and the actual owner of AF Holdings, Mark Lutz.

10        Third, attorney Gibbs was also the only attorney of record in the 6 cases in front of Judge
11   Wright. Just like this case, attorney Gibbs was the only person who drafted and filed all of the
12   pleadings on behalf AF Holdings. It appears from the initial inquiry by both Judge Wright and this
13   Court that certain misconduct occurred in the cases that Gibbs was the attorney of record in. When
14   Gibbs found himself before Judge Wright to answer for pleadings he signed and filed, oral
15   arguments he participated in, and for other behavior he is on the record conducting, Attorney Gibbs
16   had a choice. He could either have accepted responsibility for his acts, or he could blame someone
17   else. Obviously he choose the latter. Suddenly, Steele, who never filed a pleading on behalf of
18   anyone but himself in California, and whose name had never come up prior to March 2013, is being
19   made to answer for pleadings he never even saw.

20        Fourth, the only person who has ever controlled AF Holdings, Mark Lutz, has testified under
21   oath, in depositions, and in multiple affidavits, that he controls AF Holdings. No one disputes that
22   Attorney Gibbs represented AF Holdings in California. In fact, Lutz has provided his retainer
23   agreement between AF Holdings and Attorney Gibbs. There is no retainer agreement between AF
24   Holdings and Steele.

25        Most importantly, if Steele had any involvement with this case, there would have to be at
26   least one email, one phone call, or one meeting between Steele and Ranallo. Steele cannot recall
27
28

17

1  ever speaking to Ranallo, let alone having him as an opposing counsel. Certainly, if Steele was
2  opposing counsel in this or any other case, he must have some correspondence from Steele.

3  Steele will not repeat the exhaustive evidence submitted by the actual owner of Prenda Law,
4  Paul Duffy, to Magistrate Judge Vadas. But to summarize, the local counsels testified that Gibbs
5  controlled every aspect of the litigation. If any local counsel in Michigan, Minnesota, Florida,
6  Georgia, Arizona, Colorado, or any other state had a question about a case involving AF Holdings,
7  they called Gibbs. Attorney Steven Goodhue and attorney Jacques Nazaire both testified that Brett
8  Gibbs was their point of contact for all their cases in Arizona and Georgia, respectively. Even
9  opposing counsel, including attorney Ranallo's associate Morgan Pietz has testified that Gibbs was
10 the COO of Prenda Law.[3]

11 On the one hand you have Gibbs, a California attorney who has signed documents under oath
12 that he has the original document bearing Alan Cooper's signature. After a year or more of
13 appearing in dozens or hundreds of cases around the state, he suddenly claims he was "essentially a
14 secretary" when the pleadings bearing his signature are found to be improper. While that is certainly
15 convenient for Gibbs, and one can see why Gibbs would want to disown his own filings, in court
16 arguments, and appearances on the record, he cannot.

17 In what may be the most bizarre turn of events in this matter, Gibbs appears to have stolen
18 Prenda Law's operating account ledger, and given it to opposing counsel in this case. Leaving aside
19 the ethical issues of stealing an employer's financial records and giving them to opposing counsel—
20 and the Internet—what Gibbs establishes by his act is that he was certainly no secretary.

21 Despite his lack of evidentiary support, attorney Gibbs' plan has worked very well for him.
22 By blaming others for his actions, while producing no evidence that Steele or anyone else directed
23 those actions, attorney Gibbs has been able to get out of responsibility for his actions in front of
24 Judge Wright. Attorney Gibbs is attempting to use the same tactic with this Court. The fact that no
25 court in the country has ever seen any proof of Steele's direction of Attorney Gibbs, the self serving

26

27 [3] Steele would point out that accusing various people to be CEO's or owners of companies--despite
   the lack of any documented evidence—is a common practice of attorneys who oppose Prenda Law's
28 litigation.

18

1  testimony of an attorney facing sanctions for pleadings he signed, and cases he filed, should raise a
2  very large flag to this Court.

3      Steele did not create, review, or ever have the document in question. There is no evidence to
4  the contrary. Steele has no knowledge as to whether the documents produced by Gibbs is accurate,
5  or who produced them. Ironically, the only anecdotal evidence that the ledger is what it purports to
6  be is the fact that it describes Steele as a former owner. This clearly contradicts the meme repeated
7  by Attorney Rannallo in this case. What the reported ledger does not show is that Steele owns
8  Prenda Law or AF Holdings. Nor does the ledger show any improper acts on the part of Steele.
9  Other than demonstrating that Gibbs clearly had access and power well above a secretary, and that
10  Prenda paid money out of its operating account to a former owner,[4] the only thing it really
11  establishes is that Gibbs may have committed a crime by stealing the accounting records at a law
12  firm he worked with. As a side matter, Steele agrees with the ledger's description of him as not
13  being an owner of Prenda Law.

14      Gibbs is hardly a neutral party in this matter. Under Gibbs' theory, any document he
15  produces is a statement introduced to prove the facts asserted. Such a theory is absurd and is the
16  very definition of hearsay. If Gibbs suddenly produced another Microsoft Word document that states
17  "Brett Gibbs was never the attorney of record before Judge Chen", one doubts this Court would give
18  the document any weight.

19      Gibbs' arrangement with opposing counsel in this matter is to undermine his own clients and
20  lie about his relationship with Prenda in exchange for attorney Ranallo ceasing all efforts to pursue
21  sanctions against him. Both AF Holdings and Steele have filed bar complaints regarding Gibbs
22  behavior, and provided exhaustive details, including emails, signed documents, and other actual
23  proof establishing Gibbs misconduct.

24
25
26
27

[4] Steele submits that a lawyer is allowed to spend money in his operating account as he sees fit. Not even Gibbs alleges
28  Steele received money from any trust account.

19

1

### 4. The "Salt Marsh" Issue

2      The "Salt Marsh" accusation is that AF Holdings "repeatedly and intentionally represented to

3   this court ... that "Salt Marsh" was a natural person and the owner of AF Holdings LLC." (*Id*. at 16-

4   29.) However, at the 30(b)(6) deposition, which was subject to cross-examination, Paul Hansmeier

5   testified as follows:

6          Ranallo:        At any time was AF Holdings owned by a human being named Salt Marsh?

7          Hansmeier:    No.

8   (ECF No. 84-3 at 51:9-12.) What others may or may not have done is not what Steele did. There is

9   simply no document or testimony that exists showing Steele ever represented to anyone that AF

10   Holdings was owned by something or someone named "Salt Marsh". Ranallo's (and Gibbs', for that

11   matter) professed ignorance of this testimony is particularly disingenuous in light of the fact that

12   they both attended the deposition.

13      Further, even if Defendant's "Salt Marsh" allegations were actually based in fact—and they

14   are not—the issue does not even approach the level of fraud on the court. The Ninth Circuit has

15   instructed, "[s]imply put, not all fraud is fraud on the court." *In re Levander*, 180 F.3d 1114, 1119

16   (9th Cir. 1999).

17          "Fraud upon the court" should, we believe, embrace only that species of fraud
           which does or attempts to, defile the court itself, or is a fraud perpetrated by officers
18          of the court so that the judicial machinery can not perform in the usual manner its
           impartial task of adjudging cases that are presented for adjudication.
19

20   *Gumport v. China International Trust and Inv. Corp*., 926 F.2d 912, 916 (9th Cir. 1991) (quoting 7

21   James Wm. Moore et al., Moore's Federal Practice ¶ 60.33, at 515 (2d ed. 1978)). Examples of

22   misconduct that does not constitute "fraud on the court" includes a failure to produce evidence and

23   perjury. *In re Levander*, 180 F.3d at 1119-20.

24      Here, as Steele understands it, Defendant is complaining that Mr. Gibbs identified "Salt

25   Marsh"—the name of the trust that owns AF Holdings—in a single filing, namely the Alternative

26   Dispute Resolution form submitted to the Court instead of Mr. Lutz's name. If perjury does not rise

27

28

20

1    to the level "fraud on the court", then a misidentification of the person that reviewed this Court's

2    ADR handbook cannot possibly either.

3

### 5. The "sharkmp4" Issue

4    The Neville declaration concludes that John Steele or his agents are associated with Pirate

5    Bay user "sharkmp4" and have acted through that user to induce third-party infringement. Steele

6    completely denies that he has anything to do with any BitTorrent user account in his entire life. The

7    proposition that anyone would need to encourage pirates to steal content could only be made by

8    someone ignorant of the mind-boggling scale of piracy today. It simply defies common sense that

9    anyone would need to trick the millions on BitTorrent thieves into stealing more copyrighted

10    content.

11    Besides the laughable presumption that Prenda Law, or any other anti-piracy firm would

12    need to lure additional pirates into stealing copyrighted works, an analysis of Neville's conclusion

13    shows three technical flaws:

14    *First*, every Pirate Bay user is associated with a list of files that are identified by unique hash

15    values. The hash value identified in the complaint in this case is not associated with sharkmp4's file

16    list. (*See* ECF No. 106-5 ¶ 7-8.) Instead, it is identified with Pirate Bay user FluxXxu's file list. (*Id*.)

17    Accordingly, the sharkmp4 issue is totally irrelevant to this case.

18    *Second*, Neville's declaration links certain IP addresses to Mr. Steele via GoDaddy records,

19    for example. However, his declaration is conspicuously silent on what IP addresses are associated

20    with Pirate Bay user sharkmp4. Absent a credible showing of what IP addresses are associated with

21    sharkmp4, Mr. Neville has no basis for forming any conclusions about who is associated with that

22    user.

23    *Third*, it is clear that Mr. Neville lacks basic knowledge of the Copyright Act, which

24    embraces strict liability. *See* 17 U.S.C. §§ 101, 106, 501(a). *See also BMG Music v. Gonzalez*, 430

25    F.3d 888, 891-92 (7th Cir. 2005) (imposing strict liability in downloading context). In light of the

26    Copyright Act's imposition of strict liability, it is clear that the target of a sting operation would not

27    have a defense on the merits in a sharkmp4-esqe scenario. Extralegal concerns of fairness are equally

28

21

1    unavailing, given that sharkmp4 is, after all, an account associated with the world's most notorious
2    copyright infringement website, The Pirate Bay.

3        It bears mentioning that Mr. Neville is a college student paid by an associate of Attorney
4    Ranallo to produce his report. Mr. Neville has never been certified as an expert and has not testified
5    as such once. In fact, Magistrate Judge Vadas himself did not allow Mr. Neville to testify as an
6    expert at an earlier hearing.

7

### 2. The findings in *Ingenuity13 LLC*

8        Steele has attached the opening brief filed on his behalf before the Ninth Circuit to give the
9    Court a counterweight to the *Ingenuity13* order. The Court can judge for itself how viable the
10   *Ingenuity13* order is on appeal. While Steele has the utmost respect for the federal bench, Judge
11   Wright's findings are simply wrong. There is a fundamental difference between facts and findings.
12   Which is why our legal system has created an in depth legal process that a party can use if they wish
13   to preclude an issue from being litigation in a second proceeding. This process—typically a hearing
14   on a party's Motion for Issue Preclusion—is an important safeguard for our legal system and
15   protects individuals from mistakes made in prior proceedings. The need for such safeguards is
16   obvious. If one federal judge were to issue an incorrect finding—especially after a 12-minute
17   hearing in which no evidence was submitted—the victim of the mistake was be precluded from ever
18   establishing the truth. To point out one of the many factually incorrect findings made by Judge
19   Wright, one finding was that "The Principals started their copyright-enforcement crusade in about
20   2010, through Prenda Law". But according to the Secretary of State of Illinois, Prenda Law was
21   formed on November 7, 2011. A simple check of the Illinois Secretary of State's website shows
22   Judge Wright to be wrong. If a future judge were to adopt Judge Wright's findings and rule that
23   Prenda Law began in 2010, that finding would also be wrong. With the utmost respect to the federal
24   judiciary, every judge that adopts Judge Wright's finding that Prenda Law was formed in 2010 would
25   be just as mistaken as Judge Wright.

26        Steele does not mean to impugn Judge Wright or any member of the federal judiciary. But no
27   one is perfect, and appellate courts exist to correct errors. But given that Judge Wright's findings

28

1  were the subject of seven appeals, and given that there was absolutely no evidence submitted at the
2  12-minute Order to Show Cause hearing against Steele in April 2013, and given that attorney
3  Ranallo was the same attorney in both cases, it should be easy for attorney Ranallo to show the proof
4  that supported Judge Wrights findings before this Court.

5  If evidence was introduced in front of Judge Wright, or any judge in this country, that would
6  show Steele actually owned either AF Holdings or Prenda Law, Steele submits that it would be front
7  and center before this Court a long time ago. The very fact that Attorney Ranallo relies exclusively
8  on Judge Wright's findings, while completely silent regarding any facts, speaks volumes. To draw
9  from the *Silver Blaze*, the famous Sherlock Holmes story,[5] the very fact that none of the pro-piracy
10 attorneys in America have ever produced a corporate document from either Prenda Law or AF
11 Holdings showing Steele's ownership, have never produced a letter, email, or anything else showing
12 ownership by Steele is in itself evidence that Steele does not have an ownership interest. It defies
13 logic that Attorney Ranallo and his benefactors at the Electronic Frontier Foundation would fail to
14 release any proof they might have obtained from their year long, nationwide, evidence gathering
15 efforts. So because there is not a shred of uncontested evidence that Steele owns either Prenda Law
16 or AF Holdings, Attorney Ranallo is consigned to talking about phone calls to Godaddy.

17                                              **CONCLUSION**

18 The Court should not add Steele to the judgment against AF Holdings or sanction Steele
19 under its inherent powers.

20

21

22

23

24

25

26

27

28

---

[5] As Sir Arthur Conan Doyle makes clear through his protagonist, sometimes it is the lack of evidence that is most telling.

23

RESPONSE TO ORDER TO SHOW CAUSE                                    CASE NO. 3:12-CV-2396 EMC

Respectfully Submitted,

1

2  Dated, November 5, 2013.

3                                      s/ John Steele
                                       John Steele
4                                      1111 Lincoln Road Suite 400
                                       Miami Beach, FL 33139
5                                      Telephone: (786) 571-8131
                                       johnlsteele33140@gmail.com
6                                      *Pro se*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                           24

**Nos. 13-55859, 13-55871, 13-55880, 13-55881, 13-55882, 13-55883,
13-55884 & 13-56028**

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

INGENUITY 13, LLC,

Plaintiff-Appellant,

v.

John Doe,

Defendant-Appellee,

v.

AF HOLDINGS, LLC; PRENDA LAW, INC.; PAUL DUFFY, ESQ.; PAUL
HANSMEIER, ESQ.; JOHN STEELE, ESQ.; and BRETT GIBBS, ESQ.,

Additional Appellants.

---

**OPENING BRIEF FOR APPELLANTS
INGENUITY 13, LLC; AF HOLDINGS, LLC; PRENDA LAW, INC.;
PAUL DUFFY, ESQ.; PAUL HANSMEIER, ESQ.; and JOHN STEELE, ESQ.**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
U.S.D.C. No. 2:12-cv-08333-ODW-JC
THE HONORABLE OTIS D. WRIGHT II

---

DANIEL J. VOELKER, ESQ.
Voelker Litigation Group
311 West Superior Street
Suite 500
Chicago, Illinois 60654
312-870-5430
*Attorney for Plaintiff-Appellant and
Certain Additional Appellants.*

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Appellant, Ingenuity 13, LLC, is a limited liability company organized and existing under the laws of the Federation of St. Kitts and Nevis, and is owned by the I13 Trust. No publicly held corporation owns 10% or more of its stock.

Appellant, AF Holdings, LLC, is a limited liability company organized and existing under the laws of the Federation of St. Kitts and Nevis, and is owned by the Salt March Trust. No publicly held corporation owns 10% or more of its stock.

Appellant, Prenda Law, Inc., was an Illinois corporation, which was dissolved on July 26, 2013. Prenda Law had no parent corporation; and, no publicly held corporation owned, or owns, 10% or more of its stock.

Dated: November 18, 2013     Respectfully submitted,

VOELKER LITIGATION GROUP
Daniel J. Voelker, Esq.

By: /s/Daniel J. Voelker
Daniel J. Voelker
Attorney for Appellants: Ingenuity 13,
LLC; AF Holdings, LLC; Prenda Law, Inc.;
Paul Duffy, Esq.; Paul Hansmeier, Esq.; and
John Steele, Esq.

i

# TABLE OF CONTENTS

**SECTION**                                                    **PAGE NO.**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF CASES AND AUTHORITIES ............................................... v

STATEMENT OF JURISDICTION ........................................................ 1

ISSUES PRESENTED AND STANDARD OF REVIEW ...................................... 2

PERTINENT STATUTORY PROVISIONS ........................................... 5

STATEMENT OF CASE ........................................................................ 6

STATEMENT OF FACTS ..................................................................... 10

    The Underlying Litigation ............................................................... 10

    The Order to Show Cause Proceeding Against Brett Gibbs............................. 13

    The March 11 Show-Cause Hearing.................................................... 16

    The Amended Show-Cause Order ..................................................... 19

    The April 2 Show-Cause Hearing....................................................... 20

    The May 6 Sanctions Order ............................................................. 22

    The Court's Requirement of a Second Supersedeas Bond ............................. 23

SUMMARY OF ARGUMENT.............................................................. 25

ARGUMENT......................................................................................... 29

    I.    The District Court's Inherent Sanctioning Authority Did Not Extend to
        the Individual Appellants ....................................................... 29

II.    Under this Court's Prior Precedent, a District Court's Inherent
       Sanctioning Authority Does Not Permit the Imposition of Punitive
       Sanctions ........................................................................................................ 35

III.   The Procedure Used by the District Court to Impose Sanctions
       Violated Procedural Due Process Requirements................................. 37

       A.   The Sanctions Imposed by the District Court Required a
            Proceeding for Indirect, Criminal Contempt............................... 38

            1.   The sanctions imposed by the District Court
                 required criminal contempt proceedings........................... 39

            2.   The type of criminal contempt proceedings required
                 in this case was a proceeding for an indirect criminal
                 contempt............................................................................. 42

       B.   The Procedures Implemented by the District Court
            Violated Procedural Due Process Requirements....................... 42

            1.   The District Court's procedures violated procedural
                 due process by drawing adverse inferences from the
                 invocation of Fifth Amendment rights by the
                 individual Appellants....................................................... 44

            2.   The District Court's procedures violated procedural
                 due process requirements by appointing a prosecutor
                 who was not impartial....................................................... 46

            3.   The District Court's procedures violated procedural
                 due process requirements by denying Appellants the
                 ability to cross-examine witnesses................................... 49

            4.   The District Court's procedures violated procedural
                 due process requirements by denying Appellants the
                 ability to present a defense and call witnesses................. 52

IV.    The District Court Committed Clear Error in Allowing Defendant to Recover Attorneys' Fees Incurred in Pursuing Post-Dismissal Sanctions and in Requiring Appellants to Post Supersedeas Bonds that, among other Things, Insured Defendant's Ability to Recover Attorneys' Fees Incurred in Defending these Sanctions on Appeal.. 53

V.    If this Court Decides that It Is Appropriate to Remand this Case for further Proceedings, Appellants Respectfully Ask that the Case Be Transferred to a Different District Court Judge ................................... 58

CONCLUSIONS ...................................................................................................... 62

STATEMENT OF RELATED CASES...................................................................... 64

CERTIFICATE OF COMPLIANCE......................................................................... 65

# TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page No.**

*AF Holdings, LLC v. Doe,*
   No. 2:12-cv-6636-DW(JCx) (C.D. Cal. filed Aug. 1, 2012) ..................... 13 & 14

*AF Holdings, LLC v. Doe,*
   No. 2:12-cv-6669-DW(JCx) (C.D. Cal. filed Aug. 2, 2012) ............................. 13

*Am. Civil Liberties Union v. Holder,* 673 F.3d 245 (4th Cir. 2011) ....................... 30

*Anz Advanced Techs., LLC v. Bush Hog*, LLC,
   2012 U.S. Dist. LEXIS 29534 (S.D. Ala.) ............................................................ 31

*Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950 (9th Cir. 2007).......... 56 & 57

*Bartos v. Pennsylvania*, 2010 U.S. Dist. LEXIS 43937 (M.D. Pa.) ....................... 31

*Baxter v. Palmigiano*, 425 U.S. 308 (1976) ............................................................. 45

*Books Are Fun, Ltd. v. Rosenbrough,*
   239 F.R.D. 532 (S.D. Iowa 2007)....................................................................... 31

*Caldwell v. United Capital Corporation, 77 F.3d 278 (9th Cir. 1996)*.................. 32

*Cetacean Research v. Sea Shepherd Conservation Soc'y,*
   725 F.3d 940 (9th Cir. 2013) .............................................................................. 59

*Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991) .....................................29-30 & 35-36

*Cooke v. United States*, 267 U.S. 517 (1925) .................................................. 43 & 53

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990)......................................... 57

*Davis v. Alaska*, 415 U.S. 308 (1974).............................................................. 43 & 49

*Douglas v. Alabama*, 380 U.S. 415 (1985)...................................................... 49 & 51

*F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*,
  244 F.3d 1128 (9th Cir. 2001) ......................................38, 40-41, 43, 49, 51 & 53

*Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418 (1911).................................. 43

*Griffin v. California*, 380 U.S. 609 (1965) ............................................................... 45

*Helmac Products Corp. v. Roth Plastics, Corp.*,
  150 F.R.D. 563 (E.D. Mich. 1993) ................................................................. 29-32

*Hicks v. Feiock*, 485 U.S. 624 (1988)............................................................. 40 & 42

*In re: DeVille*, 280 B.R. 483 (9th Cir. B.A.P. 2002) ................................35-37 & 41

*In re Dyer*, 322 F.3d 1178 (9th Cir. 2003)............................................36-37 & 39-40

*In re Rumaker*, 646 F.2d 870 (5th Cir. 1980) ........................................................... 39

*Ingenuity 13, LLC v. Doe*,
  No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012) ................. 13 & 14

*Ingenuity 13, LLC v. Doe*,
  Dkt. No. 2:12-cv-8333-ODW(JC) (C.D. Calif. filed Sept. 27, 2012) ........ *passim*

*Ingenuity 13 LLC v. Doe*,
  Dkt. No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012)......... 13 & 14

*Int'l Union, United Mine Workers of America v. Bagwell*,
  512 U.S. 821 (1994)........................................................................... 38, 40 & 42

*Koninklijke Philips Elecs., N.V. v. KXD Tech., Inc.*,
  539 F.3d 1039 (9th Cir. 2008) ........................................................................... 39

*Lockary v. Kayfetz*, 974 F.2d 1166 (9th Cir. 1992) ...................................54-55 & 57

*Mathews v. Chevron Corp.*, 362 F.3d 1172 (9th Cir. 2004)....................................... 3

*Margolis v. Ryan*, 140 F.3d 850 (9th Cir. 1998)....................................................... 54

*Morales-Garcia v. Holder*, 567 F.3d 1058 (9th Cir. 2009) ................................... 3–5

*Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.,*
 2 F.3d 1397 (5th Cir. 1993) ................................................................ 30

*Orange Blossom Limited Partnership v. Southern California Sunbelt Developers,
Inc.*, 608 F.3d 456 (9th Cir. 2010) ........................................................53-58

*Pointer v. Texas*, 380 U.S. 400 (1965) .................................................... 51

*Roadway Express, Inc. v. Piper,* 447 U.S. 752 (1980) ............................................ 30

*Slochower v. Board of Higher Education*, 350 U.S. 551 (1956) ............................. 45

*Ullmann v. United States*, 350 U.S. 422 (1956) ...................................... 45

*Union Tool Co. v. Wilson*, 259 U.S. 107 (1922)....................................... 39

*United States v. Armstrong*, 781 F.2d 700 (9th Cir. 1986)...................................... 39

*United States v. Henry*, 2013 U.S. Dist. LEXIS 133148 (E.D. Va.) ...................... 31

*United States v. Wolf Child*, 699 F.3d 1082 (9th Cir. 2012)................................... 58

*Young v. United States ex rel. Vuitton Et Fils S.A.*,
 481 U.S. 787 (1987)............................................................43 & 46-48

## Statutes

28 U.S.C. § 1291....................................................................................... 2

28 U.S.C. § 1331........................................................................................ 1

28 U.S.C. § 1338(a) ................................................................................... 1

28 U.S.C. § 1367(a) ................................................................................... 1

Bankruptcy Act, 11 U.S.C. § 303(i) ................................................. 5 & 55

Copyright Act, 17 U.S.C. § 505..........................................4-5, 25 & 56-57

Fed. Rule Civ. Proc. 11 ........................................................................... 13, 54 & 58

Fed. R. Civ. Proc. 41(a)(1) ...................................................................................... 13

## STATEMENT OF JURISDICTION

Ingenuity 13[1] commenced this action on September 27, 2012, alleging that Defendant had downloaded an adult film in which Ingenuity 13 had a copyright. The Complaint alleged copyright infringement, contributory infringement and negligence. The District Court had jurisdiction over the copyright infringement claim pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a). The District Court had supplemental jurisdiction over Plaintiff's contributory infringement and negligence claims pursuant to 28 U.S.C. § 1367(a).

On May 6, 2013, the District Court entered an Order imposing monetary and other sanctions against, among others: AF Holdings, Ingenuity 13, Prenda Law, and the three individual Appellants (the "Sanctions Order", ER19-ER29). Hansmeier filed a timely Notice of Appeal from the Sanctions Order on May 15, 2013. (ER377-ER404.) Ingenuity 13, AF Holding, Prenda Law, Steele and Duffy, each filed a timely Notice of Appeal from the Sanctions Order on May 17, 2013.

---

[1] For brevity, Plaintiff, Ingenuity 13, LLC will be referred to as "Ingenuity 13". AF Holdings, LLC, will be referred to as "AF Holdings". Prenda Law, Inc. will be referred to as "Prenda Law". The three individual Appellants submitting this brief (John Steele, Paul Hansmeier and Paul Duffy), will be referred to individually by last name only and collectively as the "individual Appellants". Ingenuity 13, AF Holdings, Prenda Law and the individual Appellants will sometimes be referred to as "Appellants".

[2] Appellants' citation to pages in the Excerpts of the Record will be in the

(ER467-ER496; ER405-ER435; ER506-ER536; ER537-ER566 & ER436-ER466.)

On June 11, 2013, the District Court entered an Order requiring the sanctioned parties to post supersedeas bonds totaling $237,583.66, to cover the monetary sanctions plus Defendant's estimated costs and attorneys' fees for this Appeal (the "Bond Order"). (ER32-ER34.) The District Court also imposed additional requirements with respect to the bond. (*Id.*) Prenda Law filed a timely Notice of Appeal from the Bond Order on June 12, 2013. (ER601-ER603.)

Both the Sanctions and Bond Orders are final Orders. This Court has jurisdiction to hear the appeals from the Sanctions and Bond Orders pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED AND STANDARD OF REVIEW

1.    Whether the District Court exceeded its inherent sanctioning authority by imposing sanctions on individuals who had not appeared as parties or counsel in the consolidated cases, were not subject to any existing order of the District Court and were not real parties in interest.

Appellants objected to the District Court's purported exercise of its inherent authority over the individual Appellants in Hansmeier's Response to

Show Cause Order, (ER349²). This issue involves a mixed question of law and fact. Mixed questions of law and fact are reviewed *de novo*; however, the underlying factual findings are reviewed for clear error. *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004).

2.    Whether the District Court committed error by imposing criminal sanctions solely on the basis of its inherent authority to sanction improper conduct.

Appellants objected to the District Court's imposition of criminal sanctions pursuant to its inherent sanctioning authority in Steele's Response to Show Cause Order (ER368 & ER369). This issue involves a question of law, which is reviewed *de novo*. *Morales-Garcia v. Holder*, 567 F.3d 1058, 1061 (9th Cir. 2009).

3.    Whether the District Court committed error by imposing criminal sanctions in a proceeding in which the Court: (a) drew negative inferences from the individual Appellants' invocation of their Fifth Amendment rights; (b) appointed Defendant's counsel as the *de facto* prosecutor; (c) denied Appellants the right to cross-examine witnesses; and, (d) denied Appellants the right to call witnesses and put on a defense.

---

² Appellants' citation to pages in the Excerpts of the Record will be in the format "ER__".

3

Appellants objected to the District Court's denial of their criminal procedural rights in Steele's Response to Show Cause Order (ER368-ER370). This issue involves a question of law, which is reviewed *de novo*. *Morales-Garcia v. Holder*, 567 F.3d 1058, 1061 (9th Cir. 2009).

4.      Whether the District Court committed error by including in its sanctions the amount of attorneys' fees incurred by Defendant in pursuing sanctions imposed under the District Court's inherent sanctioning authority.

Appellants had no reasonable opportunity to object to the District Court's award of attorneys' fees incurred by Defendant in pursuing sanctions because the District Court awarded such attorneys' fees in its Sanctions Order without any prior indication that it would allow such fees to be included in its award and was based upon a declaration of Defendant's counsel as to the costs and fees expended on the instant litigation, rather than on a formal petition for an award of fees. The issue of whether sanctions awarded under a District Court's inherent sanctioning authority may include attorneys' fees incurred in pursuing sanctions involves a question of law, which is reviewed *de novo*. *Morales-Garcia v. Holder*, 567 F.3d 1058, 1061 (9th Cir. 2009).

5.      Whether the District Court committed error by finding that, under the fee-shifting provision of the Copyright Act, 17 U.S.C. § 505,

4

Appellants were liable for attorneys' fees incurred by Defendant in defending the sanctions award on appeal.

Appellants objected to the District Court's inclusion of attorneys' fees incurred in defending these sanctions on appeal in Hansmeier's Emergency Motion to Reconsider (ER593 & ER594). This issue involves a question of law, which is reviewed *de novo*. *Morales-Garcia v. Holder*, 567 F.3d 1058, 1061 (9th Cir. 2009).

## **PERTINENT STATUTORY PROVISIONS**

### **17 U.S.C. § 505: Remedies for Infringement: Costs & Attorney's Fees**

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award reasonable attorney's fees to the prevailing party as part of the costs.

### **Bankruptcy Act, 11 U.S.C. § 303(i)**

(i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1)     against the petitioners and in favor of the debtor for—

(A) costs; or

5

(B) a reasonable attorney's fee; or

(2)    against any petitioner that filed the petition in bad faith, for—

(A) any damages proximately caused by such filing; or

(B) punitive damages.

## STATEMENT OF THE CASE

In this Appeal, Appellants ask this Court to vacate Orders entered by the District Court on May 6, 2013, and on June 11, 2013, that: impose punitive monetary and non-monetary sanctions on Appellants (ER19-ER29) and allow Defendant to recover attorneys' fees incurred in defending the sanctions award on appeal (ER32-ER34).

Both Orders arose in the context of a lawsuit filed on September 27, 2012 (Dkt. No. 12-08333 (C.D. Cal.)) (ER113), in which Ingenuity 13 claimed that an unknown Defendant had used the internet to download an adult film in which Ingenuity 13 owned a copyright. (ER113-ER129.) In its three-count Complaint, Ingenuity 13 alleged copyright infringement, contributory infringement and negligence by Defendant in allowing an IP address to be used in a manner that infringed Plaintiff's copyright. (*Id.*)

Following a discovery order that rendered it impossible for Ingenuity 13 to discover the true identity of the copyright infringer and, therefore, to

proceed with this litigation (ER146-ER148), Plaintiff voluntarily dismissed
the case on January 28, 2013. (ER158-ER160.)

On February 7, 2013, the District Court, acting *sua sponte*, issued an
Order directed at Ingenuity 13's counsel of record, Brett Gibbs ("Gibbs"),
requiring him to show cause why he should not be sanctioned for allegedly:
violating the District Court's discovery orders, failing to perform an
adequate investigation as to the identify of two copyright infringers and
presenting to the Court a copyright assignment that had allegedly been
forged (ER1-ER11). In the sanctions proceedings, the District Court
consolidated Case No. 8333 with four other copyright infringement cases in
which Gibbs had represented Ingenuity 13 or AF Holdings (another holder
of copyrights in adult videos). (ER12.)

After reviewing an affidavit and testimony by Gibbs stating that his
actions were directed by others, the District Court expanded the target of its
Show-Cause Order to include Ingenuity 13, AF Holdings, Prenda Law and
the three individual Appellants, who had never appeared as counsel or
parties in any of the consolidated cases. (ER16-ER18.)

On May 6, 2013, the District Court issued an Order that jointly and
severally imposed what the Order characterized as "punitive" monetary
sanctions on Gibbs and Appellants. (ER28.) In addition, the Sanctions

7

Order imposed a series of non-monetary sanctions imposed on Gibbs and the individual Appellants. (ER28 & ER29.)

Hansmeier filed a timely Notice of Appeal on May 15, 2013. (ER377-ER404.) The remaining Appellants (who are filing this brief) each filed a timely notice of appeal on May 17, 2013. (ER467-ER496; ER405-ER435; ER506-ER536; ER537-ER566 & ER436-ER466.)

On May 23, 2013, Duffy filed an undertaking for a supersedeas bond equal to 125% of the value of the monetary sanctions (ER583-ER586) and an application with the District Court requesting, among other things, approval of the bond (ER574-ER582).

On June 6, 2013, the District Court entered an Order (ER587-ER595) that conditionally approved the initial supersedeas bond, but required, among other things, Appellants to post a second supersedeas bond of $135,333.66 (equal to Defendant's projected costs and attorneys' fees incurred in pursuing these sanctions on appeal). (ER589.)

In addition, the June 6 Order required Appellants to, among other things: permit Defendant's counsel to execute on the bond if any one of the parties sanctioned failed to successfully appeal the District Court's Sanctions Order; agree that the bond not be subject to a Bankruptcy Court's jurisdiction; and agree to the District Court's conditions. (ER588 & ER589.)

8

On June 11, 2013, the District Court issue a slightly amended version of the June 6 Order (the "Bond Order"). (ER32-ER34.)

On June 12, 2013, Prenda Law filed a timely Notice of Appeal from the Bond Order. (ER601-ER603.) Appellants posted the second supersedeas bond on July 23, 2013. (ER604-ER607.)

On October 17, 2013, Gibbs filed a motion with the District Court for an indicative ruling asking that the Sanctions Motion be vacated with respect to Gibbs. (E613.) On October 30, 2013, the District Court granted Gibbs' motion. (*Id.*) On November 13, 2013, this Court issued a limited remand of the case to the District Court in Appeal No. 13-55871 to allow the District Court to to consider Gibbs' motion to vacate the Sanctions Order.

On November 14, 2013, the District Court vacated the portion of the Sanctions Order imposing monetary sanctions on Gibbs, based on Gibbs' alleged disassociation from Prenda Law. However, the Order, by its terms, did not vacate the non-monetary sanctions imposed by the District Court on Gibbs or the sanctions imposed on the other Appellants. Gibbs has now asked this Court to dismiss Appeal No. 13-55871. As of the time that Appellants filed the instant brief, Gibbs' motion is pending.

# STATEMENT OF FACTS

## The Underlying Litigation

This is an Appeal from the Sanctions Order entered by the District Court after the voluntary dismissal of the underlying litigation, which imposed both monetary and non-monetary sanctions against Appellants (E19-E29), and, the subsequent Bond Order, which required Appellants to post a supersedeas bond sufficient to cover Defendant's estimated costs and attorneys' fees incurred through this Appeal (in addition to a supersedeas bond valued at 125% of the value of the monetary sanctions imposed) (E32-E34.).

Both Orders arose in the context of a lawsuit brought by Plaintiff, Ingenuity 13, alleging, among other things, that an unknown internet user ("John Doe") had infringed Ingenuity 13's rights in an adult film by improperly downloading the film. (ER113-ER129.)

Ingenuity 13 holds rights to a number of copyrighted works, including an adult video entitled "A Peek Behind the Scenes at a Show" (the "Film"). (ER114 & ER126.) In the course of monitoring internet-based infringement of its copyrighted content (*i.e.*, unauthorized downloading of copyrighted works), Plaintiff's agents observed that the Film had been unlawfully

downloaded by an unknown internet user who was accessing the internet through Internet Protocol ("IP") address 108.13.119.253. (ER114.)

On September 27, 2012, Ingenuity 13 filed a lawsuit in the District Court against the John Doe user of this IP address, alleging copyright infringement, contributory infringement and negligence. (ER113-ER129.) Ingenuity 13 was represented solely by Gibbs. (ER113.) Gibbs had listed himself as Of Counsel to Prenda Law (ER113 & ER167); and, in affidavits and argument before the District Court, Gibbs was characterized as an independent contractor to Prenda Law. (ER169 & ER204).

On October 8, 2012, Ingenuity 13 sought leave to conduct early discovery by issuing a subpoena to John Doe's Internet Service Provider in order to discover John Doe's identity. (ER130-ER142.) Leave was granted the following day (the "Early Discovery Order"). (ER143 & ER 144.)

However, on December 19, 2012, the instant case was reassigned to Judge Wright (ER145), who wasted no time in rescinding the Early Discovery Order. The day after the reassignment, Judge Wright vacated the Early Discovery Order and ordered Ingenuity 13 to show cause why it should be allowed to proceed in discovering John Doe's identity. (ER146-ER148.) In his December 20 Order, Judge Wright required that Ingenuity

11

13 "cease its discovery efforts relating to or based on information obtained through any abovementioned Rule 45 subpoenas". (ER146.)

In issuing this Order, the District Court stated that, while a subpoena issued to the Internet Provider for IP Address 108.13.119.253 may yield the identity of the subscriber for that IP Address, the Court required further proof that it was the subscriber who had performed the illegal download, rather than another individual who may have been using the subscriber's IP address. (ER147.)

As a result of Judge Wright's Order, Ingenuity 13 had no way of identifying the unknown infringer and, therefore, no way of proceeding with the litigation. Apparently aware that this Order placed Ingenuity 13 in an impossible position in the litigation, Judge Wright proclaimed that it was his "duty to protect the innocent citizens of this district from this sort of legal shakedown, even though a copyright holder's rights may be infringed by a few deviants." (ER147.)

Two days later, Ingenuity 13 filed a motion to disqualify Judge Wright, arguing that his actions and comments called into question the District Court's ability to act impartially. This motion was denied. (ER149-ER152.) Having no way to proceed without knowing the identity of the copyright infringer, on January 28, 2013, Ingenuity 13 voluntarily dismissed

the action in its entirety without prejudice pursuant to Fed. R. Civ. Proc. 41(a)(1). (ER158-ER160.)

## The Order to Show Cause Proceeding against Brett Gibbs

Ten days after the case was dismissed, on February 7, 2013, Judge Wright issued an Order to Show Cause, requiring Gibbs to appear before the District Court on March 11, 2013, to "justify his violations of Federal Rule of Civil Procedure 11 and Local Rule 83-3 . . ." (ER1-ER11.) Although nominally issued in Case No. 8333, the body of the Order described conduct by Gibbs in the instant case and in four other copyright-infringement cases that had been consolidated for purposes of Judge Wright's Show-Cause Order (the "consolidated cases"[3]), in which Gibbs had represented Ingenuity 13 or AF Holdings, a company that also held rights in various adult videos. (ER12.)

Specifically, Judge Wright identified three categories of conduct that he considered sanctionable:

---

[3] The four cases that were consolidated with the instant case for purpose of the Show-Cause Order were: *AF Holdings, LLC v. Doe*, No. 2:12-cv-6636-DW(JCx) (C.D. Cal. filed Aug. 1, 2012); *AF Holdings, LLC v. Doe*, No. 2:12-cv-6669-DW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13, LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); and *Ingenuity 13, LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012). (ER12.) Where it is necessary to refer to individual cases, the cases will be referred to by the last four digits of the case number; *e.g.*, Case No. 2:12-cv-6636-DW(JCx) will be cited as Case No. 6636.

13

1. In Case Nos. 6636 and 6639, violating Judge Wright's Orders terminating early discovery by continuing to conduct discovery based upon subpoenas that had been issued prior to the termination;

2. In Case Nos. 6662 and 6668, identifying infringers of copyrighted adult videos "based on a snapshot of Internet activity, without conducting a reasonable inquiry"; and

3. In Case No. 8333, perpetrating a fraud on the District Court by filing a forged acceptance of a copyright assignment.

(ER9 & ER10.)

Morgan Pietz, attorney for the Defendant in the Case No. 8333, was appointed by Judge Wright to present evidence concerning Gibbs' alleged misconduct. (ER10.)

The Show-Cause Order concluded by listing the potential sanctions that the District Court might impose, including: "a monetary fine, incarceration, or other sanctions sufficient to deter future misconduct." (ER10 & ER11.)

In the weeks that ensued, Gibbs filed a brief and a supporting declaration (ER167–ER180) in response to the Show-Cause Order in which he defended his conduct by claiming, among other things, that he had received guidance and direction from "senior members" of the law firms that had employed him as Of Counsel. (ER168–ER171.)

Subsequently, the District Court ordered Gibbs to identify the "senior members" referenced in his brief and declaration. (ER12 & ER13.) Gibbs

14

responded by filing a second declaration in which he identified Appellants Steele and Hansmeier as the "senior members", while simultaneously admitting that neither had an ownership interest in the law firm in which Gibbs was then Of Counsel. (ER181–ER185.)

In response to Gibbs' filings, on March 5, 2013, the District Court ordered, among others, Minnesota citizen and resident, Hansmeier, Florida citizen and resident, Steele, and Illinois citizen and resident, Duffy, "to appear on March 11, 2013, at 1:30 p.m.". (ER14 & ER15.) None of the individual Appellants had been a party, filed an appearance as counsel nor had otherwise appeared before the District Court in any of the consolidated cases. (*See* ER35-ER129.)

The District Court required Gibbs to serve the March 5 Order on the individual Appellants by March 7, 2013, the Thursday before the Monday March 11 Hearing. (ER15.) However, the March 5 Order failed to specify the purpose for which these three individuals were ordered to appear. (ER14 & ER15.) Indeed, at the time that the District Court initially ordered the three individual Appellants to appear, the existing Show-Cause Order had not accused them of any sanctionable conduct. (ER1–ER11.)

After being made aware of the March 5 Order on March 7, 2013, the individual Appellants managed to retain counsel and, within 24 hours, filed

15

an *ex parte* motion asking the District Court to withdraw its March 5 Order requiring their appearance. (ER186 & ER187.) Specifically, the three objected, among other things, to the District Court's assertion of nationwide personal jurisdiction and to the lack of sufficient notice of the hearing. (*See id.*) The District Court did not rule on this motion prior to the March 11 Hearing.

## The March 11 Show Cause Hearing

With only four calendar days (and only one business day's) notice of the hearing, and no notice of the charges that they faced, Steele, Hansmeier and Duffy, nonetheless, appeared through counsel at the March 11 Hearing and made themselves available by telephone. (ER189 & ER192–ER194.)

Pietz, acting in the role of *de facto* prosecutor appointed by the District Court, and Gibbs' counsel, presented testimony and/or documents regarding a broad range of topics, some of which addressed the three categories of sanctionable conduct identified in the Show-Cause Order. (ER213–ER258 & ER292–ER301.)

However, the District Court rebuffed the attempt by counsel for the individual Appellants to participate in the hearings. (ER192–ER194.) Upon learning that the individual Appellants were not physically present in the

16

courtroom, the District Court instructed individual Appellants' counsel to "have a seat" and would not permit counsel to complete her argument. (*Id.*)

Regarding two of the three categories of sanctionable conduct described in the Show-Cause Order, Pietz and/or Gibbs' counsel presented testimony or documents relating to: discovery conducted on behalf of AF Holdings after the District Court had terminated early discovery in two of the consolidated cases filed by Gibbs and deficiencies in the investigation performed by Gibbs before identifying the alleged copyright infringer in two of the consolidated cases that Gibbs had filed on behalf of Ingenuity 13. (*See* ER213–ER258 & ER292–ER301.)

However, there was a disconnect between the District Court's forgery allegations in the Show-Cause Order and the testimony presented at the March 11 Hearing. The Show-Cause Order contended that Gibbs and Appellants had fraudulently presented to the District Court a forged copyright acceptance in Case No. 8333. (ER10.) The allegation could not possibly have been accurate because Ingenuity 13 was the original holder of the copyright, and, consequently, had not acquired it through assignment. (ER126.) In fact, the person whose signature had allegedly been forged testified as to whether his signature had been forged with respect to other

17

copyright assignments in other cases, but was never asked about any alleged forgery in Case No. 8333. (ER208–ER221.)[4]

In addition to the conduct that the Show-Cause Order had actually alleged to be sanctionable, testimony and/or documents were presented regarding: Gibbs' failure to inform the District Court of related cases that he had filed (ER267–ER271); and his failure to inform the District Court of Prenda Law's alleged financial interest in either Ingenuity13 or AF Holdings (ER262 & ER264–ER267).

During his testimony, Gibbs attempted to deflect primary blame to Steele and Hansmeier. Despite the fact that he had testified through affidavit that he was an independent contractor (ER169) and the fact that he alone had filed the five consolidated cases (ER35, ER56, ER74, ER92 & ER113), Gibbs testified that his conduct was directed by Steele and Hansmeier. (ER261 – ER267.)

Later in the hearing, upon questioning by the District Court, counsel informed Judge Wright that, while Steele, Hansmeier and Duffy were not physically present in the courtroom, they were available by telephone to

---

[4] In addition, the District Court did not indicate what possible motive Appellants would have to intentionally present a forged copyright assignment to the Court. As the District Court itself stated in its Sanctions Order, "a recipient of a copyright assignment need not sign the document . . ." (ER26.) Thus, Appellants had absolutely nothing to gain by intentionally presenting a forged copyright assignment.

participate. (ER207 & ER208.) While Judge Wright stated that he might take them up on their offer to participate by telephone (ER208), he did not include them in the hearing.

**The Amended Show-Cause Order**

On March 14, 2013, three days after the Show-Cause Hearing, Judge Wright issued an Order, amending the original Show-Cause Order (the "Amendment"). (ER16–ER18.) In the Amendment, Judge Wright belatedly denied the individual Appellants' prior motion to withdraw the District Court's earlier March 5 Order requiring their appearance at the March 11th Hearing. (ER16.) In doing to, Judge Wright held that he had specific jurisdiction over these persons because of their alleged pecuniary interest and supposedly "clandestine" participation in the five consolidated cases. (*Id.*) In addition, despite the fact that the individual Appellants had filed their Motion within 24 hours after first receiving notice of the March 5 Order to appear at the March 11 Hearing, Judge Wright made a point of observing that movants' "eleventh-hour filing exemplifi[ed] gamesmanship . . ." (*id.*)

Judge Wright's also amended the original Show-Cause Order to include possible sanctions against Steele, Hansmeier and Duffy, and ten

19

other persons or entities, ordering each to appear at a Show-Cause Hearing

on March 29, 2013, to explain why they should not be sanctioned for:

1. Their alleged participation, direction, and execution of the acts described in the Court's February 7, 2013 Order to Show Cause;

2. Failing to notify the Court of all parties that have a financial interest in the outcome of the litigation;

3. Defrauding the Court by misrepresenting the nature and relationship of the individuals and entities involved in the five cases consolidated for purposes of the Show-Cause Order;

4. Steele's and Hansmeier's failure to file a *pro hac vice* appearance before the Court, given their alleged involvement as "senior attorneys" in the cases; and

5. Not appearing at the March 11 Show Cause Hearing.

(ER17 & ER18.) Judge Wright again invited John Doe's attorney, Morgan

Pietz, and his co-counsel, Nicholas Ranallo, to appear at the hearing.

(ER18.)

## The April 2, 2013 Show-Cause Hearing

Each of the individual Appellants appeared before the District Court

at the Show-Cause Hearing, rescheduled to April 2, 2013. (ER307 &

ER308.) However, because the Show-Cause Order, as amended, provided

for criminal sanctions, including incarceration (ER10 & ER11), and because

the District Court had indicated an intent to require testimony that might

invade the attorney-client privilege, all three invoked their Fifth Amendment

privilege against compelled testimony. (ER312–ER314.)

20

In response to their decision to exercise their Fifth Amendment privilege, Judge Wright denied counsel for the individual Appellants leave to present argument or otherwise to participate, and abruptly terminated the hearing. (ER313-ER318.) No testimony, evidence, or argument was allowed or presented at the hearing, which lasted approximately 12 minutes. (ER317–ER318.)

Gibbs had previously identified Mark Lutz ("Lutz") as the chief executive officer of both AF Holdings and Ingenuity 13. (ER184 & ER265.) Lutz was present in the courtroom, had specifically been identified to the District Court as "present", (ER310) and was in a position to testify as to the persons or entities that owned AF Holdings and Ingenuity 13. However, due to Judge Wright's abrupt termination of the hearing, counsel for the individual Appellants had no opportunity to examine Lutz.

Following the hearing, the three individual Appellants, and the other targets of the Amended Show-Cause Order, submitted substantial briefing, objecting to the procedures imposed by the District Court and the evidence presented by Pietz. (*See* ER628-ER630.)

## The May 6, 2013 Sanctions Order

On May 6, 2013, Judge Wright issued an Order sanctioning Gibbs, AF Holdings, Ingenuity 13, Prenda Law and the three individual Appellants. (ER19–ER29.) Despite threatening incarceration in the Show-Cause Order (ER10 & ER11) and imposing punitive monetary sanctions (ER28), the District Court stated that the proceedings and sanctions were civil in nature, thereby allowing the Court to draw negative inferences against those who invoked their Fifth Amendment rights. (ER21.) In addition, the Sanctions Order ignored all of the evidentiary objections to the testimony and documents introduced at the March 11 Hearing and afterward.

As monetary sanctions, the District Court held the three entities and four individuals jointly and severally liable for: (1) an award of attorneys' fees and costs totaling $40,659.86; and (2) "[a]s a punitive measure, the Court double[ed] this award, yielding $81,319.72." (ER28.)

The District Court left no doubt that it had set monetary damages to discourage any appeal from the Order. In explaining why he had calculated the punitive award in this manner, Judge Wright asserted that the monetary sanctions were "calculated to be just below the cost of an effective appeal." (*Id.*)

22

In addition, with respect to the three individuals, the District Court imposed further sanctions, including: referrals to state and federal bar organizations and disciplinary committees; referral to the United States Attorney for the Central District of California; referral to the Criminal Investigative Division of the Internal Revenue Service; and notification of "all judges before whom these attorneys have pending cases." (ER28 & ER29.)

In the Sanctions Order, the District Court noted its disappointment in its inability to identify justification for imposing further sanctions, stating: "Unfortunately, other than these specific instances of fraud, the Court cannot make more detailed findings of fraud." (ER26.)

Appellants Gibbs, Ingenuity 13, AF Holdings, Prenda Law, Steele, Hansmeier and Duffy filed timely Notices of Appeal during the period May 15, 2013, through May 18, 2013. (ER567-ER573, ER467-ER496, ER405-ER435, ER506-ER536, ER537-ER566, ER377-ER404 & ER436-ER466.)

**The Court's Requirement of a Second Supersedeas Bond**

On May 20, 2013, Prenda Law filed an application with the District Court requesting that the Sanctions Order be stayed pending resolution of the appeal (ER497-ER505). The District Court denied the application on May 21, 2013, and, thereafter, imposed a $1,000 per day, per respondent,

23

penalty for each day after May 20, 2013, that the respondents failed either to pay the sanction award or submit for approval a supersedeas bond in the amount of the court-ordered sanctions. (ER30 & ER31.)

On May 23, 2013, Duffy filed an undertaking for a supersedeas bond in the amount of $101,650, equal to 125% of the value of the monetary sanctions. (ER583-ER586.) In addition, Duffy filed an application with the District Court requesting approval of the bond and further requesting that the Sanctions Order be stayed pending resolution of the appeal. (ER574-ER582.)

Pietz opposed Duffy's motion (ER623), arguing that, under Fed. Rule App. Proc. 7, he was entitled to a bond that covered not only $5,000 in prospective appellate costs, but also $135,993.66 in prospective attorneys' fees for the appeal. Pietz also asked that several other conditions be imposed prior to approval of the original bond, including: permitting him to execute on the bond if any one respondent failed to successfully appeal the District Court's Sanctions Order; specifying that the bond not be subject to a Bankruptcy Court's jurisdiction; and requiring each Appellant to sign off on the bond and the extra conditions imposed by the District Court. (*Id.*)

24

The District Court signed Pietz's proposed order without permitting Duffy or Prenda Law an opportunity to respond to Pietz's legal arguments either by way of reply brief or oral argument. (ER32-ER34.) Further, the District Court ordered Prenda Law and the other bonded respondents to file acknowledgements of the validity of the conditions imposed by the court on each bond and to post a second bond in the amount of $135,993.66, finding that, under the fee-shifting provision of the Copyright Act, 17 U.S.C. § 505, the prevailing party in the copyright action is also entitled to receive attorneys' fees incurred in pursuing sanctions and defending those sanctions on appeal . (ER33.) The District Court also promised to impose further sanctions if the parties did not comply with the Order. (*Id.*) The undertaking for the second supersedeas bond in the amount of $135,933.66 was filed with the District Court on July 23, 2013. (ER604-ER607.)

Prenda Law filed a timely Notice of Appeal from the Bond Order on June 12, 2013. (ER601-ER603.)

## SUMMARY OF ARGUMENT

The District Court's sanctions were supposedly issued pursuant to the District Court's inherent sanctioning authority. However, under prevailing case law, the sanctions chosen by the District Court were improper for at least three reasons:

1.  The District Court's inherent sanctioning authority did not extend to persons, such as the individual Appellants, who had not appeared as parties or counsel in the consolidated cases, who were not (at the time of the Show-Cause Order) subject to any order by the District Court and who were not real parties in interest;

2.  The sanctions chosen by the District Court were criminal in nature and were imposed without the procedural safeguards required by federal law; and,

3.  The District Court, in its sanction award, improperly included punitive sanctions and attorneys' fees incurred by Defendant in pursuing the sanctions and defending the sanctions on appeal.

The District Court's inherent sanctioning authority does not extend to the three individual Appellants. Under prevailing case law, the District Court's inherent sanctioning authority is limited to: parties and their counsel, persons and entities that are subject to an existing court order and real parties in interest. The individual Appellants did not fall into any of these categories. None of the three appeared as parties or counsel in any of the five consolidated cases. Further, the record on appeal is devoid of any information from which the District Court could reasonably infer that the individual Appellants were real parties in interest. None of the three held an ownership interest in either of the two Plaintiffs in the five consolidated cases (*i.e.*, Ingenuity 13 or AF Holdings).

In addition, the District Court erred in its conclusion that its sanctions were civil in nature. Under the case law of the Supreme Court and of this

Court, civil sanctions must be either compensatory or intended to coerce compliance with a court's directive. Sanctions that are intended to punish are considered criminal sanctions.

There is no possibility that the sanctions entered by the District Court were intended to coerce compliance with a court directive. The District Court's sanctions were issued after each of the five consolidated cases had been voluntarily dismissed. Moreover, by setting the sanctions at 200% of Defendant's stated costs and attorneys' fees, the sanctions were not merely compensatory. Indeed, the District Court itself characterized the sanctions as "punitive".

This Court has previously held that monetary sanctions set at 200% of a party's costs and attorneys' fees are criminal in nature, and can only be imposed through criminal contempt proceedings, which require the full panoply of procedural due process rights required in criminal cases, including: a prohibition against drawing negative inferences from the exercise of Fifth Amendment Rights; the right to an unbiased, disinterested prosecutor; the right of cross-examination; and, the right to call witnesses.

The procedures used by the District Court did not comply with these Constitutional requirements. The District Court's factual findings were based, in large part, or in whole, on the individual Appellants' invocation of

their Fifth Amendment privileges.  The District Court appointed Defendant's counsel as the *de facto* prosecutor, who could not qualify as a disinterested prosecutor under federal case law.  Appellants were denied any right to cross-examine witnesses; and, Appellants were denied the right to call witnesses and put on a defense.  In short, while the District Court's punitive sanctions could only be imposed through criminal contempt proceedings, the procedures employed by the Court violated procedural due process requirements in criminal contempt proceedings.

Moreover, under its inherent sanctioning authority, the District Court lacked the authority to impose either punitive sanctions or sanctions that included Defendant's costs and attorneys' fees incurred in pursuing those sanctions or defending such sanctions on appeal.  The case law is crystal clear that a District Court, acting under its inherent sanctioning authority, cannot impose punitive monetary sanctions.  Moreover, the case law is equally clear that sanctions imposed under a District Court's inherent sanctioning authority cannot include the attorneys' fees incurred by the party in seeking sanctions, either at the District Court level or on appeal.  Thus, by requiring Appellants to post supersedeas bonds that guarantee Defendant's ability to recover attorneys' fees incurred in this appeal, the District Court's Bond Order constitutes error.

## ARGUMENT

## I. THE DISTRICT COURT'S INHERENT SANCTIONING AUTHORITY DID NOT EXTEND TO THE INDIVIDUAL APPELLANTS.

Under prevailing case law, the District Court's inherent sanctioning authority did not extend to the three individual Appellants. The sole authority cited by the District Court for imposing sanctions on these individual Appellants was the Court's inherent sanctioning authority. (ER24 & ER25.) Under modern case law, a District Court's inherent sanctioning authority is limited to three classes of persons or entities: parties and their counsel, persons who violate an existing court order and real parties in interest. *Helmac Products Corp. v. Roth Plastics Corp.*, 150 F.R.D. 563, 565-66 (E.D. Mich. 1993). The three individual Appellants do not fall within any of these categories.

To be sure, a District Court's inherent authority to sanction improper conduct extends beyond the parties and their counsel who have appeared before the Court. Indeed, in the watershed case describing the scope of a District Court's inherent authority, *Chambers v. Nasco, Inc.*, 501 U.S. 32, 36-37 (1991), a portion of the sanctioned conduct occurred prior to the time that Chambers became a party or was subject to any order by the District Court.

However, a District Court's inherent authority to impose sanctions is not unlimited. *Am. Civil Liberties Union v. Holder,* 673 F.3d 245, 256 (4th Cir. 2011); *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.,* 2 F.3d 1397, 1406-07 (5th Cir. 1993). In *Chambers* itself, the Supreme Court cautioned that the Court's inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function" (501 U.S. at 42) and "must be exercised with restraint and discretion." (*Id.* at 45). *See also Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980).

In the seminal case of *Helmac Products Corp. v. Roth Plastics, Corp.*, *supra*, the court pioneered a two-part test to gauge whether a District Court's inherent sanctioning authority extends to an individual who is neither a litigant nor an attorney who has appeared in the case. In that case, the owner of the defendant corporation had ordered the destruction of relevant documents, thereby rendering it impossible to conduct a trial on his corporation's liability. However, the owner was not a party to the case and was not subject to any court order at the time that he directed the document destruction.

In finding that the court's inherent sanctioning authority extended to the owner of the defendant corporation, the court held that its "inherent

30

power to sanction [is limited] to those individuals [who] were either (1) parties, (2) subject to a court order, or (3) real parties in interest." 150 F.R.D. at 568. Finding that the owner of the defendant corporation was, for all practical purposes, the real party in interest, the court imposed sanctions.

Since its development, the *Helmac* standard has been widely applied by federal courts in determining whether, and to what extent, a District Court's inherent sanctioning authority extends to a non-party and non-attorney (*i.e.*, an individual who has neither filed an appearance nor otherwise appeared before the court in the case as counsel).

Within the past two months, the test and principles underlying *Helmac* were echoed in *United States v. Henry*, 2013 U.S. Dist. LEXIS 133148 (E.D. Va.) at \*108-09, in which, partially quoting *Helmac*, the court stated:

> Although the federal courts may certainly sanction disruptive or disobedient bad faith conduct, "the Court's power to sanction cannot possibly extend to everyone who interferes with litigation before the court. Otherwise the power to sanction would be so wide that it would be unenforceable."

*See also Anz Advanced Techs., LLC v. Bush Hog*, LLC, 2012 U.S. Dist. LEXIS 29534 (S.D. Ala.) at \*34; *Bartos v. Pennsylvania*, 2010 U.S. Dist. LEXIS 43937 (M.D. Pa.) at \*18; *Books Are Fun, Ltd. v. Rosenbrough*, 239 F.R.D. 532, 555 (S.D. Iowa 2007).

31

The prior decisions of this Court are in accord with the *Helmac* standard. In *Caldwell v. United Capital Corporation*, 77 F.3d 278 (9th Cir. 1996), this Court held that a District Court's inherent sanctioning authority extended to a person who had a controlling interest in the debtor and who, through the debtor, had implemented a fraud on the District Court. Such a result is consistent with *Helmac*'s extension of the District Court's inherent power to real parties in interest. However, diligent research has not shown a single case in which the District Court's inherent authority to sanction has been extended to persons who are neither parties, attorneys of record, persons subject to an existing court order or real parties in interest.

It is undisputed that none of the three individual Appellants appeared as parties or counsel in any of the five consolidated cases. (ER35, ER56, ER74, ER92 & ER113.) Further, none of the three were subject to any order of the District Court in any of the consolidated cases when the Sanctions Order was issued.

Under the *Helmac* standard, the District Court's inherent sanctioning authority can extend to these three individuals if and only if they were real parties in interest in at least one of the consolidated cases. Under the case law cited above, to be real parties in interest, an individual Appellant must

have a controlling ownership interest in either AF Holdings or Ingenuity 13, who were Plaintiffs in the consolidated cases.

There was no evidence from which the District Court could reasonably infer that any of the three individual Appellants had an ownership interest in either AF Holding or Ingenuity 13, much less a controlling interest. The District Court simply states, without any factual support or citation, that "the principles are the de facto owners and officers [of AF Holdings and Ingenuity 13]". (ER22.) With total respect for the District Court, there was not a shred of evidence supporting that conclusion, nor did the District Court cited any supporting evidence. (*Id.*)

The only witness who claimed to have any knowledge of Ingenuity 13 or AF Holdings was Gibbs. Nothing in Gibbs' testimony or affidavits could possibly be construed as suggesting that any of the three individual Appellants had an ownership interest of any kind in either Ingenuity 13 or in AF Holdings.[5] Further, there were no documents of any kind that lent

---

[5] Five months after the Notice of Appeal had been filed, Gibbs filed a motion with the District Court seeking an indicative ruling vacating the Sanction Order as to Gibbs. (ER613.) In his Motion and supporting Declaration, Gibbs for the first time alleges that the individual Appellants have a financial interest in Ingenuity 13 and AF Holdings. The other Appellants, each of which strongly denying the accuracy of that allegation, have had no opportunity to counter Gibbs' assertion. Moreover, the District Court could not have relied upon Gibbs' eleventh-hour "revelation", which

support to the District Court's conclusion that the individual Appellants are owners of either company.

Under the procedures employed in this case, it would be particularly unfair to infer, without any supporting evidence, that any of the individual Appellants had an ownership interest in AF Holdings or Ingenuity 13. The one person who was in a position to explain the ownership of both entities, Mark Lutz ("Lutz"), was physically present at the April 2 Hearing. (ER310.) Had the individual Appellants been permitted to examine Lutz, any question regarding the ownership of AF Holdings or Ingenuity 13 could have been established.

However, the Circuit Court terminated the hearing abruptly upon learning that the individual Appellants were invoking their Fifth Amendment rights. (ER317 & ER318.) In effect, the District Court impermissibly prevented the individual Appellants from introducing exculpatory testimony as a punishment for invoking their Fifth Amendment rights.

---

came long after this Appeal was noticed by each of Appellants (including Gibbs himself).

## II. UNDER THIS COURT'S PRIOR PRECEDENT, A DISTRICT COURT'S INHERENT SANCTIONING AUTHORITY DOES NOT PERMIT THE IMPOSITION OF PUNITIVE SANCTIONS.

In its own words, the District Court's imposition of monetary sanctions that doubled Defendant's actual costs and attorneys' fees was intended "[a]s a punitive measure". (ER 28.) This Court's prior precedents hold that a District Court's inherent sanctioning authority is limited to sanctions necessary to compensate an opposing party for harm caused by improper conduct or to coerce compliance with an existing order. However, the imposition of punitive sanctions can only be done pursuant to criminal contempt proceedings.

In a series of cases dating back to 2002, the Bankruptcy Panel of this Court has interpreted the Supreme Court's decision in *Chambers v. Nasco, Inc.*, *supra*, as limiting sanctions that may be imposed under a Court's inherent sanctioning authority to compensatory or coercive sanctions. The Bankruptcy Panel of this Court first addressed this issue in *In re: DeVille*, 280 B.R. 483 (9th Cir. B.A.P. 2002). In that case, the plaintiff had filed a lawsuit against a number of defendants in a state court action. In order to delay the state court trial, defendants' counsel orchestrated a series of bankruptcy filings and notices of removal of the state court action to the bankruptcy court that halted the state court action on several occasions. The

District Court found that the sole purpose of the bankruptcy filings was to
delay prosecution of the state court claims; and, imposed sanctions on the
defendant, citing, among other things, its inherent sanctioning authority.
After finding that reasonable costs and attorneys' fees totaled $5,548.50, the
court doubled the costs and attorneys' fees as a deterrent to future
misconduct (as the District Court in the instant case did). 280 B.R. at 490-
91.

In holding that the court's inherent sanctioning authority would not
permit such an award, this Court stated:

> It is apparent from *Chambers* that "inherent authority" will not
> suffice to support such a "penalty" in this instance. The award
> in *Chambers* was purely compensatory. *The context of the
> Chambers rationale is that "inherent power" is not a
> manifestation of contempt power and may be determined
> without resort to contempt proceedings so long as the sanctions
> are compensatory. Id.,* 501 U.S. at 42-51. By implication, a
> penalty is not authorized as part of "inherent power"
> sanctioning authority and, if imposed as part of the court's
> "inherent power," must be done by way of contempt
> proceedings.

280 B.R. at 497-98 (emphasis added). *Accord In re Dyer*, 322 F.3d 1178,
1197 (9th Cir. 2003).

The holding in *DeVille* could not possibly be more on point. In the
instant case, the District Court awarded attorneys' fees and costs of
$40,659.86. In the District Court's own words, "[a]s a punitive measure, the

36

Court doubles this award, yielding \$81,319.72." (ER28.) This is precisely the same conduct that was expressly prohibited in *DeVille*.

Under the holdings in *DeVille* and *Dyer*, the District Court clearly exceeded its inherent sanctioning authority by doubling the award of compensatory costs and attorneys' fees. Before doubling the award, it was incumbent upon the District Court to conduct criminal contempt proceedings, under which Appellants would have been entitled to all of the constitutional protections inherent in a criminal proceeding.

## III. THE PROCEDURE USED BY THE DISTRICT COURT TO IMPOSE SANCTIONS VIOLATED PROCEDURAL DUE PROCESS REQUIREMENTS.

The portion of this Court's decision in *DeVille* quoted above specifically holds that a District Court may impose punitive sanctions only by conducting contempt proceedings. 280 B.R. at 497-98. While the District Court did not characterize its two hearings (March 11, 2013 and April 2, 2013) as contempt proceedings, the type of sanctions imposed by the District Court could only be imposed through a criminal contempt proceeding.

Therefore, the key question is whether the District Court's procedures complied with requirements of procedural due process mandated in a criminal contempt proceeding. As discussed below, the particular type of

37

criminal contempt proceeding required in order to impose the punitive sanctions contained in the Sanctions Order was an indirect criminal contempt proceeding. The case law is crystal clear that the District Court's procedures systematically violated no fewer than four safeguards mandated by procedural due process: the right to invoke the Fifth Amendment without incurring negative inferences; the right to an independent, impartial prosecutor; the right to cross-examine witnesses; and, the right to call witnesses and put on a defense.

## A. The Sanctions Imposed by the District Court Required a Proceeding for an Indirect Criminal Contempt.

Federal case law distinguishes between civil and criminal contempt proceedings. *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826–30 (1994). Within the category of criminal contempt proceedings, the case law recognizes a distinction between contemptuous conduct that occurs in the court's presence (direct contempt) and contemptuous conduct that occurs outside of the court's presence (indirect contempt). *Id.*, 512 U.S. at 826, n.2. Both Supreme Court case law and the prior precedents of this Court require that a party accused of an indirect criminal conduct be accorded the procedural due process rights required in criminal actions. *See, e.g.*, *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1139 (9th Cir. 2001).

38

### 1. The sanctions imposed by the District Court required criminal contempt proceedings.

The prior decisions of this Court have provided a bright-line test to be used in determining whether the sanctions imposed by a court are civil or criminal. A District Court's characterization of a contempt proceeding as civil or criminal is not dispositive. *In re Rumaker*, 646 F.2d 870, 871 (5th Cir. 1980). The distinction between a civil contempt and a criminal contempt lies in the purpose underlying the sanction. *Koninklijke Philips Elecs., N.V. v. KXD Tech., Inc.*, 539 F.3d 1039, 1041-42 (9th Cir. 2008).

The purpose of civil contempt is to coerce the contemnor into compliance with an existing court order, or to compensate a party for the contemnor's improper conduct. *United States v. Armstrong*, 781 F.2d 700, 703 (9th Cir. 1986). The purpose of a criminal contempt is to punish. *Id.* Where the sanctions imposed are quasi-remedial and quasi-criminal, the sanction is treated as a criminal sanction. *Union Tool Co. v. Wilson*, 259 U.S. 107, 110 (1922); *In re Rumaker*, 646 F.2d at 872.

In the case of monetary sanctions, this Court has held that the sanction is civil if the amount of the sanction is calculated to be compensatory or it is intended to coerce compliance with a directive of the court. In general, civil coercive sanctions can be avoided by complying with the court's directive. As this Court stated in *In re Dyer*:

39

We recently explained the difference between civil sanctions and criminal sanctions: Civil penalties must either be compensatory or designed to coerce compliance. . . . In contrast, "a flat unconditional fine totaling even as little as \$50" could be criminal "if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance," and the fine is not compensatory. *Id. at 1138* (citation omitted).

322 F.3d at 1192. *Accord F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d at 1137-38; *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. at 829.

Similarly, in the case of incarceration, the sanction is civil only if the contemnor can secure release by compliance with a required behavior. *Hicks v. Feiock*, 485 U.S. 624, 646 (1988). Where, however, the punishment is for a definite period of time, the contempt is regarded as criminal. *Id.*

In its Sanctions Order, the District Court characterized the proceedings under which it imposed sanctions as a civil proceeding. (ER21, n.3.) However, that characterization squarely, and unambiguously, contradicts the principles quoted above from *Dyer*, *Hanshaw*, *Hicks* and *United Mine Workers*.

At the time that the District Court issued its Sanctions Order on May 6, 2013 (ER19-ER29), each of the five consolidated cases had been voluntarily dismissed. (ER153-ER166.) There was no possibility that the

40

sanctions either threatened or imposed by the District Court were intended to coerce compliance with any court directive. Thus, when the District Court threatened incarceration in its Show-Cause Order (ER10 & ER11), there was nothing that any of the individual Appellants could do to secure their release through compliance with a court directive. Similarly, there was nothing that any of the Appellants could do to avoid a monetary sanction threatened in the Show-Cause Order. (*Id.*)

Further, the Sanctions Order clearly states that it was set at 200% of the amount needed to compensate the Plaintiff. (ER28.) In effect, the sanction was "a flat unconditional fine", which has been held to constitute a criminal sanction. *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d at 1137-38; *In re: DeVille*, 280 B.R. at 497-98.

It is clear from both the context in which these sanctions were imposed and from the very characterization of these sanctions in the Sanctions Order that the purpose of these sanctions was to punish, rather than to compensate or coerce compliance with a court directive. Under both Supreme Court case law and the prior decisions of the Ninth Circuit, these sanctions were criminal and could only be imposed after conducting criminal contempt proceedings.

41

### 2. The type of criminal contempt proceedings required in this case was a proceeding for an indirect criminal contempt.

As discussed above, the case law distinguishes between a direct criminal contempt, in which the conduct takes place in the presence of the court, and an indirect contempt, in which the conduct takes place outside of the presence of the court. *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. at 827. While direct criminal contempts can be penalized summarily in light of the court's substantial interest in maintaining order, greater procedural protections are afforded regarding sanctions for indirect contempts. *Id.* at 833.

The contempt alleged in the instant case is, of necessity, an indirect criminal contempt. The Appellants were not parties, and had never appeared before the District Court in any of the consolidated cases. (ER35, ER56, ER74, ER92 & ER113.) Thus, it is impossible that the alleged offending conduct could have occurred in the presence of the District Court.

### B. The Procedures Implemented by the District Court Violated Procedural Due Process Requirements.

Criminal contempt is a crime in the ordinary sense. *Bloom v. Illinois,* 391 U.S. 194, 201 (1968); and, criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings. *Hicks v. Feiock,* 485 U.S. at 632.

42

In *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d at

1139, this Court delineated the specific procedural rights inuring to a person

or entity accused of an indirect criminal contempt, stating:

> . . . . . An individual charged with an indirect criminal
> contempt is entitled to the right to be advised of the charges,
> *Young*, 481 U.S. at 794; the right to a disinterested prosecutor,
> *id.* at 808; the right to assistance of counsel, *Cooke v. United
> States*, 267 U.S. 517, 537, 69 L. Ed. 767, 45 S. Ct. 390 (1925);
> a presumption of innocence, *Gompers v. Bucks Stove & Range
> Co.*, 221 U.S. 418, 444, 55 L. Ed. 797, 31 S. Ct. 492 (1911);
> proof beyond a reasonable doubt, *id.*; the privilege against self-
> incrimination, *id.*; the right to cross-examine witnesses, *Davis
> v. Alaska*, 415 U.S. 308, 315-16, 39 L. Ed. 2d 347, 94 S. Ct.
> 1105 (1974); the opportunity to present a defense and call
> witnesses, *Cooke*, 267 U.S. at 537; and the right to a jury trial if
> the fine or sentence imposed will be serious, *Bagwell*, 512 U.S.
> at 837 n.5.
>
> We hold that when a court uses its inherent powers to
> impose sanctions that are criminal in nature, it must provide the
> same due process protections that would be available in a
> criminal contempt proceeding.

A review of the record on appeal demonstrates that the District Court

erroneously concluded that its sanctions and proceedings were civil in

nature, and, therefore, made no attempt to provide Appellants with any of

the required criminal procedural safeguards described in *Hanshaw*.

1. **The District Court's procedures violated procedural due process by drawing adverse inferences from the invocation of Fifth Amendment rights by the individual Appellants.**

The District Court made clear, both at the April 2 Hearing and in its Sanctions Order, that its findings were based in part on adverse inferences that it drew from the invocation of Fifth Amendment rights by the individual Appellants.

At the April 2, 2013 hearing, the District Court stated,

> I want to know if some of my conjecture is accurate. The only way I can find out is to have the principles [*sic*] here and answer those questions.
>
> Now, if you say he will not answer those questions, then I will draw whatever inferences I think are reasonable from the facts as I know them.

(ER313 & ER314.)

Further, the Sanctions Order makes clear that the District Court made good on its threat, stating:

> Based on the evidence presented on the papers and through sworn testimony, the Court *finds the following facts, including those based on adverse inferences drawn from Steele, Hansmeier, Duffy, and Van Den Hemel's blanket refusal to testify.*

(ER21, emphasis added.)   As justification for its inferences, the District Court further explained:

> Even if their refusal was based on the Fifth Amendment privilege against self-incrimination, the Court still may draw adverse inferences against them in this civil proceeding. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

(ER21, n.3.)

The Supreme Court has made abundantly clear, on numerous occasions, that, in a criminal proceeding, a trier of fact is prohibited from drawing an inference of guilt from a defendant's invocation of his Fifth Amendment rights. *Griffin v. California*, 380 U.S. 609, 615 (1965). As the Court stated in *Ullmann v. United States*, 350 U.S. 422, 426 (1956):

> Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege.

Rather, "[t]he privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Slochower v. Board of Higher Education*, 350 U.S. 551, 557-58 (1956); *accord Griffin*, 380 U.S. at 613.

The District Court attempted to justify its right to draw adverse inferences from the individual Appellants' invocation of Fifth Amendment rights by characterizing the sanctions proceedings as a civil proceeding. (ER21, n.3.) Indeed, the case upon which the District Court relied, *Baxter v. Palmigiano*, 425 U.S. 308 (1976), was a civil proceeding. However, as discussed in detail above, the sanctions imposed by the District Court could

only be imposed through a criminal contempt proceeding, in which the District Court is precluded from drawing adverse inferences based on the invocation of Fifth Amendment rights.

### 2. The District Court's procedures violated procedural due process requirements by appointing a prosecutor who was not impartial.

A second major constitutional flaw in the procedures implemented by the District Court was its failure to appoint a disinterested prosecutor. In *Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 812 (1987), the Court characterize this particular deficiency as "an error whose effects are pervasive. Such an appointment calls into question, and therefore requires scrutiny of, the conduct of an entire prosecution, rather than simply a discrete prosecutorial decision." Indeed, this breach of constitutional rights is so major that the Court went on to hold that it cannot constitute harmless error. *Id.* at 813-14.

There is absolutely no question that the District Court violated this requirement by appointing Defendant's counsel, Pietz, as the *de facto* prosecutor. In its February 7, 2013 Show-Cause Order, the District Court "invite[d]" Pietz "to present evidence concerning the conduct outlined in this order." (ER10.) With the sole exception of Gibbs, whom Pietz cross-examined, Pietz played the role of prosecutor, deciding on the witnesses who

46

testified, selecting the documents to be presented to the District Court and presenting oral argument in favor of sanctions. (ER213-ER260 & ER292-ER300.)

Pietz was also invited by the District Court to appear at the April 2 Hearing against Appellants. (ER18.) There, Pietz took his place with his co-counsel at the prosecutor's table, with several boxes of documents ready to levy against the Appellant. (ER307 & ER309.)

After the March 11 and April 2 Hearings, the District Court granted Pietz leave to file post-hearing submissions against Appellants. (*E.g.,* ER629 & ER630.) Ultimately, the vast majority of the District Court's award of attorneys' fees to Pietz was attributable to the extensive prosecutorial work he performed after the underlying copyright infringement action had been dismissed. (*See* ER331-ER336.)

The standard for determining whether a prosecutor is disinterested was established in *Young v. United States, supra,* in which the Supreme Court held that "counsel for a party that is the beneficiary of a court order may not be appointed to undertake contempt prosecutions for alleged violations of that order." 481 U.S. at 790, 809. "[S]uch an attorney is required by the very standards of the profession to serve two masters." *Id.* at 814.

Under this standard, Pietz is the antithesis of a disinterested prosecutor. Pietz's John Doe client was a direct beneficiary of the District Court's orders vacating early discovery in the consolidated cases. The termination of early discovery rendered it impossible to ascertain the identity of Pietz's client, necessitating dismissal of Case No. 8333 and the other consolidated cases. Further, the alleged violation of the early discovery orders in the consolidated cases was one of the District Court's bases for finding sanctionable conduct. (ER26.) Under the Supreme Court's standard in *Young v. United States*, Pietz was, by definition, "counsel for a party that is a beneficiary of a [allegedly violated] court order."

Further, a simple review of Pietz's website, "pietzlawfirm.com" reveals many statements and links that are inconsistent with any contention that he was a disinterested prosecutor. As an example, regarding the litigation involving Ingenuity 13, Pietz provided the following solicitation on his website:

> This summer, Prenda Law, Inc. and its attorneys John Steele and Brett Gibbs have been busy filing lawsuits in California on behalf of Ingenuity 13, LLC. Ingenuity 13 is the latest plaintiff that Prenda is using to orchestrate its national campaign to coerce copyright "settlements" from ISP subscribers who may or may not have actually downloaded any of plaintiff's movies…. If you have received a letter from your ISP regarding an Ingenuity 13 subpoenas, or if you have been contacted by an Ingenuity 13 representative directly, please contact The Pietz Law Firm.

(ER376A & ER376B.)

The District Court's appointment of Pietz as the prosecutor in what, of necessity, was (or should have been) a criminal contempt proceeding was a direct violation of procedural due process.

> ### 3. The District Court's procedures violated procedural due process requirements by denying Appellants the ability to cross-examine witnesses.

In *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974), the United States Supreme Court held that the Sixth Amendment requires that defendants in a criminal action be allowed to cross-examine opposing witnesses. In explaining the importance of this right, the Court, quoting *Douglas v. Alabama*, 380 U.S. 415, 418 (1965), stated: "Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination." In *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d at 1139, this Court confirmed that the right of cross-examination extends to indirect criminal contempt proceedings.

As discussed above, the District Court in this matter conducted two hearings, the March 11 and April 2 Hearings. (*Supra* at 16-19 & 20-21.) The District Court only allowed testimony at the earlier hearing. (*Id.*) While Appellants were represented by counsel at the March 11 Hearing, an examination of the transcript of that hearing demonstrates that the District

49

Court did not permit Appellants' counsel to participate, much less conduct cross-examination of the witnesses hand-picked by Pietz or of Appellants' principal accuser, Gibbs. (ER192–ER194.)

The effect of denying Appellants the right to cross-examine witnesses is particularly pernicious in this case. None of the individual Appellants appeared as counsel or parties in any of the consolidated cases. Every one of the three categories of sanctionable conduct identified by the District Court (ER24-ER26) was performed directly by Plaintiffs' attorney of record, Gibbs. The only nexus between Appellants and the sanctioned conduct was Gibbs' exculpatory (and inaccurate) testimony that his conduct was directed by Steele and Hansmeier. (ER183; ER261 – ER267.)

The weakness and implausibility of Gibbs' attempt to extricate himself from his own conduct is demonstrated by the fact that, while filing the consolidated cases as Of-Counsel to Prenda Law, he affirmatively represented that the two persons whom he accuses of directing his conduct had no any ownership interest in the law firm. (ER183.) Gibbs fails to explain how, as Of Counsel for Prenda Law and the attorney of record in each of the consolidated cases, he was answerable to two individuals who have no ownership interest in the law firm. Perhaps even more to the point, Gibbs made no claim whatsoever that the third individual Appellant, Duffy,

performed any supervision at all over Gibbs in the consolidated cases, or at any other time. (ER264.)

Certainly, if Appellants were to be, in effect, convicted of criminal contempt on the basis of Gibbs' testimony, they had a right to challenge that testimony by cross-examining Gibbs. Failure to accord Appellants that right was clear error. *Douglas v. Alabama, supra.*

Moreover, it was also critical that Appellants' counsel be given the right to cross-examine Alan Cooper (ER208-ER223), whose testimony was the sole basis for the District Court's conclusion that Appellants and others had perpetrated a fraud on the Court by submitting acceptances of copyright assignments containing Cooper's forged signature. (*Id.*) Appellants should have been given the opportunity to examine Cooper with respect to his involvement with Ingenuity 13 and AF Holdings and whether the individual Appellants had any involvement whatsoever with respect to the allegedly forged assignment-acceptances.

In this case, the District Court's imposition of punitive (and thereby criminal) sanctions against Appellants without allowing the right of cross-examination is precisely what both the United States Supreme Court and the prior decisions of this Court have forbidden. *Pointer v. Texas*, 380 U.S. 400, 404 (1965); *F.J. Hanshaw Enters. v. Emerald River Dev., Inc., supra.*

### 4. The District Court's procedures violated procedural due process requirements by denying Appellants the ability to present a defense and call witnesses.

In addition to preventing Appellants from cross-examining witnesses, the District Court's procedures also prevented Appellants' counsel from calling witnesses and putting on a defense. The three individual Appellants were present at the April 2 Hearing. (ER309 & ER310.) As emphasized above, upon learning that each of these individuals were invoking their rights under the Fifth Amendment, the District Court abruptly terminated the hearing and refused to hear further argument from Appellants' counsel. (ER311-ER318.)

The termination of the hearing effectively cut-off Appellants' ability to present testimony from other witnesses. This was particularly important because Mark Lutz, whom Gibbs had identified as the chief executive officer of both Ingenuity 13 and AF Holdings (ER184), was present at the April 2 Hearing pursuant to the District Court's amended Show-Cause Order. (ER17.) Indeed, Lutz was identified to the District Court as being present at that hearing. (ER310.)

Lutz was in a position to explain the ownership of Ingenuity 13 and AF Holdings and (contrary to the District Court's findings (ER22)) to demonstrate that none of the individual Appellants had an ownership interest

in, or control of, either entity.  That definitive proof would have conclusively established that the District Court's inherent sanctioning authority did not extend to the individual Appellants.

The opportunity to present a defense and call witnesses has long been held to be a fundamental requirement of procedural due process in connection with indirect criminal contempt proceedings (*Cooke v. United States*, 267 U.S. 517, 537 (1925)) and has been explicitly endorsed by this Court.  *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d at 1139.  As with the denial of cross-examination, the District Court's denial of Appellants' right to present a defense by its sudden termination of the April 2 Hearing constitutes error.

## IV.  THE DISTRICT COURT COMMITTED CLEAR ERROR IN ALLOWING DEFENDANT TO RECOVER ATTORNEYS' FEES INCURRED IN PURSUING POST-DISMISSAL SANCTIONS AND IN REQUIRING APPELLANTS TO POST SUPERSEDEAS BONDS THAT, AMONG OTHER THINGS, INSURED DEFENDANT'S ABILITY TO RECOVER ATTORNEYS' FEES INCURRED IN DEFENDING THESE SANCTIONS ON APPEAL.

Of the $40,659.86 in costs and attorneys' fees awarded by the District Court, $21,090 was expended in connection with the post-dismissal sanctions hearings mandated by the District Court.  (ER331-ER336.)  Under this Court's decision in *Orange Blossom Limited Partnership v. Southern California Sunbelt Developers, Inc.*, 608 F.3d 456, 466-67 (9th Cir. 2010), a

monetary sanction issued pursuant to a District Court's inherent sanctioning authority cannot include attorneys' fees incurred in pursuing those sanctions. Thus, the District Court's inclusion of such attorneys' fees in its sanctions award was clearly erroneous.

In *Lockary v. Kayfetz*, 974 F.2d 1166, 1177-78 (9th Cir. 1992), this Court held the attorneys' fees generated by counsel in pursuing sanctions issued pursuant to both Fed. Rule Civ. Pro. 11 and the District Court's inherent sanctioning authority are not properly included in the sanctions award. While Rule 11 was subsequently amended to allow such attorneys' fees [6], in *Orange Blossom Limited Partnership v. Southern California Sunbelt Developers, Inc.*, 608 F.3d at 466-67 (9th Cir. 2010), this Court reiterated that sanctions issued pursuant to a court's inherent sanctioning authority cannot include attorneys' fees incurred in pursuing such sanctions.

The decision in *Orange Blossom Limited Partnership* is directly on point. In that case, 13 entities filed involuntary bankruptcy petitions against two alleged debtors. After the petitions were dismissed, the alleged debtors

[6] *See Margolis v. Ryan*, 140 F.3d 850, 854-55 (9th Cir. 1998), confirming that the portion of *Lockary* dealing with Rule 11 sanctions was overruled by the 1993 Amendments to Rule 11. However, in *Orange Blossom Limited Partnership*, this Court stated that *Margolis* did not overrule *Lockary* with respect to the prohibition against including such attorneys' fees in sanctions issued under the District Court's inherent authority. *Orange Blossom Limited Partnership v. Southern California Sunbelt Developers, Inc.*, 608 F.3d at 467, n.6.

54

filed motions against the petitioning creditors for costs, attorney's fees and punitive damages under § 303(i) of the Bankruptcy Act, 11 U.S.C. § 303(i). The Court found that 11 U.S.C. § 303(i) (like the copyright law involved in each of the consolidated cases) is a fee shifting provision that allows recovery of attorneys' fees by the prevailing party. 608 F.3d at 461-63. The Court even found that the debtors were entitled to attorneys' fees incurred in pursuing their claims for attorney's fees and damages under § 303. *Id.* at 463-65.

However, the Court drew the line at allowing attorneys' fees incurred in pursuing sanctions issued under the court's inherent authority. Citing to *Lockary*, this Court held that, while the fee shifting provision allowed recovery of attorneys' fees incurred in the substantive underlying litigation, it had no applicability to a post-dismissal motion for sanctions under the court's inherent authority. 608 F.3d at 466-67.

The holding in *Orange Blossom Limited Partnership* is dispositive of the issue in this case. The fee shifting provision of the copyright law permits the prevailing party to recover attorneys' fees incurred in pursuing or defending the copyright claim. However, under *Orange Blossom Limited Partnership*, that provision is wholly inapplicable to attorneys' fees incurred

55

in pursuing post-dismissal sanctions imposed under the court's inherent authority.

A moment's reflection reveals the practical rationale for the decision in *Orange Blossom Limited Partnership*. If a fee-shifting provision permitted the prevailing party in the substantive phase of the case to recover attorneys' fees in both the substantive litigation and in subsequent sanctions motions, the prevailing party would have every incentive to file a sanctions motion regardless of the merits. Under such an illogical procedure, a party that succeeded in defeating a sanctions motion would, nonetheless, be responsible for the attorneys' fees incurred by the party that filed the meritless motion. Such a rule would encourage sanctions motions in virtually every case involving a fee-shifting provision.

The District Court committed further error by holding that Defendant was entitled to recover attorneys' fees incurred in defending these sanctions on appeal and requiring Appellants to post a second supersedeas bond sufficient to cover those projected attorneys' fees. (ER33.) Citing to *Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950 (9th Cir. 2007), the District Court reasoned that the fee-shifting provision of the Copyright Act, 17 U.S.C. § 505, extended to attorneys' fees incurred by a party seeking sanctions. (*Id.*)

56

Even ignoring the fact that *Azizian* was not a copyright case, it has nothing to do with Defendant's right to recover attorneys' fees on this appeal. The issue regarding this appeal is whether the fee-shifting provision in the Copyright Act, 17 U.S.C. § 505, applies to attorneys' fees incurred in pursuing sanctions or defending sanctions on appeal. That issue was not addressed in *Azizian*. It was, however, addressed in both *Lockary v. Kayfetz, supra*, and in *Orange Blossom Limited Partnership*.

As discussed above, *Orange Blossom Limited Partnership* definitively holds that a fee-shifting provision does not allow a prevailing party in the substantive phase of a case to also recover attorneys' fees incurred in pursuing sanctions. That holding would bar Defendant's recovery of attorneys' fees incurred in pursuing sanctions before both the District Court and before this Court.

However, in *Lockary*, this Court discussed an additional reason why Defendant cannot recover attorneys' fees incurred in this appeal. In that case, this Court held that attorney's fees incurred in defending a sanctions award on appeal are not directly caused by the conduct of the sanctioned party, but rather, by the District Court's sanction. Quoting the United States Supreme Court's decision in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 407 (1990), this Court stated:

57

If the district court imposes *Rule 11* sanctions on the plaintiff, and the plaintiff appeals, the expenses incurred in defending the award on appeal are directly caused by the district court's sanction and the appeal of that sanction, not by the plaintiff's initial filing in district court.

974 F.2d at 1178. This holding was reaffirmed in *Orange Blossom Limited Partnership*, 608 F.3d at 466-67. Thus, under no circumstances would Defendant be permitted to recover attorneys' fees incurred in this appeal. Accordingly, the District Court's Bond Order was clearly erroneous.

## V.  IF THIS COURT DECIDES THAT IT IS APPROPRIATE TO REMAND THIS CASE FOR FURTHER PROCEEDINGS, APPELLANTS RESPECTFULLY ASK THAT THE CASE BE TRANSFERRED TO A DIFFERENT DISTRICT COURT JUDGE.

In the event that this Court remands this case to the District Court, Appellants very respectfully ask the Court to remand the case with instructions that it be transferred to a different District Court Judge. In making this request, Appellants are aware that, under this Court's prior precedents, a case is remanded to a different judge "only in unusual circumstances or when required to preserve the interests of justice." *United States v. Wolf Child*, 699 F.3d 1082, 1102 (9th Cir. 2012).

However, with total respect for Judge Wright, and without any intent to question his motives or integrity, the outward appearances of bias in this case are very similar to those in this Court's very recent decision in *Inst. of*

58

*Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 947-48 (9th Cir. 2013), in which this Court remanded with instructions that the case be transferred to a different District Court Judge.

In *Cetacean Research*, after reversing the District Court's denial of a preliminary injunction, this Court remanded the case with instructions that it be reassigned to a different District Court Judge, stating:

> Panels have broad discretion to reassign cases on remand when they feel justice or its appearance requires it. The district judge has expressed strong and erroneous views on the merits of this high profile case. Without ourselves reaching any determination as to his ability to proceed impartially or impugning his integrity, to preserve the appearance of justice, we conclude reassignment is appropriate. The appearance of justice would be served if the case were transferred to another district judge, drawn at random, and we so order in accordance with the standing orders of the Western District of Washington.

(725 F.3d 940, 947-48, citations omitted.)

There are strong parallels between the instant case and *Cetacean Research*. The instant case, like *Cetacean Research*, has been well-publicized. Moreover, the District Court Judge has expressed very strong, negative views about the Appellants, particularly the three individual Appellants.

One day after Case No. 8333 was assigned to him, Judge Wright expressed extreme negative views on the merits of litigation designed to enforce copyrights for adult films, characterizing Ingenuity 13's effort to

59

enforce its copyright as a "legal shakedown" and stating that it was his "duty to protect the innocent citizens of this district . . . even though a copyright holder's rights may be infringed by a few deviants." (ER147.) It should be emphasized that this statement was made months before the District Court had even commenced its sanctions investigation.

In addition, the District Court has described the three as "attorneys with shattered law practices". (ER21.) Without any investigation into the merits of the copyright infringement claims, the District Court has characterized the consolidated lawsuits as a use of the copyright law to compensate "starving attorneys in this electronic-media era to plunder the citizenry". (ER20.) The Court's overt animosity toward the three attorneys, who have never appeared in any of the cases before Judge Wright, was graphically highlighted in the District Court's assertion that the individual Appellants "suffered from a form of moral turpitude unbecoming of an officer of the court" (ER28); and, has even speculated that Appellants will hide assets to avoid paying sanctions (ER27).

The District Court's apparent naked hostility toward Appellants is further demonstrated in the breadth of sanctions imposed. In addition to imposing "punitive" monetary sanctions (ER28), the District Court has stated that it intends to notify the local and federal bars in which the

60

individual Appellants practice, refer the matter to the U.S. Attorney for the Central District of California, contact the Criminal Division of the Internal Revenue Service and notify all of the judges before whom these attorneys have pending cases. (ER28 & ER29.) Moreover, the District Court expressed disappointment in its inability to identify justification for imposing further sanctions, stating: "Unfortunately, other than these specific instances of fraud, the Court cannot make more detailed findings of fraud." (ER26.) Indeed, the vast majority of the Sanctions Order is devoted to the District Court's open objections of using the copyright laws to protect Ingenuity 13 and AF Holdings' rights in adult films, which are wholly unrelated to the three categories of conduct that were identified as sanctionable. (ER19-ER29.)

Finally, if the District Court's Sanctions Order is taken at its word, the monetary sanctions were set to discourage Appellants from appealing the Sanctions Order. The District Court specifically stated that its monetary sanctions were "calculated to be just below the cost of an effective appeal." (ER28, n.5.)

Thus, in the event that this Court deems a remand of this case for further proceedings to be necessary, the above-cited examples of hostility, coupled with procedural defects in the process used below, give at least the

appearance that Appellants will not receive an impartial hearing on remand and argue strongly for reassignment to a different District Court Judge.

## CONCLUSION

As discussed in detail above, the District Court committed reversible error by: extending its inherent sanctioning authority to individuals who were not subject to that authority; imposing criminal sanctions without affording Appellants the protections required by procedural due process in criminal cases; improperly calculating the monetary sanctions imposed by including attorneys' fees incurred in pursuing such sanctions; and, committing further error by requiring Appellants to procure supersedeas bonds that, among other costs, were calculated to reimburse Defendant for attorneys' fees incurred in defending these sanctions on appeal.

For each of these reasons, Appellants respectfully ask this Court to vacate the District Court's Sanctions Order, entered on May 6, 2013, and its Bond Order, entered on June 11, 2013.

Alternatively, if this Court determines that any further proceedings are necessary, due to the appearance of bias suggested by the District Court's strong, and often gratuitous, statements in its various Orders and at the two hearings conducted, Appellants respectfully ask that this case be reassigned to a different District Court Judge.

Dated:  November 18, 2013          Respectfully submitted,

                                              VOELKER LITIGATION GROUP
                                              Daniel J. Voelker, Esq.

                                              By:  /s/Daniel J. Voelker
                                              Daniel J. Voelker
                                              Attorney for Appellants:  Ingenuity 13,
                                              LLC;  AF Holdings, LLC; Prenda Law, Inc.;
                                              Paul Duffy, Esq.; Paul Hansmeier, Esq.; and
                                              John Steele, Esq.

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, there are no known pending cases in this Court which Appellants deem related to the cases that have been consolidated in this appeal.

Dated: November 18, 2013     Respectfully submitted,

VOELKER LITIGATION GROUP
Daniel J. Voelker, Esq.


By: /s/Daniel J. Voelker_____
Daniel J. Voelker
Attorney for Appellants: Ingenuity 13,
LLC; AF Holdings, LLC; Prenda Law, Inc.;
Paul Duffy, Esq.; Paul Hansmeier, Esq.; and
John Steele, Esq.

## CERTIFICATE OF COMPLIANCE

I certify that, in accordance with Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, Appellants' Opening Brief is proportionally spaced and has a typeface of 14 points. According to the word-count feature in Microsoft Word software used to prepare this brief, it contains 13,166 words, including footnotes, and is double spaced. This brief, therefore, complies with the 14,000 word type-volume limit established by Fed. R. App. P. 32(a)(7)(B).

Dated: November 18, 2013    Respectfully submitted,

VOELKER LITIGATION GROUP
Daniel J. Voelker, Esq.


By: /s/Daniel J. Voelker
Daniel J. Voelker
Attorney for Appellants: Ingenuity 13,
LLC; AF Holdings, LLC; Prenda Law, Inc.;
Paul Duffy, Esq.; Paul Hansmeier, Esq.; and
John Steele, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 18, 2013.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: November 18, 2013    /s/Daniel J. Voelker
                                     Daniel J. Voelker