Pages 1 - 144

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE NANDOR J. VADAS, MAGISTRATE JUDGE


AF HOLDINGS, LLC,                  )
                                   )
               Plaintiff,          )
                                   )
     v.                            )   NO. 3:12-cv-02396-EMC
                                   )
JOE NAVASCA,                       )
                                   )
               Defendant.          )   Kelseyville, California
_____)   Wednesday, August 28, 2013


**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**

**OF PROCEEDINGS - EVIDENTIARY HEARING**


FTR 1:16 p.m. - 4:23 p.m. =  187 minutes


**APPEARANCES**:


For Plaintiff:          **PAUL DUFFY, ESQ.**
                        2 North LaSalle Street, 13th floor
                        Chicago, Illinois  60602


For Defendant:          **NICHOLAS RANALLO, ESQ.**
                        2443 Fillmore Street, No. 380-7508
                        San Francisco, California  94115



    (All counsel and witnesses appeared by video conference.)


Transcribed by:         Leo T. Mankiewicz, Transcriber
                        leomank@gmail.com
                        (415) 722-7045

# I N D E X

**PAGE**

Recess - 3:31 p.m. to 3:41 p.m.                        107


                    INDEX OF EXAMINATION

WITNESS


GIBBS, BRETT

Direct Examination by Mr. Ranallo                      20
Cross-Examination by Mr. Duffy                         52


NEVILLE, DELVAN

Direct Examination by Mr. Ranallo                      98
Cross-Examination by Mr. Duffy                        110
Redirect Examination by Mr. Ranallo                   122
Recross-Examination by Mr. Duffy                      123

---oOo---

## E X H I B I T S

| PLAINTIFF'S EXHIBITS | W/DRAWN | IDEN | EVID |
|---|---|---|---|
| 1 | | 62 | 139 |
| 2 | | 70 | 140 |
| 3 | | 68 | |
| 4 | | 72 | 141 |
| 5 | | 75 | |
| 6 | | 81 | |
| 7 | | 83 | |
| 8 | | 87 | |
| 9 | | 119 | 143 |

| DEFENDANTS' EXHIBITS | W/DRAWN | IDEN | EVID |
|---|---|---|---|
| A | | 28 | 133 |
| B | | 34 | 134 |
| C | | 36 | 134 |
| D | | 47 | 134 |
| E | | 47 | |
| F | | 48 | |
| G | | 48 | |
| H | | 93 | |
| I | | 97 | |
| J | | 104 | 136 |
| K | | 126 | 136 |
| L | | | 139 |

1    <u>Wednesday, August 28, 2013</u>

2                                                          <u>1:16 p.m.</u>

3                        P R O C E E D I N G S

4            **THE CLERK:**  This case number C12-2396-EMC and JV,

5    AF Holdings, LLC versus Doe.  If the parties could state their

6    appearances for the record.

7            **MR. DUFFY:**  Paul Duffy for the plaintiff

8    AF Holdings.

9            **THE COURT:**  Good afternoon, counsel.

10           **MR. RANALLO:**  Nicholas Ranallo for the defendant Joe

11   Navasca.

12           **THE COURT:**  Good afternoon, counsel.  Can you see

13   me?

14           **MR. DUFFY:**  Yes, your Honor.

15           **THE COURT:**  Can you hear me?

16           **MR. RANALLO:**  Yes.

17           **THE COURT:**  Can you also hear me?

18           **MR. DUFFY:**  Yes.  Yes.

19           **THE COURT:**  All right, I can hear both of you.

20           All right, I have had a chance to review the

21   pleadings.  I've also reviewed the filings regarding my

22   questions for today's hearings, and we are in receipt of the

23   surreply brief by defense -- by plaintiff's counsel.  The

24   responses from defense counsel regarding my questions were more

25   than adequate.

1          I do, however, have some questions to plaintiff's

2     counsel, and I'd like to touch on those right now before we

3     start the hearing.

4          Let me ask you, how long do you think this hearing

5     will take?

6          **MR. DUFFY:**  At least, your Honor, probably less than

7     an hour.

8          **THE COURT:**  All right.  The only reason I'm saying

9     it's now 1:20 or 1:15.  At 3:15 I have a search warrant, and at

10    3:30 I have a phone conference that I have to attend, but that

11    would give you two hours.  So would that be enough to resolve

12    the issues within that time frame?

13         **MR. RANALLO:**  I would certainly hope so, your Honor.

14         **THE COURT:**  All right, excellent.

15         To plaintiff's counsel, and I apologize -- that was,

16    again...?  I'm sorry, I didn't quite catch your name, sir.

17         **MR. DUFFY:**  My name is Paul Duffy.

18         **THE COURT:**  Mr. Duffy.  All right, Mr. Duffy, I note

19    your -- the opposition was filed on July 16th and the reply was

20    filed on July 23rd.  The Court's a little concerned that you

21    waited until today to file an *ex parte* application to file a

22    surreply.  I do note that Mr. Steele signed his affidavit on

23    July 25th, so that was not the hold-up.

24         What do you contend to the arguments that defendant

25    raised for the first time in his reply?

1          **MR. DUFFY:**  I apologize, your Honor, I didn't hear

2    the last part of what you said.

3          **THE COURT:**  Can you hear me?

4          **MR. DUFFY:**  I can, but I kind of slightly missed

5    part of your last --

6          **THE COURT:**  I'm sorry.  What do you contend to the

7    arguments that defendant raised for the first time in his

8    reply?

9          **MR. DUFFY:**  Well, since he submitted a new affidavit

10   from Mr. Gibbs, and it's also raised new arguments regarding

11   the declaration and the purported expert report of the

12   individual who I believe is going to testify today regarding

13   hash values and so forth, and we've discovered, after some

14   additional research, that there's a fundamental error in the

15   individual's report that we addressed in the proposed surreply,

16   as well.

17         **THE COURT:**  But I guess, then, why did you wait

18   until today to file this?

19         **MR. DUFFY:**  I was originally not going to file it.

20   My understanding was the Court was accepting briefs in

21   connection with the questions I guess you forwarded last week.

22   So I decided I would change course and decided that I was going

23   to stick to the final one.

24         **THE COURT:**  All right, thank you.  Your description

25   in the response to the Court's August 20th inquiry of

1    AF Holdings ownership remains a bit vague.  I think you were

2    saying that the only people in any way involved or with a

3    financial interest in AF Holdings are Mr. Lutz and Mr. Gibbs,

4    and no one else?

5          **MR. DUFFY:**  And I believe we said that it was owned

6    by a trust, that AF Holdings is owned by a trust, the Salt

7    Marsh Trust, for which there are known currently of up to five

8    beneficiaries.

9          The trust documents have stated, I believe, that

10   there's -- and I apologize, your Honor, my -- my Mr. Lutz was

11   supposed to be here today, and I understand his flight landed

12   several hours ago and he's not here.  We did include an

13   affidavit with -- of his in connection with the filing today,

14   and it states clearly the owner of the company is the Salt

15   Marsh Trust.  The beneficiaries will be the children and heirs

16   of Mr. Lutz.  Currently, he doesn't have any children or heirs.

17   There's not a defined beneficiary.  Mr. Lutz has acted as the

18   CEO for -- or was a managing member for the company -- for the

19   entity.

20         **THE COURT:**  I guess it begs the question:  Where did

21   the money go?

22         **MR. DUFFY:**  Where did what -- the settlement money?

23         **THE COURT:**  Correct.

24         **MR. DUFFY:**  The settlement money went to IOTA

25   accounts (phonetic) on behalf of AF Holdings to fund -- to fund

litigation, that was paid at the direction of AF Holdings.

**THE COURT:**  To whom?

**MR. DUFFY:**  Well, to AF Holdings.  I believe that most of the money went to pay for litigation costs, the cost of litigation in connection with the matter --

**THE COURT:**  To whom?

**MR. DUFFY:**  -- there were final --

**THE COURT:**  To whom?

**MR. DUFFY:**  To the Court, to the attorneys who worked on the cases, and to AF Holdings, and --

**THE COURT:**  And those attorneys would have also been Mr. Lutz and Mr. Gibbs, is that correct?

**MR. DUFFY:**  If -- I'm sorry?

**THE COURT:**  And would those have also been Mr. Lutz and Mr. Gibbs?

**MR. DUFFY:**  I don't know how much money went to Mr. Gibbs.  I know the money in the Elmo account (phonetic) was distributed in accordance with Mr. Lutz' instructions.

**THE COURT:**  All right.  Let me ask you another question.  Why hasn't your client paid the fees and costs Judge Chen awarded plaintiffs in this matter?

**MR. DUFFY:**  I believe my client attempted to, early on.  There were three cases where -- and I believe at the time, Judge Breyer had given that award of attorneys' fees and there were two other cases pending on attorneys' fees as well, and

1    I can't testify on behalf of my client.  I know my client did

2    make a very diligent and reasonable attempt to settle the

3    matter, and to pay defendant's counsel -- well, the settlement

4    amount, to settle the three cases.

5         I believe, given circumstances since then, I believe

6    he doesn't have many resources left.  So I don't know if he's

7    able to pay or not -- the company AF Holdings is capable of

8    paying or not.

9    **THE COURT:**  All right.  Let me ask defendant.  I do

10   have one question.  Did you get a chance to look at the

11   documents filed by plaintiffs?

12   **MR. RANALLO:**  I did briefly, not as much the

13   surreply as the bench memorandum, but I did take a look at them

14   briefly.

15        **THE COURT:**  Plaintiff argues the Court cannot hold

16   non-parties liable under 28 U.S.C. 1927 unless it obtains

17   jurisdiction over them.  That's document 106, at 17.  That

18   raises an issue.  I'm concerned about that.

19        If you would like a chance to reply later on by way

20   of writing, I understand that, but can I ask, before we start

21   this hearing, what's your opinion regarding that issue?

22        **MR. RANALLO:**  Well, your Honor, the individuals who

23   we're seeking sanctions against were served by mail, despite

24   what their affidavits say, and I actually have dated receipts

25   of mailing with me today that I can -- that basically shows

1    packages were delivered to Minneapolis and Miami, mailed on the

2    date that the motion was filed.

3                THE COURT:  All right.

4                MR. RANALLO:  To the extent they claim not to have

5    gotten them, that simply means they don't receive mail where

6    they claim to accept service.

7                THE COURT:  All right.  Those were the questions

8    that I had before the evidentiary portion.  It's defendant's

9    motion, so why don't you proceed, counsel.

10                MR. RANALLO:  Would you like me to address the

11    questions from the bench memorandum, or simply begin with

12    witnesses?

13                THE COURT:  If you have something that you want to

14    add other than what's already been submitted, please proceed.

15    Otherwise, the Court will obviously review the previous

16    filings.

17                MR. RANALLO:  Okay, so I'll just make a couple notes

18    on the bench memorandum filled by Mr. Duffy this morning.

19    I think there are several parts that are not accurate either at

20    all or at least partially inaccurate.

21                We can start basically on page 6 of that.

22    Basically, he -- Mr. Duffy argues that the Los Angeles court

23    did not issue an order --

24                THE COURT:  Counsel?

25                MR. RANALLO:  -- to show cause --

1          **THE COURT:** Counsel? Counsel? Counsel?

2          **MR. RANALLO:** -- directing plaintiff's --

3          **THE COURT:** Counsel? I'm sorry to interrupt. Refer

4     to it also by line number, page and line number, so that we're

5     clear as to what you're talking about.

6          **MR. RANALLO:** Sure. It would be page 6, beginning

7     at line 3. He says, "The Los Angeles court did not issue an

8     order to show cause regarding plaintiff's copyright

9     assignment."

10          I think, as an initial matter, that's absolutely

11     untrue. The initial order to show cause specifically brings up

12     the Alan Cooper issue, and that issue remains all throughout.

13          Another -- on that same page, at line 16 and 17, he

14     indicates that Mr. Lutz appeared via telephone at the show

15     cause hearing --

16          **THE COURT:** Well --

17          **MR. RANALLO:** -- on March 11.

18          **THE COURT:** Counsel, I am looking at -- I believe we

19     were referring to Ingenuity 13, LLC, plaintiff, versus John

20     Doe, defendant, is that correct?

21          **MR. RANALLO:** That is correct.

22          **THE COURT:** I do note that on page 2 of the copy

23     that I have, under Procedural History, the very first line is,

24          "The Court issued its February 7th, 2013 order to

25          show cause re: sanctions to allow counsel Brett

1          Gibbs to explain why he ignored the Court's

2          discovery stay order."

3     Is that the one you're referring to?

4          **MR. RANALLO:**  That is the one I'm referring to, yes.

5          **THE COURT:**  Thank you.

6          **MR. RANALLO:**  And that specifically includes

7 discussion of the Alan Cooper forgery in this (inaudible).

8          I think it's also worth noting -- moving on through

9 his memorandum, basically, as far as the citations to issue

10 preclusion, you'll notice that they cite to a lot of Eighth

11 Circuit law, perhaps because they just filed a motion there on

12 the same issues, but as far as the actual standard, whether it

13 be, you know, offensive issue preclusion or defensive use,

14 there is no Ninth Circuit standard, and the standard that they

15 cite is far more strict, frankly, than anything in Ninth

16 Circuit precedent.

17          **THE COURT:**  So I'm going to -- so, counsel --

18 counsel -- I'm going to --

19          **MR. RANALLO:**  Yes.

20          **THE COURT:**  -- assume that you would prefer that the

21 Court not adopt the Eighth Circuit standard.

22          **MR. RANALLO:**  No.  No, I would not.

23          **THE COURT:**  All right.

24          **MR. RANALLO:**  And if you would like, I can recite

25 the Ninth Circuit standard for you that, you know, it's

1    actually in my papers repeatedly --

2            THE COURT:  All right, but --

3            MR. RANALLO:  -- but it seems clear that it doesn't

4    match the standard recited by the plaintiffs herein.

5            THE COURT:  All right.

6            MR. RANALLO:  I think also I'll point you to

7    page 14, at line 20.  It says,

8                "While the Los Angeles court discussed the Alan

9                Cooper issue, it only found that the issue 'smacked

10               of fraud,' [and] not that it constituted actual

11               fraud."

12           If you look at Findings of Fact number 9, I think

13   it's pretty clear that the principals stole the identity of

14   Alan Cooper, and then the principals fraudulently signed the

15   copyright assignment for Popular Demand, which is the work at

16   issue herein.

17           So to the extent, I think, that they're arguing

18   there was no finding of fraud, I would just have to say that

19   that's simply false.

20           THE COURT:  So I'm -- excuse me, counsel -- so I am

21   looking, again, at the Central District order filed May 6, 2013

22   in the *Ingenuity 13, LLC* case, and that's an opinion by Judge

23   Wright, of course, and on page 3 of my copy, I note here, as

24   you indicated, under Findings of Fact, that,

25               "The Principals stole the identity of Alan Cooper

1          of 2170 Highway 47 North, Aisle, Minnesota."
2     I'm not quite sure how that's pronounced.
3               "The principals fraudulently signed the copyright
4               assignment for Popular Demand using Alan Cooper's
5               signature without his authorization, holding him out
6               to be an officer of AF Holdings.  Alan Cooper is not
7               an officer of AF Holdings and has no affiliation
8               with plaintiffs other than his employment as a
9               groundskeeper for Steele.  There is no other person
10              named Alan Cooper related to AF Holdings or
11              Ingenuity 13."
12         **MR. RANALLO:**  That is correct.  One more point that
13    plaintiff's bench memorandum brings up is the issue of --
14    considering issue preclusion *sua sponte*, more or less.
15    Actually, they say, basically, that I -- that the defense has
16    been waived.  I actually have two cites to Ninth Circuit cases
17    that -- holding that the court may consider preclusion on a *sua*
18    *sponte* basis.
19              In *Hawkins v. Risley*, that's R-I-S-L-E-Y, 984 F.2d
20    321 at 324, the Ninth Circuit expressly states that the
21    magistrate had authority to *sua sponte* apply *res judicata*
22    effect to a prior judgment where the defendants prevented the
23    issue in motion for continuance and the parties had an adequate
24    opportunity to examine and contest the issue of preclusion.
25              In 1986, in *McClain v. Apodaca*, it looks like,

1    A-P-O-D-A-C-A, at 793 F.2d 1031, the Ninth Circuit approved *sua*

2    *sponte* consideration of preclusion as long as the Court heard

3    evidence on it and gave both parties an opportunity to address

4    the issue.

5              So I would say that has been satisfied here.  To the

6    extent that the Court is concerned about addressing the issue

7    *sua sponte*, I believe there is ample authority for it.

8              Another point, actually, that's made in the bench

9    memorandum is that sanctions under 28 U.S.C. 1927 are not

10   appropriate for the entire action, but there's significant case

11   law holding that if the case itself should never have been

12   filed, then the entire case is (inaudible) vexatious, then

13   sanctions for the entire amount of the award are appropriate.

14             Moving on, basically, I think the issue of

15   preclusion is important in this, and, you know, we can get to

16   it in more detail if you want or, you know, I'm happy to leave

17   it on the brief beyond that.

18        **THE COURT:**  Why don't we just -- I think it's been

19   fairly well briefed by both sides.

20        **MR. RANALLO:**  Okay.  And then, if I could touch on,

21   for a moment, the issue of contempt sanctions and just -- you

22   know, I think it's something that's sort of not -- not touched

23   on in the plaintiff's bench memorandum, though it was

24   specifically -- a specific question, and so I would just like

25   to take a second and, you know, go through sort of our

1    interpretation of it, if you're so inclined, as far as when the

2    attorney fee award represents a money judgment and, if so,

3    whether contempt is appropriate.

4            As I indicated in my memorandum, it's not actually

5    as easy a question as it seems to be.  Certainly an attorney

6    fee award appears to be a money judgment, I think that's clear.

7    But if you look at, on the cases cited in there, especially the

8    cases interpreting the EAJA attorneys' fees provisions, there,

9    the Northern District and the Eastern District expressly find

10   that attorney fee awards in that case are necessarily ancillary

11   to the actual relief sought, and therefore, are more akin to

12   equitable relief than a money judgment.

13           In the event that this Court does consider it in

14   that way, I think that contempt sanctions are particularly

15   appropriate in this case, especially given what Mr. Duffy just

16   said about, you know, their purported attempts to pay.

17           I would note that they already had a judgment

18   against them for attorneys' fees at that point, which has still

19   not been satisfied either.

20           So to the extent that they did have the money to

21   satisfy it at that point, and that money is no longer anywhere

22   to be found, I think that that's a clear issue of, you know,

23   contempt of court, if not, you know, hiding assets

24   intentionally.

25           **THE COURT:**  Well, I mean --

1          **MR. RANALLO:**  There's certainly a lot of questions

2     I'd like to ask Mr. Lutz about that, if he gets here --

3          **THE COURT:**  Well, let me -- let me just -- I mean,

4     as somewhat of a practical matter, and I mean no disrespect,

5     but if you go after AF Holdings for a money judgment, you're

6     basically drilling a dry well.  The only place that you're

7     going to find any money to satisfy these attorneys' fees are if

8     they're in the form of sanctions.

9          **MR. RANALLO:**  I believe that's probably true,

10    although I'm -- you know, we haven't gotten that far into the

11    execution proceedings, but I know that for fraudulent transfers

12    and that type of thing, you are not left necessarily without a

13    remedy, although it may be, as you say, a dry well.

14         **THE COURT:**  Well, let me ask you this.  Have you

15    filed a request for an order of examination?

16         **MR. RANALLO:**  We have not yet, actually.  I intend

17    to -- I have three cases, like I said, that are all proceeding

18    in the judgment phase at this point.  I've actually subpoenaed

19    Mr. Duffy's trust records, which he has actually -- he's not

20    provided.

21         So to the extent that, you know, these funds, as of

22    February 19th, according to AF Holdings' 30(b)(6)

23    representative, were all in Prenda Law trust accounts, and now

24    they no longer are, I think it's important to get ahold of

25    those records before, you know, trying to get too much out of a

```
1    debtor's examination, I guess.
2              MR. DUFFY:  May I address some of these issues, your
3    Honor?
4              THE COURT:  In just -- in just a moment, counsel.
5    Thank you.
6              Did you -- did anybody attempt to file a temporary
7    restraining order to keep the money in place until this was
8    litigated?
9              MR. RANALLO:  I did not.
10             THE COURT:  All right.  Anything further, counsel?
11   And you indicated you have witnesses.
12             MR. RANALLO:  Yes, I do have two witnesses, Brett
13   Gibbs and Delvan Neville, to speak about basically the issues
14   in -- that were raised in the original sanctions motions,
15   vis-a-vis HMO.
16             THE COURT:  All right.  Why don't we go ahead and
17   allow plaintiff to put on his evidence, and then you can put on
18   a rebuttal as you see fit, counsel, all right?
19             MR. DUFFY:  A rebuttal I can also, your Honor?
20             THE COURT:  Yes, of course.  Why don't you proceed,
21   counsel.
22             MR. RANALLO:  I think we can go ahead and start with
23   Mr. Gibbs, then.
24             THE COURT:  That would be fine.
25             THE CLERK:  Please raise your right hand.
```

```
1                    (Inaudible colloquy.)

2           THE CLERK:  Do you solemnly swear or affirm that the

3    testimony you are about to give in the matter now pending

4    before this court shall be the truth, the whole truth and

5    nothing butt truth, so help you God?

6           THE WITNESS:  I do.

7                          ---oOo---

8                          BRETT GIBBS,

9    called as a witness for the DEFENDANTS, having been duly sworn,

10   testified as follows:

11          THE CLERK:  Please state your full name and spell

12   your last name.

13          THE WITNESS:  My name is Brett Gibbs.  Last name is

14   G-I-B-B-S.

15          THE COURT:  Mr. Gibbs, can you hear us?

16          THE WITNESS:  I can.

17          THE COURT:  And we can hear you.  Can you see us?

18          THE WITNESS:  I can.

19          THE COURT:  And can you see me?

20          THE WITNESS:  I can.

21          THE COURT:  All right, good.  I can see you.  Thank

22   you.

23          Why don't you proceed, counsel.

24          MR. RANALLO:  Thank you, your Honor.

25
```

1       <u>**DIRECT EXAMINATION**</u>

2       **BY MR. RANALLO:**

3       **Q.**   Good afternoon, Mr. Gibbs.  I know that you have testified

4       on these issues before, and to that end, we'll start basically

5       by perhaps rehashing some of the things that we went over on

6       March 11th.

7       **A.**   Okay.

8       **Q.**   First of all, I'd like to just start with, when you were

9       hired by Steele Hansmeier, and -- when were you hired by

10      (inaudible)?

11      **A.**   I believe it was March of 2011.

12      **Q.**   And when did Steele Hansmeier become Prenda Law?

13                  **MR. DUFFY:**  Objection to the form of the question.

14                  **THE COURT:**  Overruled.

15                  **THE WITNESS:**  I believe it was early 2012.  That's

16      what I remember.  Somewhere in there.

17      **BY MR. RANALLO:**

18      **Q.**   And what do you recall about that transition?  Let me

19      rephrase that.

20                  Who did you speak to regarding that transition?

21      **A.**   I was informed by Paul Hansmeier and possibly John Steele

22      as well.  They basically said that they were -- the firm was

23      changing names, and it was changing, I think it was, over to

24      Prenda Law, but everything was kind of to go as it was in

25      Steele Hansmeier.  So I would be instructed by John Steele and

1  Paul Hansmeier, as I was before.  Nothing would change in that

2  sense.

3  **Q.**  And so Mr. Steele and Mr. Hansmeier continued to be your

4  sole points of access as far as client contact?

5  **A.**  Absolutely.  They actually told me that, you know, they

6  were the ones that were contacting the client.  That was sort

7  of their role.  They were, you know, I guess, for Steele

8  Hansmeier, they were the partners.  They were the ones that had

9  the client contact.  And so I was essentially of counsel.

10  I was a 1099 contract attorney for them.

11          So, yeah, they told me that they had all the client

12  contact, and whenever I needed to verify anything, I verified

13  with them, who they told me had the client contact.

14          **THE COURT:**  Mr. Gibbs, let me -- Mr. Gibbs, just let

15  me make sure I'm clear.  Mr. Steele and Mr. Hansmeier were

16  partners of which firm?

17          **THE WITNESS:**  They were partners of Steele

18  Hansmeier.

19          **THE COURT:**  Steele Hansmeier.  And you were --

20          **THE WITNESS:**  Yes.

21          **THE COURT:**  -- you were not an associate, but a

22  contract attorney.

23          **THE WITNESS:**  I -- well, I was classified as a 1099

24  contract attorney, yes.

25          **THE COURT:**  All right, thank you.

1          THE WITNESS:  Yes.

2          THE COURT:  Counsel, go ahead.

3          THE WITNESS:  As I were saying before, they did

4    not -- when we went over to Prenda, the entire (inaudible)

5    didn't turn over.  It was -- I was essentially, essentially

6    taking my orders and my instructions from Paul Hansmeier and

7    John Steele.

8          THE COURT:  All right.  Thanks.

9          THE WITNESS:  It was no different than what it was

10   for Steele Hansmeier.

11         THE COURT:  All right, thank you.

12   BY MR. RANALLO:

13   Q.   And you're aware that they have, in the time since your

14   March 11th testimony, on numerous occasions, sort of denied

15   your version of events.  Is that your...?

16   A.   I'm aware of it.

17   Q.   And in fact, concerning the Central District of California

18   case, they actually said that they had no contact with you

19   about it whatsoever.  Is that true?

20   A.   Yes, that's true.

21   Q.   And did you have contact regarding that Central District

22   of California case?

23   A.   Yes, we did.

24   Q.   And do you know approximately -- so the first order to

25   show cause was issued on February 7th.

1   **A.**   Yes.

2   **Q.**   Do you recall when you would have spoken to them?

3   **A.**   Yeah, I talked to him that day.  I was pretty shocked by

4   the allegations in there.  I had no ownership interest in

5   AF Holdings or Ingenuity, and that was essentially what the

6   Court was assuming at that point, and so I called Paul

7   Hansmeier and basically said, "Look, you know, you guys have to

8   indemnify me here.  You know, there's got to be something you

9   can do.  You've got to hire an attorney or something like that,

10  to straighten this whole thing out, and explain to the Court

11  why it's wrong, essentially."

12          And Hansmeier referred me over to John Steele,

13  because his insurance, or -- his insurance for, I guess, Prenda

14  Law at that time, he knew all the -- he had all the contacts.

15  So he knew who to call, he knew the insurance policy number and

16  everything like that.

17          So I, you know, contacted him, eventually got an

18  e-mail back saying, "Here is the information, here is my

19  contact, here is the company to call," and all that sort of

20  thing, "Call them" and, you know, that led to representation by

21  the insurance company.

22          **THE COURT:**  Well, let me ask you this.  Mr. Gibbs,

23  I'd like to ask a question.

24          Mr. Gibbs, is it your position, from the time you

25  were employed at the Steele Hansmeier/Prenda Law firm, that

1    Mr. Steele, Mr. Hansmeier, and Mr. Duffy maintained full

2    control over the entire copyright litigation operation, and

3    that they dictated the strategy to employ in each case, ordered

4    their hired lawyers, including yourself, and witnesses to

5    provide disinformation about the cases and the nature of their

6    operation, and possessed all financial interest in the outcome

7    of each case?

8         THE WITNESS:  Um, I couldn't quite hear what you

9    said.  Information or disinformation, or...?

10        THE COURT:  That witnesses provide disinformation

11   about the cases and the nature of their operation and possessed

12   all financial interest in the outcome of each case.

13        THE WITNESS:  Well, okay, I testified that it was

14   John Steele and Paul Hansmeier that were in control the entire

15   time.  I wouldn't necessarily say that Paul Duffy was in

16   control, because these two guys were partners.  They were the

17   ones that ran the show.  They made it very clear that they were

18   the bosses, essentially.  They had different styles of

19   supervising people, but, you know, they were making decisions

20   together.

21        Any major decisions, literally I had conversations

22   with Paul and with John where they would -- either one of them,

23   I would have them on the phone, and they would say, "You know

24   what, this decision that I need to talk to John about, and then

25   we'll let you know what needs to happen."

GIBBS - DIRECT / RANALLO

1        And, you know --

2            THE COURT:  Just so that the record is clear, you've

3    been using first names.  Would you please refer to the senior

4    lawyers or the principal lawyers by their last name.

5            THE WITNESS:  I apologize.  I will.  And that would

6    be -- I'm referring to John Steele and Paul Hansmeier.

7            THE COURT:  Thank you.

8            THE WITNESS:  And these were are the individuals

9    that were directing everything, essentially, for Steele

10   Hansmeier and then for Prenda Law, as well.  I don't know why,

11   I can only speculate as to why they switched over to Prenda

12   Law, and -- I have no idea, but all I know is that things

13   continued the way they were, essentially, from that point on.

14   So...

15   BY MR. RANALLO:

16   Q.   Let me see if I could -- at the initial case management

17   conference in this case, and I believe it was November 30th,

18   was that the first you heard of this Alan Cooper issue?

19   A.   Yes, I believe it was.  Yes.

20   Q.   Okay, and did you, following that hearing, did you speak

21   to Mr. Steele and Mr. Hansmeier?

22   A.   Yes.  I spoke with -- I spoke with Paul Hansmeier.

23   I believe I might have spoken with John Steele, as well.

24   I spoke more, your Honor, with -- with Paul Hansmeier.  We just

25   got along better.

1        And so I spoke with him, I asked him, you know,

2    what's going on here?  Why are these allegations out there?  Is

3    there any truth to them?  What is -- you know, I need an

4    explanation here.  Because like, obviously, I don't want to do

5    something -- I don't want to be involved in any fraud.

6        And I was told by Paul Hansmeier that I had nothing

7    to worry about, that it was -- these were -- (cough obliterates

8    audio) theories.  And, you know, he actually told me, you know,

9    at some point in time, we're just -- John and I are trying to

10   pine it out, but at some point in time, we are going to get the

11   truth out, and so -- but for right now, you can rest assured

12   that these -- the assignments are completely valid, there's no

13   issue with Alan Cooper's signature, and on top of it, even if

14   there was an issue with the Alan Cooper signature -- this is

15   from Paul Hansmeier -- even if there was an issue with Alan

16   Cooper's signature, it would be moot because the assignee did

17   not even sign the assignment.

18       So that was my conversation with him.  I believed

19   him, and now, of course, where this subject has come up,

20   I don't necessarily believe him anymore.

21       **THE COURT:**  All right, why don't we proceed by

22   question, question and answer.  Counsel, proceed.

23       **MR. RANALLO:**  Yes.

24   **Q.**   I'd like to refer you to -- see if we can do this -- I'm

25   going to refer you to a spreadsheet, here.  Can you tell me

1    what this spreadsheet is?

2    **A.**    Yeah, it's a spreadsheet that I got from AT&T.  I have

3    AT&T cell phone service, I have AT&T home phone service, and so

4    I -- actually, my mother requested, since it was in her name,

5    so my mother requested the AT&T records, and I -- I received my

6    records back.

7    **Q.**   And you isolated Mr. Hansmeier's calls in these records,

8    is that true?

9    **A.**    That's correct, that is sorted, the Excel sheet, by

10   number, and came up with clumps of numbers.  I referred to my

11   cell phone for numbers, and I -- your Honor, that (651)

12   399-1583 was the number for Paul Hansmeier in my cell phone,

13   and I -- I used to talk to him a lot when I was working for

14   him.

15   **Q.**   Okay, so let me refer you to --

16          **THE COURT:**  Counsel?  Counsel?  Counsel, are you

17   going to want to mark a hard copy of this and move this into

18   evidence?

19          **MR. RANALLO:**  I certainly can, yes, if the Court

20   will accept it.

21          **MR. DUFFY:**  Your Honor, may I -- I don't have

22   necessarily an objection at this point, but I would request the

23   Court enter some type of protective order or whatever to

24   prevent Mr. Hansmeier's personal telephone number from being

25   broadcast.

GIBBS - DIRECT / RANALLO

1          There may be situations in this case, for instance,

2     from Rule 30(b)(6) depositions was taken, the transcript was

3     circulated worldwide, including the individual's home address,

4     before the Court ever saw it, and because this is personal

5     information and his phone number, and there's some very wide

6     potential for harassment, given how the defense counsel have

7     acted in this and other litigation, I would request some type

8     of -- that the number be redacted or be subject to a protective

9     order.

10          **THE COURT:**  All right, why don't I take that under

11     submission at this time.  Do you have a hard copy with you,

12     counsel?

13          **MR. RANALLO:**  Yes, I do.

14          **THE COURT:**  Why don't you go ahead and mark that as

15     Defendant's A in order, and I'm going to assume that it's a

16     true and accurate representation of what's before the Court on

17     the screen right now, and I'll move that into evidence, subject

18     to a protective order -- request for a protective order.

19                    (Defendant's Exhibit A

20                         marked for identification and received in

21                         evidence)

22          **MR. DUFFY:**  Thank you, your Honor.

23          **MR. RANALLO:**  Okay.  If I could just clarify, for a

24     second, I actually have similar records corresponding to

25     Mr. Steele, Mr. Hansmeier, Paul Hansmeier, Paul Duffy and the

GIBBS - DIRECT / RANALLO

1    number of individuals.  Would you like them cumulatively as

2    Exhibit A, or separate, per individual?

3             THE COURT:  Per individual, as the testimony

4    proceeds.

5             By the way, does defense counsel have any objection

6    to a protective order as outlined by defense counsel -- by

7    plaintiff's counsel?

8             MR. RANALLO:  No, I do not, your Honor.

9             THE COURT:  All right, thank you.

10            MR. DUFFY:  And your Honor, just so the record's

11   clear, I would renew my request with respect to all personal

12   telephone numbers -- any evidence introduced which includes

13   personal telephone numbers.

14            THE COURT:  All right, I'll take that under

15   submission.

16            Why don't you proceed, counsel.

17   BY MR. RANALLO:

18   Q.   So the calls that are highlighted on this screen right

19   now, those have a date next to them of November 30th, 2012.  Do

20   you recall, was that -- strike that.

21            Do you recall when the initial case management

22   conference was in this case?

23   A.   It was that day, on November 30th.

24   Q.   And so it appears to me that you spoke with Mr. Hansmeier

25   for over an hour on that day, is that correct?

GIBBS - DIRECT / RANALLO

1   **A.**   That is correct.

2   **Q.**   Okay.  And now, if we can move down just a little to --

3   **A.**   And I mean, in terms of content, I, just as a practice,

4   when I would have these hearings, I would check in with

5   Mr. Hansmeier and just let him know how the hearing went.

6   I would do that on my way home.  It was just a practice of

7   mine.

8   **Q.**   Understood.

9   **A.**   Or I would do it from the house, or either way.

10   **Q.**   Now I've highlighted four more of them.  These all were

11   made on February 7th, is that correct?

12   **A.**   That is correct.

13   **Q.**   And February 7th was the date of Judge Wright's order to

14   show cause, is that correct?

15   **A.**   That is correct.

16   **Q.**   And so is it your recollection, or your belief, that you

17   would have been discussing the matter before Judge Wright in

18   these phone calls on February 7th?

19   **A.**   Absolutely.  Actually, the entire day was consumed by that

20   order, for me at least, because I was just -- it kind of came

21   out of the blue and the allegations threw me off.  And so I --

22   my focus was on that order, and trying to solve it or

23   understand it.

24   **Q.**   So it looks like between that Thursday and the next

25   Thursday on February 14th, you spoke with Mr. Hansmeier almost

1    daily, is that correct?

2    **A.**    That is correct.

3    **Q.**    And primarily, these calls would have been about the

4    Central District of California case, is that correct?

5    **A.**    Primarily, yes, and again, also I informed them during

6    that time period that I would no longer be working for them,

7    for Prenda Law, and for John Steele or Paul Hansmeier.

8    **Q.**    Understood.

9    **A.**    Or for Live Wire, as well, which is, in the name.

10    **Q.**    As long as you mention it, let's discuss that situation,

11    which came up on March 11th.

12          I believe you previously testified that for a time

13    it was your understanding that Live Wire Holdings actually

14    owned AF Holdings, is that correct?

15    **A.**    That's correct.

16          **THE COURT:**    You know, counsel, I'm sorry -- counsel?

17    Counsel, I'm sorry, this is, I think, the third image you have

18    shown the Court.  So the first image would be Defendant's A,

19    the second image would be defendant's B, and I believe this

20    image would be Defendant's C.  Is that correct?

21          **MR. RANALLO:**    Pardon me.  These are all a single

22    file, and were all basically -- I mean, it's multi-pages, but

23    they were all part of the same cell phone record for the same

24    individual.  So I made them all into this.

25          **THE COURT:**    All right, thank you.

1          **MR. RANALLO:**  So they're just different lines of the

2    same spreadsheet.

3          **THE COURT:**  Thank you.  Proceed.

4    **BY MR. RANALLO:**

5    **Q.**  Okay.  So now, if we could just focus on line 520 for a

6    second, that number in the right column that I have

7    highlighted, what does that represent?

8    **A.**  The total time I've spoken with John -- with Paul

9    Hansmeier, on his cell phone, from my cell phone, from the

10   beginning of 2012 up till I left the company, essentially,

11   which was -- or the day after I left the company, which was

12   on -- I left the company on 2/28/2013.

13   **Q.**  And so I take that to mean that there were over 4500

14   minutes of conversation during that period?

15   **A.**  Yes.

16   **Q.**  And let's focus sort of towards the end of this period,

17   because I know that at the beginning, Prenda Law had a number

18   of clients, is that correct, a number of producers that they

19   filed copyright infringement suits on behalf of?

20   **A.**  Yeah, that is correct.  So they would instruct me to file

21   certain cases, and certain companies, like Hard Drive

22   Productions or Boy Racer, Inc., those companies I would file

23   suit on behalf of those companies on, you know, naming

24   potential -- er, naming or not naming the potential defendants

25   in the cases.

GIBBS - DIRECT / RANALLO

1  **Q.**   And at some point, did your litigation come to encompass

2  almost exclusively AF Holdings and Ingenuity 13 suits?

3  **A.**   Yeah.  Around late last year, so in December of 2012,

4  I started -- well, John Steele told me essentially that their

5  plan ultimately was to be a company, and they called this

6  company -- eventually they called this company Live Wire

7  Holdings, and that that company would own AF Holdings and

8  Ingenuity 13, and they would solely work on those -- on those

9  files.

10        And I learned later that month that it was going to

11  be the transition to that was going to mean that they were

12  going to -- essentially, they would let go all their other

13  clients and that they would focus entirely on AF Holdings and

14  Ingenuity 13, which would be owned by Live Wire, and that would

15  happen on January 1st, 2013.

16  **Q.**   And so is it safe to say that, at least these calls

17  through late 2012 through the end of them, through the present,

18  is it a fair assessment that they were primarily calls related

19  to AF Holdings and Ingenuity 13 suits?

20  **A.**   Yes, primarily.  I think that also, obviously, dealing

21  with the other cases outstanding, but I'd say the majority.

22  **Q.**   And do you recall at, say, you know, the end of 2012, how

23  many cases remained open for producers that were not

24  AF Holdings or Ingenuity 13?

25        **MR. DUFFY:**   Objection to the question.  Lack of

1    foundation.

2              THE COURT:  Why don't you rephrase the question.

3    BY MR. RANALLO:

4    Q.   At what point did -- so on December 1st, let's say, could

5    you estimate how many cases you had open and approximately what

6    percentage of them were AF Holdings or Ingenuity 13 cases?

7              MR. DUFFY:  Objection, calls for speculation.

8              THE COURT:  If you know.

9              THE WITNESS:  I can't give you a number.  I would

10   have to estimate.  I would say it dramatically reduced.  So

11   I don't know.  In the tens, as opposed to hundreds or something

12   like that.  I was -- I was instructed, as time went on, I was

13   instructed to file more and more AF Holdings and Ingenuity 13

14   cases.  So it kind of -- they didn't ask me to file the Hard

15   Drive, the other cases much anymore, and the majority of the

16   cases filed were AF Holdings and Ingenuity.

17             MR. RANALLO:  If we can see -- this is now a new

18   spreadsheet for John Steele's cell phone, if we could now

19   submit this as the Defendants' Exhibit B.

20                       (Defendant's Exhibit B was marked for

21                        identification)

22   BY MR. RANALLO:

23   Q.   And I'll just take you through this one, much more

24   briefly.  Again, what does this number on line 174, what does

25   that represent?

GIBBS - DIRECT / RANALLO

**A.**    That would be the total minutes that I spoke with John

Steele from my cell phone, and I believe this is his cell

phone.

**Q.**    Okay, and these calls continued right through the --

strike that.

You said your last day was approximately

February 28th?

**A.**    It was my last day.

**Q.**    Okay, and so am I correct in understanding that you

continued to discuss Prenda Law cases with John Steele right up

until that time?

**A.**    Absolutely.

**Q.**    And during those phone calls, did you -- you had the

opportunity to hear his voice?

**A.**    Absolutely.

**Q.**    And are you familiar with his voice?

**A.**    I am.

**Q.**    And could you testify to it if you heard it on a

recording?

**A.**    I believe I could.

**MR. RANALLO:**    Your Honor, I would seek to introduce

an audio recording, under the business records exception.

I have basically the certification from GoDaddy, and these

phone calls are with GoDaddy Customer Service, wherein an

individual identifies himself as Alan Cooper.

1        **MR. DUFFY:**  I object, your Honor.  There's no

2    foundation.  There's no -- there's no valid authenticity about

3    this tape.  It's some certificate, without any foundation as to

4    how this a fair basis for authenticating whatever it is.

5        Secondly, he's going to ask Mr. Gibbs to basically

6    testify as an expert in voices that he may or may not have

7    heard in the last six months, whether he can recognize it or

8    not.  He's not an appropriate witness to testify with respect

9    to that, as well.

10       So I would object to the introduction of it and

11   I would object to Mr. Gibbs being asked questions about them.

12       **THE COURT:**  All right, I believe --

13       **MR. DUFFY:**  And that --

14       **THE COURT:**  I believe that there's a sufficient

15   foundation laid by use of the certificate as a business

16   exception rule, and if Mr. Gibbs testifies that he's familiar

17   with the voice of the party who's in question, then he can, as

18   a lay witness, testify as to whether or not he believes it's

19   the person whom he associates with the name.

20       **MR. RANALLO:**  Thank you, your Honor.  With that,

21   I will admit the certificate of authenticity as Defendant's

22   Exhibit C.

23       **THE COURT:**  C?

24                    (Defendant's Exhibit C

25                      marked for identification.)

1          **MR. DUFFY:**  Have you got -- I don't have a copy of

2     the main exhibit.

3                **MR. RANALLO:**  Yes.  I believe I have an extra one.

4                **THE COURT:**  Mr. Gibbs?

5                **THE WITNESS:**  Yes, your Honor.

6                **THE COURT:**  To your knowledge, did Mr. Hansmeier,

7     Mr. Steele or Mr. Duffy ever make an appearance in District

8     Court in the matter of *AF Holdings, LLC v. Joe Navasca*, as

9     counsel?

10               **THE WITNESS:**  As counsel, I believe Mr. Duffy is

11    counsel in that case.  Currently, he's the counsel in that

12    case.

13               **THE COURT:**  All right, thank you.

14               **THE WITNESS:**  I don't believe anyone else has made

15    an appearance as counsel.  I mean --

16               **THE COURT:**  Other than yourself.

17               **THE WITNESS:**  Other than those individuals.

18               **THE COURT:**  Other than yourself.

19               **THE WITNESS:**  Yeah.

20               **THE COURT:**  All right.

21               **THE WITNESS:**  And then I -- they substituted

22    Mr. Duffy for me when I announced that I was leaving,

23    essentially, and demanded the substitution.

24               **MR. DUFFY:**  And I'll object as nonresponsive.

25    I think, as a matter of fact, Mr. Gibbs filed a motion to

1    substitute counsel, so....

2            **THE COURT:**  All right.

3            **MR. RANALLO:**  Okay, so now -- your Honor, there's

4    two places that I'm actually going to point to on this.  One is

5    at approximately 30 seconds, where the individual identified

6    himself, and then there's -- the tape itself, I believe, is 12

7    minutes.  So then I'll skip ahead to a point, basically, where

8    Mr. Steele is accessing his personal e-mail while discussing

9    the issue with the GoDaddy representative.

10           **MR. DUFFY:**  Your Honor, I also object to the grounds

11   of relevance.  Counsel hasn't introduced any testimony as to

12   what this tape is or how it's relevant to any of the matters at

13   issue in this proceeding.

14           **THE COURT:**  All right, I'll take it under

15   submission.  Why don't you proceed at this time.

16           **MR. RANALLO:**  Okay.

17           (Audio tape, Exhibit C, played in open court.)

18           **MR. RANALLO:**  All right, if I could just stop it

19   right there for a second.

20   **Q.**   The individual on that tape just identified himself as

21   Alan Cooper, is that correct?

22   **A.**   Yes.

23   **Q.**   And do you recognize the voice on that tape?

24   **A.**   I do.

25   **Q.**   And can you tell me who that was?

1   **A.**   John Steele.

2   **Q.**   Thank you.  We're going to move ahead, if we could, to

3   approximately five minutes.

4            **THE COURT:**  And just so that the record is clear,

5   the John Steele that you indicated identified himself as Alan

6   Cooper is the partner in the firm of Steele Hansmeier that then

7   morphed into the Prenda Law firm, is that correct?

8            **THE WITNESS:**  That is correct, and he is the same

9   John Steele that was directing my actions or telling me when to

10  file, what to file.

11           **THE COURT:**  Thank you.

12           **THE WITNESS:**  Thank you.

13       **MR. DUFFY:**  And your Honor, this is another

14  foundation objection.  Counsel hasn't indicated -- asked

15  whether this individual has ever heard or spoken with Alan

16  Cooper, and whether he would recognize his voice, either.

17           **THE COURT:**  All right.

18       **MR. RANALLO:**  I believe he just identified him as

19  John Steele.  If you'd like, we can certainly say that John

20  Steele is not also Alan Cooper.

21       **MR. DUFFY:**  I'm objecting on the grounds that

22  there's no evidence that this witness knows what Al Cooper's

23  voice sounds like.

24           **THE COURT:**  Well, it appears to me that this witness

25  has identified a person who has stated his name is Alan Cooper,

1    recognizes the voice, and the voice is that -- that this

2    witness has testified to, as John Steele, the partner of Steele

3    Hansmeier.

4              Is that correct, counsel?  Counsel?

5              **MR. RANALLO:**  Yes, that is correct.

6              **THE COURT:**  All right, why don't we proceed.

7              (Audio tape is played in open court.)

8         (Counsel makes simultaneous comments.  Unintelligible.)

9    **BY MR. RANALLO:**

10   **Q.**   All right, so I would just note right there, he appears to

11   identify his e-mail address as johnlsteele@gmail.com.

12             Mr. Gibbs, are you familiar with that e-mail

13   address?

14   **A.**   Yes, I am.

15   **Q.**   And who does that belong to?

16   **A.**   John Steele.

17   **Q.**   And have you sent e-mails to him at that address?

18   **A.**   I have.

19   **Q.**   And have you received e-mails from him at that address?

20   **A.**   I have.  The only caveat there is that I was sending these

21   e-mails through a Prenda Law e-mail address, and when they cut

22   that off, or -- they cut me off essentially from that e-mail

23   address, I had no access to those e-mails.  So I didn't have a

24   whole lot of e-mails personally sent to me by that e-mail

25   address.

1          **MR. RANALLO:**  I noticed that -- I will in a just a

2    moment actually seek to introduce John Steele's Notice of

3    Appeal filed in the Central District of California case, where

4    he identifies himself by the JohnLSteele@gmail address, and

5    then we're going to move forward just a little bit here.

6          And it's clear that the person on this tape is

7    accessing and responding to that e-mail contemporaneously with

8    the phone call.

9          (Audio tape played in open court.)

10         Okay, I think that pretty much establishes what we

11   need to -- as far as that goes.  I'd like to play one more

12   recording from GoDaddy also, an individual identifying himself

13   as Mark Lutz.

14         (Audio tape played in open court.)

15   **Q.**   And I'll just go ahead and ask you, then, did you

16   recognize the voice on that recording I just played for you?

17   **A.**   Yes.

18   **Q.**   And who was that voice?

19   **A.**   John Steele.

20   **Q.**   And who did he identify himself as?

21   **A.**   Mark Lutz.

22   **Q.**   Thank you.

23         **MR. DUFFY:**  Your Honor, I just renew my objection on

24   the grounds of relevance.  Nothing in any of those recordings

25   or any of the testimony suggesting that whatever reason that

1   those phone calls were made to GoDaddy had anything to do with

2   AR Holdings or Ingenuity 13, or any the matter under

3   consideration here.

4              THE COURT:  All right.  Objection is --

5          MR. RANALLO:  Your Honor, one of the matters under

6   consideration is --

7                    (Simultaneous colloquy.)

8          THE COURT:  Objection is overruled.

9          MR. RANALLO:  Thank you.  Moving on just quickly,

10  your Honor, I'd like to just get to the Salt Marsh issue for a

11  moment.

12  Q.   Mr. Gibbs, you filed a number of documents in a number of

13  cases identifying Salt Marsh as the owner of AF Holdings, is

14  that correct?

15  A.   That's correct.

16  Q.   And at the time you filed those, was it your understanding

17  that Salt Marsh was a natural person?

18  A.   Absolutely, yes.

19  Q.   And did anyone specifically tell you that?

20  A.   Yes.  I remember asking for this information when we

21  needed to sign the ADR papers, and I asked Mr. Hansmeier,

22  I said, "Who is essentially the client here, and whose

23  signature do we need to get here?"

24          And he said, "It's -- the individual's name is Salt

25  Marsh," and that individual, you know, "Don't worry about it,

1    he's already signed these papers, you can go ahead and file

2    with the electronic signature on them."

3           And I remember that specifically, because I was kind

4    of taken back by the name, as it was kind of a strange name.

5    To me, it was almost like, you know, "Salt," like an old Mafia

6    guy or something like that, and I remember laughing about it

7    with Paul, and Paul had his own version of what it sounds like,

8    so...

9    Q.   All right, when you say "Paul," --

10   A.   Paul Hansmeier had his own version of what he thought

11   about it, but he essentially said, yeah, that's his name.  And

12   so I accepted it for, you know -- I accepted his word on it.

13          THE COURT:  Well, counsel, let me -- counsel, let me

14   ask something.

15          MR. RANALLO:  Okay.

16          THE COURT:  When the witness identified Mr. Steele's

17   voice as that of a Mark Lutz, is it your contention that we're

18   talking about the Mark Lutz who was a former paralegal at

19   Steele Hansmeier, Prenda Law and the anti-piracy group, and

20   that it appears, at least I think, from former testimony that

21   he was a telephone agent that made dunning calls to defendants,

22   including the defendant in this matter?  Is that correct?

23          MR. RANALLO:  That is correct.  The one thing

24   I would note is that it was John Steele identifying himself as

25   Mark Lutz.  I believe in your original question, you might have

1    conflated those two.

2           **THE COURT:**  All right.

3           **MR. RANALLO:**  But it is certainly the same Mark Lutz

4    that we are talking about.

5           **THE COURT:**  All right, and it's the witness'

6    testimony that the voice he heard was of John Steele

7    identifying himself as Mark Lutz, as the previous testimony

8    that you elicited where the witness had identified Mr. Steele

9    identifying himself as Alan Cooper, is that correct?

10          **THE WITNESS:**  That is correct.

11          **THE COURT:**  All right.

12          **THE WITNESS:**  That is correct.

13          **THE COURT:**  All right, counsel, proceed.

14   **BY MR. RANALLO:**

15   **Q.**   All right, I'm just going to bring up one particular

16   document that you filed, in addition to the ADR certifications

17   which may have brought this whole thing to light.  Pardon me,

18   (inaudible) back here.  I will ask you about that.  Excuse me.

19          So you previously filed in another matter a Rule 26

20   disclosure that indicated that Salt Marsh was an individual

21   with knowledge of the AF Holdings claims, is that correct?

22   **A.**   That is correct.

23   **Q.**   And did you speak to Mr. Hansmeier before filing that

24   document?

25   **A.**   I did, and I confirmed that with Mr. Hansmeier.

1    **Q.**   That Salt Marsh was an individual likely to have

2    discoverable information.

3    **A.**   Yes, absolutely.  I mean, like I explained before, Paul

4    Hansmeier, I spoke with him daily, multiple times a day, and

5    so, you know, he's requested don't ask him, he had the client

6    contact that he told me before, so I trusted him.

7             **MR. RANALLO:**  Okay, then I would just seek to

8    admit -- I actually don't have a video copy, it doesn't appear,

9    for you, your Honor, but I do have a physical copy of the

10   Rule 24 (sic) report that we're speaking of filed in Northern

11   District of California case number C-11-03067, that I would

12   seek to admit.

13            **THE COURT:**  All right.  Any objection, counsel?

14            **MR. DUFFY:**  No.  No, your Honor.

15            **THE COURT:**  All right, then that will be admitted

16   as, I believe it's defendant's D, as dog, in order.

17            **MR. RANALLO:**  No, I believe that's incorrect.

18   I also -- I gave audio versions of each of the clips I played

19   for you, or MP3 CDs of each of the clips I played for you,

20   which were independently marked as exhibits, and so we were

21   on -- we are on G.

22            **THE COURT:**  All right, let's -- I know that

23   consistency tends to be the hobgoblin of small minds, but so

24   that the record is clear and we know exactly what evidence is

25   coming in, let us just pause for a moment and go through the

1    evidence list again.

2              Madam Clerk, Defendant's A is, as far as your record

3    is concerned...?

4              **THE CLERK:**  A single file, multi-page same cell

5    numbers for the same individual, spreadsheet.

6              **THE COURT:**  Counsel, do you agree?

7              **MR. RANALLO:**  Yes, that was Paul Hansmeier's phone

8    calls.

9              **THE COURT:**  Defendant's B, as in boy?

10             **THE CLERK:**  Total minutes that the witness said was

11   Mr. Steele.

12             **THE COURT:**  Counsel?

13             **MR. RANALLO:**  Yes, your Honor, that's actually the

14   entire spreadsheet of John Steele's cell phone calls, is what

15   I gave to the clerk as Exhibit B.

16             **THE COURT:**  Okay.

17             **THE CLERK:**  (Inaudible).

18             **THE COURT:**  I'm sorry?  I don't have any

19   (inaudible).  Okay.

20             **THE CLERK:**  And Exhibit C was the certificate of

21   authenticity.

22             **THE COURT:**  Is that correct, counsel?

23             **MR. RANALLO:**  That is correct.

24             **THE COURT:**  Defendant's D, as in dog?

25             **THE CLERK:**  Defendant's D was the audio -- er, I'm

1    sorry.  Defendant's D was a report, the Rule 24 report.

2              **MR. RANALLO:**  No.

3              **THE COURT:**  All right, I believe that --

4              **UNIDENTIFIED SPEAKER:**  D would be the audio, the

5    first audio we heard.

6              **THE COURT:**  That would be, for the record, the audio

7    clip of Alan Cooper, just to identify it.

8                              (Defendant's Exhibit D marked for

9                              identification)

10             **THE COURT:**  And then E would be the audio clip of

11   Mark Lutz.

12                             (Defendant's Exhibit E marked for

13                             identification)

14             **THE CLERK:**  (Inaudible).

15             **THE COURT:**  Yes, and F, then, would be the

16   Rule 24 --

17             **MR. RANALLO:**  F is actually here, your Honor.  It is

18   the John Steele's notice of Appeal in the Central District of

19   California case where he identifies himself using the

20   JohnLSteele@gmail address.

21             **THE COURT:**  And is there --

22             **MR. DUFFY:**  And I have no objection, to have these

23   move into evidence.

24             **THE COURT:**  That is --

25             **MR. RANALLO:**  Pardon me, your Honor.

1          **THE COURT:**  Please listen to me.  Is there a

2     document identification number on the top of that?

3          **MR. RANALLO:**  Yes, document 156.

4          **THE COURT:**  All right, that would be document 156 in

5     case number 12-CV -- I can't see that far, I'm getting old --

6          **THE CLERK:**  Is that 11-03067?

7          **THE COURT:**  No, it's right on the --

8          **UNIDENTIFIED SPEAKER:**  12-CV-8333.

9          **THE COURT:**  333, O -- is that OOW?

10          **UNIDENTIFIED SPEAKER:**  D as the --

11          **MR. RANALLO:**  ODW.

12          **THE COURT:**  ODW.  ODW, and then it's document 156.

13     All right.  Then that's -- what letter is that?  What do you

14     have?

15          **THE CLERK:**  F.

16                    (Defendant's Exhibit F marked for

17                     identification)

18          **THE COURT:**  F.  Now, do we have a G?

19          **MR. RANALLO:**  G is the Rule 26 report that I just

20     referenced from case number 4:11-cv --

21          **THE COURT:**  Wait, wait, hold on.  Hold on.  Hold on.

22     So G is the Rule 24 (sic) report.  So if you could give us the

23     case number and the document number, so that we're clear.

24                    (Defendant's Exhibit G marked for

25                     identification)

1      **MR. RANALLO:**  Sure.  It is case number

2  4:11-cv-03067, and it is document number 26.

3      **THE COURT:**  And the judge is -- the judge's

4  initials?

5      **MR. RANALLO:**  ...are CW.

6      **THE COURT:**  All right, Judge Wilken.  All right.  Do

7  you have anything else at this time that you intended to move

8  into evidence?

9      **MR. RANALLO:**  I do not.

10      **THE COURT:**  All right, then why don't you proceed.

11  BY MR. RANALLO:

12  **Q.**  All right.  Mr. Gibbs, I believe you previously testified

13  on -- let me just ask it.

14      When, if you recall, approximately when did you hear

15  for the first time that Mark Lutz had some role with

16  AF Holdings?

17  **A.**  It was early this year, where I'd been told that -- that

18  Mark Lutz was essentially some sort of representative on behalf

19  of the company, and then evolved into, frankly, was like CEO

20  position or something like that, but it was earlier this year.

21  **Q.**  So early in 2013, and do you recall approximately when you

22  started filing cases for AF Holdings?

23  **A.**  I'd say May 2012, mid- to later 2012.  Maybe, actually --

24  sorry, that's when we started set and filing a bunch of cases

25  on behalf of AF Holdings.  Initially, it was -- it was well

GIBBS - DIRECT / RANALLO

1    before that, and I don't remember exactly when, but it was

2    just -- at the first point, it was AF Holdings was simply one

3    of the clients of many, and then AF Holdings was -- you know,

4    we started filing cases on behalf of AF Holdings just

5    consistently, per instructions of John Steele and then Jonathan

6    Pinesman (phonetic), and --

7             THE COURT:  Mr. Ranallo, where are we going with

8    this?

9             MR. RANALLO:  Partly, I was just trying to get to

10   the point of, basically, AF Holdings is the entity that

11   actually served summons and complaints on defendants, whereas

12   many of the primary other producers did not, and to the extent,

13   I think, that shows basically that these entities were created

14   to be judgment-proof and made decisions that firms with, er --

15   producers with assets did not, based on the fact that they were

16   judgment-proof.

17             And so when -- to the extent, if you will let me,

18   I would just ask a few questions sort of to try and establish

19   that point --

20             THE COURT:  All right, why don't you go ahead and do

21   that, but let's move on.

22             MR. RANALLO:  Okay.

23   Q.   And so -- and you heard much of that, I'm sure, but when

24   you were filing cases for other -- for lack of -- other

25   pornography producers, did you regularly serve summons and

GIBBS - DIRECT / RANALLO

1  complaints on defendants?

2  **A.**   No.

3  **Q.**   Can you recall any instances where you served a defendant

4  with a summons and complaint for copyright infringement, except

5  for AF Holdings or Ingenuity 13 cases?

6  **A.**   Yes, I mean, I believe we served summons onto at least a

7  Hard Drive case with Abrahams, Seth Abrahams was his name.

8  There might have been a few others, but I don't recall.

9  **Q.**   Okay, and once AF Holdings started filing individual

10  cases, it became common practice to actually serve the

11  defendants with the summons and complaints, is that correct?

12  **A.**   Yes, I believe so.  I mean -- yeah.

13  **Q.**   And just one final question, sort of, about your role as

14  Prenda Law/Steele Hansmeier.  Did you negotiate employment --

15  did you negotiate Mr. Lutz's employment with Prenda Law?

16  **A.**   No, absolutely not.  Mr. Lutz, just so everyone's clear,

17  was there before me.  He was working for John, he was a friend

18  of John.  They used to hang out and stuff like that, after

19  work.  And so, you know, I met him the first time through this

20  whole thing, once he was already an employee of Prenda Law.

21  **Q.**   Right, and --

22  **A.**   Or, sorry, Steele Hansmeier.

23  **Q.**   Right, and let me just clarify that point, actually, some

24  more.  What I'm asking you specifically is, at the transition

25  from Steele Hansmeier to Prenda Law, presumably somebody must

1    have hired Mr. Lutz as a paralegal at Prenda Law.  Was that

2    you?

3    **A.**   No.

4            **MR. RANALLO:**  Okay.  I have nothing further for

5    Mr. Gibbs, your Honor.

6            **THE COURT:**  All right, thank you.

7            Counsel?

8            **MR. DUFFY:**  May I just -- may I make a preliminary

9    point, your Honor, just on timing?  Counsel indicated that he

10   thought this would take about 15 minutes.  It took about 45, so

11   we're already running substantially behind schedule.  I'll try

12   to go as quickly as I can, but I just wanted to point that out.

13           **THE COURT:**  The Court's well aware of that, counsel.

14           **MR. DUFFY:**  Thank you.

15                      <u>**CROSS-EXAMINATION**</u>

16   BY MR. DUFFY:

17   **Q.**   Mr. Gibbs, you're in charge, right?

18           **THE COURT:**  Could we go back to the full screen,

19   please?

20           **MR. DUFFY:**  Sorry?

21           **THE COURT:**  Could we go back to the full screen,

22   please?

23           **MR. RANALLO:**  Oh, sorry.

24   BY MR. DUFFY:

25   **Q.**   You worked -- through the transition from Steele Hansmeier

1  to Prenda Law, you worked in Steele Hansmeier, correct?

2  **A.**  Yeah, I was a 1099 independent contractor.

3  **Q.**  In Prenda --

4  **A.**  I don't believe that was passed by -- I'm sorry.  I don't

5  believe that was passed by correctly, but that's it, I'm sorry.

6  **Q.**  But you did work on it.

7  **A.**  I did, yes.

8  **Q.**  And who constitutes Steele Hansmeier?

9  **A.**  In terms of the owners?  In terms of --

10 **Q.**  How big of an operation was it when you were there?

11 **A.**  When I started working for Steele Hansmeier, it was

12 probably less than ten but, you know, around eight people.

13 **Q.**  How many attorneys did you work with at Steele Hansmeier?

14 **A.**  Well, I -- I mean, I did my own -- I was of counsel for

15 California, so I didn't exactly work day-to-day with these

16 attorneys.  There was other attorneys there.  I believe that --

17 yeah, couple others.

18 **Q.**  You indicated you worked for Hansmeier extensively,

19 though, right?

20 **A.**  Yeah, absolutely.

21 **Q.**  So that's one attorney you worked with.

22 **A.**  I was following his -- whatever he directed me to do.

23 **Q.**  When you were saying this transition from Steele

24 Hansmeier, tell me what the transition was, legally.

25 **A.**  I was just told one day that we're going to call ourselves

1    Prenda Law now, and it looks like Paul Duffy is going to be the

2    owner of Prenda Law, and but don't worry, everything's going to

3    work out the same way, I'm going to -- we're going to be

4    instructing you the same way we have always been.

5    **Q.**    Are you aware that the Steele Hansmeier firm was dissolved

6    in Minnesota, Minnesota Secretary of State's office, in about

7    2011?  Are you aware of that?

8    **A.**    I'm not aware of that.

9    **Q.**    Did you ever bother to look it up?

10   **A.**    I -- you know, I tend to trust people that I believe could

11   be trusted.

12   **Q.**    Okay, so, my question was, did you ever look it up to see

13   if it was still in existence, or if it had merged into another

14   firm?

15   **A.**    No, I didn't know --

16   **Q.**    Did you ever look up the Illinois Secretary of State

17   records, again, to see if it had merged in --

18   **A.**    I believe I've seen that before, yes.

19   **Q.**    What do you recall seeing?

20   **A.**    I don't remember.  Just I remember looking it up.

21   **Q.**    That there was nothing saying that there a merger with an

22   existing entity, was there?

23   **A.**    I don't remember.

24   **Q.**    It was an Illinois corporation, correct?

25   **A.**    Again, I don't remember the details.  I just remember

1    seeing the piece of paper, the -- whatever was on that Illinois

2    state --

3    **Q.**    So --

4    **A.**    -- website.

5    **Q.**    So other than somebody telling you there was a transition,

6    there's nothing -- the two were clearly separate firms.

7    There's nothing for you to suggest otherwise.

8    **A.**    All I know is what I've testified to so far today, and

9    whether it was the same firm or they were separate firms, I was

10   managed the entire time by both firms, by John Steele and Paul

11   Hansmeier.

12   **Q.**    You never looked up whether they were separate entities as

13   corporations, correct?

14   **A.**    I believe, like I just testified, that I looked up the

15   papers on --

16   **Q.**    You don't -- definitely don't remember what you saw?

17   **A.**    I don't remember.

18   **Q.**    So there's nothing written that you'd ever seen that the

19   two had merged or that they're the same firm.

20   **A.**    I think it's a matter of public knowledge --

21   **Q.**    I'm asking a very specific question.  Did you ever see

22   anything written in the corporate Secretary of State's saying

23   that the two were merged, if they were --

24   **A.**    I didn't know -- I don't remember if I did.  I don't think

25   I did, though.

1    **Q.**   Is that no?  Do you want me to -- as you sit here today,

2    you don't remember?

3    **A.**   As I sit here.

4    **Q.**   Are you familiar with -- you practice in the Northern

5    District of California, correct?

6    **A.**   That's correct.

7    **Q.**   And you know that -- the Local Rules in the District Court

8    for California?

9    **A.**   (Inaudible).

10   **Q.**   Local Rule 5.1.

11   **A.**   I believe so, yes.

12          **MR. DUFFY:**  I have an electronic copy, your Honor.

13   May you read with me from an electronic copy of the local rule?

14          **THE COURT:**  I'm sorry, counsel, you're...?

15          **MR. DUFFY:**  I have an electronic -- I don't have a

16   physical copy of the --

17          **THE COURT:**  That's fine.  What are you referring to?

18          **MR. DUFFY:**  May I read from Local Rule 5.1 --

19          **THE COURT:**  Please.

20          **MR. DUFFY:**  -- electronically?

21          **THE COURT:**  The Court will take judicial notice of

22   its own Local Rules.

23          **MR. DUFFY:**  Okay.

24   **Q.**   Did you -- are you familiar with the requirement of

25   submitting an electronic signature?

1   **A.**   Yes.

2   **Q.**   And are you aware that the Local Rule is that you, as the

3   attorney who would be filing it, are supposed to maintain or

4   required to maintain a handwritten copy of the actual

5   signature?

6   **A.**   I don't know if it's stated exactly that way (inaudible).

7            Just to clarify, your Honor, in this situation,

8   I was told, as I explained already, that Mr. Hansmeier had the

9   signature at the law firm.  So I didn't see a necessity of

10  having my own version, considering I was a 1099 independent

11  contractor, you know, of counsel from the law.

12           **MR. DUFFY:**  Your Honor, counsel is an attorney, and

13  I'm cross-examining him.  Can I object?  Can I move to strike

14  his cite of the --

15           **THE COURT:**  All right, that's nonresponsive to the

16  question.  Let's proceed by question and answer and let's move

17  this along a little bit.  Thank you.

18  **BY MR. DUFFY:**

19  **Q.**   Yes, let me read to you a section of the Local Rule,

20  Section 5.1, Section (i), part of Rule (3),

21               "In the case of a Signatory who is not an ECF

22           user, or who is an ECF user -- "

23                    (Indistinct colloquy.)

24               "-- but whose user ID and password are not

25           utilized in the electronic filing...the filer of the

1              document shall attest that concurrence in the filing

2              of the document has been obtained from each of

3              the...signatories....  The filer shall maintain

4              records to support this concurrence for subsequent

5              productions to (sic) the Court, if so ordered, or

6              for inspection upon request by a party, until one

7              year after the final resolution of the action."

8              Are you familiar with that rule?

9    **A.**    I am.

10   **Q.**    And it requires you to keep an original signature for

11   inspection, correct?

12   **A.**    It requires the law firm to keep the original written

13   signature.

14   **Q.**    It doesn't say law firm.

15   **A.**    I filed --

16   **Q.**    It just --

17              **THE COURT:**  Please don't argue.  Just answer the --

18   please don't argue.  Just answer the questions.

19              I'm taking a look at Local Rules -- let me get here.

20   Where are we?  All right, I have -- let's see.  Electronic

21   filing.  Where are we?  Rule 5.  So you're referring to what,

22   counsel?

23              **MR. DUFFY:**  To 5.1, subsection (i), sub-subsection

24   (3).

25              **THE COURT:**  (g), (h), (i), so....    All right.

1        **MR. DUFFY:**  I could just ask him a question, your

2    Honor.

3        **THE COURT:**  All right.

4            "In the case of a signatory who is not an ECF

5            user or who is an ECF user but whose user ID and

6            password are not utilized in the electronic filing

7            of the document, as in the case of documents

8            requiring multiple signatures, the filer of the

9            document shall attest that concurrence in the filing

10           of the document has been obtained from each of the

11           other signatories..."?

12       **MR. DUFFY:**  It says,

13           "The filer shall maintain records to support this

14           concurrence for subsequent production to the Court,

15           if so ordered -- "

16       **THE COURT:**  Right.

17       **MR. DUFFY:**  " -- or for inspection upon request by a

18           party, until one year after the...resolution of

19           the action."

20       **THE COURT:**  All right.

21   BY MR. DUFFY:

22   **Q.**   The question is, did you ever see an original signature

23   for the person that you were told was Salt Marsh?

24   **A.**   I don't believe so.

25   **Q.**   Did you ever do any investigation as to whether the person

1    who you were submitting documents on behalf of was named Salt

2    Marsh?

3    **A.**    I did.   I think I testified to that earlier with --

4    **Q.**    Aside from asking Mr. Hansmeier.

5    **A.**    Aside from asking Mr. Hansmeier?   I don't remember

6    anything, aside from that.

7    **Q.**    So if there's no original signature anywhere, that -- you

8    never obtained an original signature.

9    **A.**    I never -- I don't believe I ever saw an original

10   signature.

11   **Q.**    You never obtained....   I'm asking a very easy question.

12   So you obtained -- you never obtained an original signature,

13   correct?

14   **A.**    I never obtained an original signature.

15   **Q.**    And the Court in this case gave you an opportunity to

16   produce that, are you aware of that, the original signature of

17   Salt Marsh, in April of 2013?

18   **A.**    I believe -- yes, I am aware of that, actually.

19   **Q.**    And you were given a two weeks extension to produce it,

20   correct, because you were out of town?

21   **A.**    I believe it was -- well, I believe he was characterizing

22   it, but...

23   **Q.**    Did the Court give you an opportunity to file a --

24   **A.**    I believe there was --

25   **Q.**    Excuse me -- to file the original signature for that --

1  for that ADR document?

2  **A.**   I believe the order was directed at yourself, to file --

3  **Q.**   There's an order on the docket, though, for requiring

4  (indiscernible) to Brett Gibbs, correct?

5  **A.**   I believe it was directed to yourself.

6  **Q.**   Well, it wasn't.  To help -- I ask the Court to take

7  judicial notice, the Court's specifically addressed -- staffs

8  is to inform you, um, if you had -- if you had the original

9  signature.  So I will represent that that's true, what the

10 order, in large part, provided.

11         So you didn't take the opportunity to file an

12 original signature then, or declaration explaining why you

13 filed what you did, did you?

14 **A.**   No, but I remember my attorneys --

15         **THE COURT:**  Counsel, where are we going with this?

16         **THE WITNESS:**  I don't know.

17         **THE COURT:**  No, I'm not asking the -- I'm not asking

18 the witness.  I'm asking --

19         **MR. DUFFY:**  Counsel -- counsel, by -- counsel is

20 claiming -- counsel has the obligation under the federal and

21 local rules to maintain the original signature, and he didn't

22 do it.  He's trying to blame other people who were not on the

23 case for it.  So I want to establish that he had the obligation

24 to do it.  He did not conduct reasonable inquiry, obviously,

25 and he filed something on behalf of Salt Marsh, and then he --

1    then he -- the liability -- the (inaudible) should fall on him

2    as the filer of the document.

3              But I don't have any further questions as to that.

4              **THE COURT:**  All right.

5              **MR. RANALLO:**  Just one thing, quickly, as you

6    direct --

7              **MR. DUFFY:**  I'm sorry, I'm moving on to a different

8    topic.  I haven't finished with --

9              **MR. RANALLO:**  Oh, I'm sorry, I'm sorry.

10             **MR. DUFFY:**  I'm sorry if I was confusing...

11   Q.   I'm going to hand you, what I'd like to have marked -- to

12   be Plaintiff's Exhibit A?

13             **THE COURT:**  Well, this is -- I believe you would be,

14   in the matter, technically plaintiff.  So it would be marked as

15   Plaintiff's 1.

16                       (Plaintiff's Exhibit 1

17                       marked for identification.)

18   **BY MR. DUFFY:**

19   Q.   What is that document I just handed you?

20   A.   It's a declaration in a sumlus (phonetic) case, in

21   Florida.

22   Q.   If you look at page 6, what signature is on there?

23   A.   That's mine.

24   Q.   Did you write this affidavit?

25   A.   I wrote most of it.  It was written also by attorneys.

1    **Q.**   You signed it -- that's your signature, correct?

2    **A.**   I believe -- yes.

3    **Q.**   And if you look at the second -- if you look at

4    paragraph -- the paragraph before your signature, it states, it

5    says,

6                    "I, Frank Gibbs -- Frank L. Gibbs, declare, under

7                the penalty of perjury, that the foregoing is true

8                and correct, and was executed on December 21st,

9                2012."

10               Correct?

11   **A.**   That's correct.

12   **Q.**   And in this affidavit, you describe the work you did with

13   Prenda, correct?

14   **A.**   Yes.

15   **Q.**   In paragraph 5, you state that you are an attorney who

16   works as of counsel for Prenda Law, Inc., "I am not an employee

17   or partner of Prenda Law, Inc."  Is that what you said in your

18   declaration in December?

19   **A.**   That is correct.

20   **Q.**   You submitted a later declaration in the same case, didn't

21   you?

22   **A.**   The same -- in this case?

23   **Q.**   Yes.

24   **A.**   Uh, yes.

25   **Q.**   It was different from what your original affidavit was,

1  wasn't it?

2  **A.**    I think it was an expansion on my original affidavit.

3  **Q.**    On your second affidavit, you said you were an employee,

4  correct?

5  **A.**    I don't -- if you show it to me.  I don't believe I -- if

6  I said I was an employee, I was employed as an independent

7  contractor.  I never said I was an actual W-2 employee, if

8  that's what you're referring to.

9  **Q.**    That's not my question.  I said, you said you were an

10  employee, is what I said.  I didn't ask you whether you thought

11  you were going to --

12  **A.**    I don't know.

13           **THE COURT:**  Where are we -- counsel, where are we

14  going with this?

15           **MR. DUFFY:**  Because Mr. Gibbs has submitted two

16  affidavits in this case which conflict materially with the

17  affidavit he filed in December in 2012 in Florida.  Factually,

18  materially, they contradict his testimony here today, and he

19  changed -- he changed and offered to do an affidavit as a

20  result of a deal with defense counsel in Florida, said he would

21  withdraw a sanction motion against him if he gave a different

22  affidavit.

23           **THE COURT:**  All right.

24  BY MR. DUFFY:

25  **Q.**    Paragraph 6, you say that your role as of counsel was to

1    file and litigate copyright lawsuits for Prenda Law, Inc. in

2    California, correct?

3    **A.**   That is correct.

4    **Q.**   And in paragraph 7, you said you advise and educate other

5    attorneys working with Prenda, as well as Prenda Law's clients,

6    on proceeding in lawsuits protecting the rights of copyright

7    holders, correct?

8    **A.**   Yeah, that is correct.  I said that.

9    **Q.**   And in paragraph 8, you said, in your role with Prenda,

10   you helped -- you assist Prenda, as well as their clients,

11   retain counsel to bring lawsuits in other states, and consult

12   with the lead counsel on those cases as the cases progress.

13              "I occasionally help lead counsel prepare

14              documents with motions and responses so they --

15              lawsuits representing their clients."

16              Is that correct?

17   **A.**   That is what's stated, yes.

18   **Q.**   Now you're saying you did not have any supervisory

19   (inaudible) at Prenda Law.  You're saying you were --

20   directions solely from Hansmeier and Steele, correct?

21   **A.**   That is correct.

22   **Q.**   And you changed -- you submitted a different affidavit in

23   Florida after consulting with your counsel, correct?

24   **A.**   After consulting with -- I'm not --

25   **Q.**   Defense counsel in the Florida litigation.

1    **A.**    I submitted a declaration in that case, yes, a separate

2    declaration, I guess.

3    **Q.**    As part of the deal you came up with, with opposing

4    counsel, right?

5    **A.**    I'm not quite sure what you mean by "deal," but no.

6    I wouldn't classify it as a "deal."

7    **Q.**    Following change for the new affidavit, they retreated the

8    sanctions motion against you, correct?

9    **A.**    No, I spoke with the attorney there, and he basically said

10   that if I were to tell essentially what was happening, and

11   I were to testify to certain things, they would have no reason

12   to go after me with a sanctions motion.  So I provided that

13   declaration and they didn't go after me for -- (audio noise).

14   **Q.**    Well, they had already gone after you with a sanctions

15   motion, correct?

16   **A.**    I believe that my name was on a sanction motion.

17   **Q.**    And you were subject to a sanctions motion, correct?

18   **A.**    At some point, yes.

19              **THE COURT:**  Counsel, it's a little difficult to hear

20   when you're rattling papers like that.  If you could try to --

21              **MR. DUFFY:**  (Inaudible) -- on paper.  May I take a

22   moment and --

23              **THE COURT:**  Please.

24              **MR. DUFFY:**  And (inaudible).

25   **Q.**    Do you know an attorney by the name of Steve Goodhue?

1    **A.**    I do.

2    **Q.**    Who is Steve Goodhue?

3    **A.**    Steve Goodhue is a counsel in Arizona, and he also

4    practices in California.

5    **Q.**    I'm going to hand you a document which has been submitted

6    in this case, an affidavit.

7    **A.**    Thank you.

8    **Q.**    Have you seen that document before?

9    **A.**    Uh --

10             **THE COURT:**  Whoa, whoa, whoa, whoa, whoa, whoa,

11    whoa, whoa, whoa.  Let's mark it, Plaintiff's -- Ms. Knudson?

12             **THE CLERK:**  Two.

13             **THE COURT:**  -- Plaintiff's 2, in order.  Counsel,

14    please describe the document.

15    **BY MR. DUFFY:**

16    **Q.**    Well, before I ask a question about that, I want to the

17    return to the former memory, you provided a new affidavit,

18    Mr. Gibbs, you did not come to a deal with defense counsel in

19    that case, with your affidavit, correct?

20    **A.**    I said I provided them with an affidavit, and in return,

21    they dropped the sanctions motions against me.

22    **Q.**    And that was the deal you came up with, right?

23    **A.**    I don't -- I don't know -- you're trying to classify it as

24    something shady, but I don't see it as something --

25    **Q.**    I'm asking if it was a deal; that's all I'm asking.

1          I'm going to hand you an e-mail chain, which I'd

2    like to mark -- and I apologize, your Honor -- shall I mark

3    this as Exhibit B?

4          **THE COURT:**  Are you going to try to discuss the

5    previous document that you marked as B, or are you withdrawing

6    that?

7          **MR. DUFFY:**  I do, yes.  Yes.

8          **THE COURT:**  Why don't you go ahead and mark that as

9    Plaintiff's 3 in order, and describe it, please, counsel.

10                    (Plaintiff's Exhibit 3

11                    marked for identification.)

12   **BY MR. DUFFY:**

13   Q.   I'm going to hand you what appears to be an e-mail chain

14   between Graham Syfert and Andrew Waxler.

15         **THE COURT:**  That's Plaintiff's 3.

16   **BY MR. DUFFY:**

17   Q.   First of all, did you know who Graham Syfert is?

18   A.   Yes.

19   Q.   Who is he?

20   A.   He's an attorney in Florida.

21   Q.   He was the one that filed the sanction motion, correct?

22   A.   Yes.

23   Q.   And who's Andrew Waxler?

24   A.   He was my attorney.

25   Q.   If you take a look at the message from Mr. Waxler to

1    Mr. Syfert, and I believe in the second or third paragraph, do

2    you see the word "deal"?  Let me show you.

3    **A.**   I'm not quite sure where you're pointing to.

4    **Q.**   Look at the paragraph, from your lawyer, that starts with

5    the word -- (noise obliterates audio).

6    **A.**   Sure.  "Please confirm that we now have a deal."

7    **Q.**   Okay, good.  And in response to that, Mr. Syfert says,

8    "Okay, Mr. Waxler, you have the client's wedding present from

9    me."  Do you see that, in there?

10   **A.**   I do.

11   **Q.**   So in exchange for providing a new affidavit as requested

12   by Mr. Syfert, he gave you a wedding gift, dismissing --

13   (inaudible) -- sanctions.

14   **A.**   As I explained before -- okay, what I believe was that

15   because of the testimony I was giving to Mr. Syfert, that I was

16   no longer part of the sanctions motion.  My testimony -- and

17   that testimony, that declaration testimony, was that I was

18   directed, as I've testified here, by John Steele and Paul

19   Hansmeier --

20   **Q.**   That's not my question.  You had a deal, right?  You give

21   him a new affidavit, they drop the --

22                        (Simultaneous colloquy.)

23              **THE COURT:**  All right, it's been -- counsel, it's

24   been asked and answered.  Why don't we move on.

25        //                          //

1  BY MR. DUFFY:

2  Q.   Here's Exhibit B again, the affidavit from Mr. Goodhue.

3              THE COURT:  All right, Mr. -- counsel, you're now

4  going to mark as Plaintiff's 2 a document.  What is the title

5  of that document?

6              MR. DUFFY:  Affidavit of Steven James Goodhue.

7              THE COURT:  All right, thank you.  Plaintiff's 2.

8                        (Plaintiff's Exhibit 2

9                        marked for identification.)

10             MR. RANALLO:  And I would actually object on hearsay

11  grounds.

12             THE COURT:  Well, I don't know what it is or what

13  it's being offered for yet.  So let's see what -- what's

14  happening.

15  BY MR. DUFFY:

16  Q.   Would you first -- take a look at the document, and you

17  said you knew Steven Goodhue, right?

18  A.   I know of a Steven Goodhue, yes.

19  Q.   And you've worked -- you were co-counsel, in fact, with

20  him on cases in California, weren't you?  Or you attempted to

21  substitute him -- (noise obliterates audio) -- California.

22  A.   That is correct.

23  Q.   If you'd take a look at paragraph 5 of that affidavit, and

24  read it out loud, please.

25  A.   (Reading as follows:)

1              "Mr. Gibbs was my supervising attorney and point

2         of contact for all the work I performed for Prenda

3         Law, Inc. until his departure from the firm.  I had

4         a question about -- if I had a question about how to

5         handle an issue that would come up in a case,

6         I would contact Mr. Gibbs."

7   **Q.**   And that's consistent with your first affidavit where you

8   transcribed -- where -- your first affidavit in Florida, where

9   you said you directed and advised counsel in other states on

10  cases that were proceeding for Prenda clients, correct?

11  **A.**   I believe that is consistent.  I'd also be giving --

12  **Q.**   I'm not -- I'm not --

13  **A.**   If you'd like me to clarify things, I can make things a

14  lot --

15  **Q.**   I'm cross-examining.  I'm going to hand you what would be,

16  I believe, Plaintiff's 4.  Do you know who Jacques Nazaire is?

17           **THE COURT:**  All right, all right, all right.  Whoa,

18  whoa, whoa, whoa, whoa, whoa.

19           We have a document in front of us, you believe you

20  wish to mark that as Plaintiff's 4.  What is it, counsel?

21           **MR. DUFFY:**  And I apologize, trying to rush around.

22  I'll try to slow down.  It is an affidavit of Jacques,

23  J-A-C-Q-U-E-S, Nazaire, N-A-Z-A-I-R-E.

24           **THE COURT:**  Plaintiff's 4 marked for evidence.

25       //                         //

```
 1              (Plaintiff's Exhibit 4

 2         marked for identification.)

 3         THE COURT:  Is this for impeachment?  What are these

 4    documents being marked for, counsel?

 5         MR. DUFFY:  They're for impeachment purposes.

 6    They're from two of Mr. Gibbs' co-counsel who have submitted

 7    affidavits saying they took direction from him, and Mr. Gibbs

 8    is now saying he was a secretary for Prenda Law and didn't give

 9    direction.

10         THE COURT:  Well, it strikes me as --

11              (Simultaneous colloquy.)

12         THE COURT:  It strikes me that there -- from what

13    I have heard so far, that there's a chain of command here, that

14    Mr. Steele and Mr. -- is it Haymeyer, Hammemer? -- were

15    managing partners of the firm that became Prenda Law, continued

16    to be the managing partners of that firm, from the sketchy

17    information the Court has, and that this counsel, as other

18    counsel, basically were contract lawyers doing the heavy

19    lifting in whatever state these lawsuits were being filed.

20         I mean, is that --

21         MR. DUFFY:  Well, the point is that --

22              (Simultaneous colloquy.)

23         THE COURT:  Isn't that a fair -- isn't that a fair

24    analysis of sort of the chain of command here?

25         MR. DUFFY:  That's a fair analysis of what this
```

1    individual is testifying, but it's -- Mr. Gibbs submitted an

2    affidavit in Florida saying he was directing all these other

3    attorneys, and his attorneys agreed that he was directing them,

4    and then he submitted another affidavit in that case and --

5    (audio noise) -- this case, and he didn't tell anybody, he just

6    took his orders from elsewhere.

7          So he was given -- in exchange for consideration, he

8    substantially changed his declaration that he's filed in

9    federal court.

10          **THE COURT:**  But can't you -- can't you take your

11    marching orders from above, and then, you know, from the

12    generals and then, as the captain, order your lieutenants and

13    sergeants below you to do whatever heavy lifting you've been

14    given instructions to do in a case?  I mean --

15          **MR. DUFFY:**  Mr. Gibbs described himself as the

16    secretary.

17          **THE COURT:**  All right.

18          **MR. DUFFY:**  In the -- (audio noise) -- during the

19    hearing.  I mean, a secretary doesn't supervise other attorneys

20    licensed in different states in federal engagement.  At least

21    not in my experience.

22          **THE COURT:**  All right, why don't you go on, counsel.

23          **MR. DUFFY:**  Thank you.

24    **Q.**   Would you read paragraph 4 of that.

25    **A.**   (Reading as follows:)

1              "On occasion, when I needed to speak with a

2          representative for AF Holdings, LLC, my point of

3          contact was Brett Gibbs, who I understood to be lead

4          counsel for all of AF Holdings' cases nationwide."

5     **Q.**   It doesn't -- it doesn't state that Mr. Hansmeier or

6     Steele served that role, right?

7     **A.**   I think I read it, yeah, so it doesn't mention them in

8     that paragraph.

9     **Q.**   Okay.  You represented AF Holdings in connection with this

10    case, is that correct?

11    **A.**   That is correct.

12    **Q.**   And you withdrew sometime when, around February 2013?

13    **A.**   That is correct.

14    **Q.**   And you've since then submitted two affidavits in support

15    of your clients' opponents in connection with this litigation,

16    correct?

17    **A.**   Yeah, that is correct.

18    **Q.**   And the first one -- when was the first one?  Do you

19    recall it being the first part of June 2013?

20    **A.**   Somewhere in there.  I don't know.

21    **Q.**   Do you remember the month?

22    **A.**   June or July.

23    **Q.**   I hand you -- let me see -- I'd like to mark, as

24    Plaintiff's E, a document filed in the Central District of

25    California case, stipulation between movant Brett L. Gibbs and

GIBBS - CROSS / DUFFY

```
 1   attorney Morgan E. Pietz.

 2              THE COURT:  What's the next number, Ms. ...?

 3              THE CLERK:  Five.

 4              THE COURT:  All right, that will be marked as

 5   Plaintiff's 5.

 6                       (Plaintiff's Exhibit 5

 7                       marked for identification.)

 8              MR. DUFFY:  For the record, in the Central District

 9   case, it was filed as docket 178.

10              THE COURT:  Thank you.

11   BY MR. DUFFY:

12   Q.   Do you recognize that document?

13   A.   I do.

14   Q.   What is it?

15   A.   It's a stipulation between myself and attorney Morgan

16   Pietz.

17   Q.   And what's the date of it?  June 10th, right?

18   A.   It is dated June 10th.  June 11th, my signature,

19   June 10th, Morgan's signature.

20   Q.   Now, you --

21              THE COURT:  And that is 2013?

22                       (Simultaneous colloquy.)

23              Counsel?  Counsel?  Counsel?

24              Is that 2013?

25              THE WITNESS:  Oh, sorry, 2013.
```

1           **THE COURT:**  Thank you.

2           **THE WITNESS:**  Yes, your Honor.

3  BY MR. DUFFY:

4  **Q.**   There's a substantial judgment against several people,

5  including you, correct?

6  **A.**   Yes, that is correct.

7  **Q.**   And jointly and severally?

8  **A.**   Yes, that is correct.

9  **Q.**   And you know what joint and several means, obviously,

10  right?

11  **A.**   I do.

12  **Q.**   And paragraph 2 includes a statement by your opposing

13  counsel in this case, and in that case -- in which it states

14  that -- let's see -- that the defendant in that case does not

15  object to your position, and your position is that because,

16  basically, because somebody had posted a bond, people besides

17  you, that you should be relieved from the requirement of

18  posting a bond, is that correct?

19  **A.**   Um, I don't know if that's exactly what I said there, but

20  yeah, that's the general idea.

21  **Q.**   And that was -- if so, if you were removed from the

22  obligation of posting a several hundred thousand dollar bond,

23  that would be a considerable economic benefit, correct?

24  **A.**   I believe at that time it was not several hundred thousand

25  dollars.  It was the --

GIBBS - CROSS / DUFFY

1    **Q.**   Whatever the amount, a hundred thousand dollars.

2    **A.**   What was the question?

3    **Q.**   Is that an economic benefit, if you were placed on the

4    bond, that they didn't --

5    **A.**   Well, it's definitely -- yeah, I mean, it's nice to be

6    relieved of that type of bond, yes.

7    **Q.**   And this is, again, this is again dated June 11th,

8    correct?

9    **A.**   Like I said, it's June 10th and June 11th, to that -- the

10   signature.

11   **Q.**   And it was around the same time that you gave the

12   defendants your first affidavit in this case, in which you said

13   that Mr. Lutz was not telling the truth when he said he sent

14   you documents, correct?

15   **A.**   Again, I remember doing that on -- either in June or July.

16   So I don't know when it was.

17   **Q.**   I believe it's in -- I believe it's in....

18          The Court will take judicial notice, it's attached

19   to the defendants' motion for sanctions in this case.

20   Actually, it was the centerpiece of their motion.

21   **A.**   Correct.

22   **Q.**   So if you'll take judicial notice, it was the first week

23   of June.

24   **A.**   All right, okay.

25   **Q.**   So at the same time you were giving an affidavit to your

1    former attorney opponents adversarial to your former clients,

2    you were getting a financial economic benefit from the same

3    attorneys in a different case, correct?

4    **A.**    Um, yes, that's correct.

5    **Q.**    You gave them a second affidavit, too.  You gave them an

6    affidavit for the reply brief, correct?

7    **A.**    That is correct.

8    **Q.**    And in your reply brief, you said you felt you had to --

9    you were doing it out of a sense of responsibility to the

10   court, right?

11   **A.**    That is correct.

12   **Q.**    And that sense of responsibility arose after you got this

13   financial benefit from the defense counsel, right?

14   **A.**    If you want to classify it that way, then yes.

15   **Q.**    But you never acted out on your sense of responsibility to

16   the court, because you never filed anything, did you?

17   **A.**    That's a compound question, but what are you asking, then?

18   **Q.**    You never -- you said you had a sense of responsibility to

19   the court to submit the affidavit, correct?

20   **A.**    That is correct.

21   **Q.**    And you never filed it with the court.

22   **A.**    I believed at that time that --

23   **Q.**    Did you file it with the court or not?

24   **A.**    If I can explain, my --

25   **Q.**    I asked you a very simple question.  Did you, yes or no,

1    file with the court?

2    **A.**    I did not.

3    **Q.**    Okay.  So you never acted out of that sense of

4    responsibility.

5    **A.**    I did, actually.

6    **Q.**    But you never did just so by informing the court.

7    **A.**    I did, by --

8                    **THE COURT:**  Why don't we allow, the -- why don't we

9    allow the -- counsel, excuse me.  Let's not bicker, let's not

10   argue.  Let's proceed by question and answer, and let's allow

11   the witness to explain his answer.  This is not television.

12   Thank you.

13                   **THE WITNESS:**  I actually spoke with Paul Hansmeier

14   about this, and I said, look, Mr. Lutz is incorrect, and his

15   statements are completely incorrect.  He indicated to me that

16   this would solve all the problems in this case, essentially.

17   I was -- had the dilemma at that point with filing anything

18   because Mr. Lutz apparently was my client, so I had a frank

19   attorney-client privilege dilemma.  I, you know, was struggling

20   over it at that time, and I definitely told Mr. Hansmeier that,

21   you know, you have to do something about this declaration,

22   because it's untrue, and he said to me that he would talk to

23   Mr. Lutz and get it resolved, and it never happened.  So

24   I filed something.

25        //                          //

1   **BY MR. DUFFY:**

2   **Q.**   Did you ever talk to counsel of record?

3   **A.**   Did I talk to counsel of record, in this -- yourself?

4   **Q.**   Yeah.

5   **A.**   Um, I called you.  I don't know if I talked about this.

6   **Q.**   Isn't it true that you haven't discussed it with counsel

7   of record in this case?

8   **A.**   In terms of this, this --

9   **Q.**   You're claiming an affidavit filed in this case was false.

10   **A.**   That's correct.

11         **THE COURT:**  All right.

12   **BY MR. DUFFY:**

13   **Q.**   Setting a -- (indiscernible) -- there to bring it to

14   attention of the Court, although you never did bring it to the

15   attention of the court.

16         **THE COURT:**  All right.

17   **BY MR. DUFFY:**

18   **Q.**   I'm saying, did you ever discuss it with counsel of

19   record?

20         **THE COURT:**  I think we're getting a little far a

21   field from -- (simultaneous colloquy).  Counsel, excuse me,

22   speaking.

23         I believe that we're getting a little far afield

24   from the issues that are currently before the Court regarding

25   the attorneys' fees and the issues regarding whether there are

1  judgments or sanctions against individual lawyers.  So why

2  don't we move on.

3  **BY MR. DUFFY:**

4  **Q.**   Are you aware that your attorney -- your client, Mr. Lutz,

5  filed a complaint against you, against (sic) the State Bar of

6  California?

7  **A.**   I'm aware.

8  **Q.**   And one of things that he's claiming in it is that you

9  can't do settlements in a different case for attorneys' fees

10  without consulting him, right?  Is that correct?

11  **A.**   Um, I haven't anytime recently.

12  **Q.**   Here's a copy of the -- it's a July 2013 letter to the

13  State Bar of California bearing the signature -- what appears

14  to be the signature of Mark Lutz.

15  **A.**   I would --

16          **THE COURT:**  Wait, wait.  Whoa, whoa, whoa, whoa,

17  whoa, whoa, whoa.

18          **MR. DUFFY:**  Exhibit B.

19          **THE COURT:**  That would be Plaintiff's 6 marked for

20  evidence.

21          **MR. DUFFY:**  Okay.

22                  (Plaintiff's Exhibit 6

23                  marked for identification.)

24  **BY MR. DUFFY:**

25  **Q.**   Please take a look at number 2 on page 2.

1           **THE CLERK:**  (inaudible).

2           **MR. RANALLO:**  I would object to this being used for

3    the truth of the matter asserted.

4           **THE COURT:**  Apparently, they're being used for

5    impeachment, and that is a document -- what is the name of that

6    document that you're using?

7           **MR. DUFFY:**  It's a letter dated -- I believe dated

8    July 8, 2013 to the State Bar of California regarding

9    Mr. Gibbs, from Mr. Lutz.

10          **THE COURT:**  All right.

11   **BY MR. DUFFY:**

12   **Q.**   Please take a look at number 2 in there.  What does 2

13   state?

14   **A.**   Do you want me to read the entire thing?

15   **Q.**   I want you to read -- why don't you just tell us what it

16   relates to.  This relates to a case called Mangan Bolsol

17   (phonetic), correct, where the defendant and Levis (phonetic)

18   (inaudible) -- his name?

19   **A.**   Yes, it does.

20   **Q.**   And it states that you came to a -- reached an agreement

21   with defendant's counsel without consulting Mr. Gibbs,

22   correct -- I mean, without consulting Mr. Lutz, correct?

23   **A.**   That's what it says.

24   **Q.**   And did you settle that case?

25   **A.**   This --

1    **Q.**  Did you agree to a settlement?

2    **A.**  No, I did not.

3    **Q.**  Were you still representing Mr. Lutz then?

4    **A.**  I was representing AF Holdings, or -- yeah, AF Holdings in

5    that case.

6    **Q.**  And were you conversing with Mr. Lutz in connection with

7    that case?

8    **A.**  May I explain the entire circumstances of this, your

9    Honor?

10   **Q.**  It's not -- no --

11           **THE COURT:**  All right.  You know, counsel, I think

12   you've made your point that you wish the Court to discount

13   Mr. Gibbs' testimony because of inconsistencies in other

14   AF Holdings cases.  Why don't we move on to another area.

15   **BY MR. DUFFY:**

16   **Q.**  I'm going to hand you Plaintiff's 7, which is a document

17   that bears the heading, "engagement letter," and a date

18   November 15, 2011, and signature from Mark Lutz.

19           Would you take a look at that.

20                   (Plaintiff's Exhibit 7

21                   marked for identification.)

22   **BY MR. DUFFY:**

23   **Q.**  That's an engagement letter between AF Holdings and

24   Ingenuity 13.  It states, "Regarding anti-piracy legal services

25   for AF Holdings and Ingenuity 13," correct?

1    **A.**    That is correct.  I've never seen this before.

2    **Q.**    It states --

3            **MR. RANALLO:**  And also, if I could see a copy?

4            **THE COURT:**  Now, is this for continued impeachment,

5    or are we on a different tack here, counsel?

6            **MR. DUFFY:**  It's for continued impeachment.

7            **THE COURT:**  All right, counsel --

8            **MR. DUFFY:**  Not with respect to -- I'm sorry.

9            **THE COURT:**  I think the Court has understood your

10    point.

11            **MR. DUFFY:**  It's impeachment for a different issue.

12    It's his prior testimony that he never knew about Mark Lutz

13    until early 2013.

14    **Q.**    Take a look at the --

15            **THE COURT:**  All right, have we marked the document?

16            **MR. DUFFY:**  We have to mark the document.  It's,

17    I believe, 7.

18            **THE COURT:**  And what is the document?

19            **MR. DUFFY:**  It states, "Prenda Law engagement

20    letter, November 15th, 2011."

21            **THE COURT:**  Thank you.

22            **MR. DUFFY:**  "On behalf of AF Holdings and

23    Ingenuity 13."

24            **THE COURT:**  All right.

25        //                        //

1  **BY MR. DUFFY:**

2  **Q.**  If you just look at, under Services to be Provided, it

3  states, "The attorney will be overseeing your company's

4  litigation and your primary -- "

5              **THE COURT:**  Why don't we show the witness the

6  document, counsel.

7              **MR. DUFFY:**  I think you just gave it away.

8              **THE COURT:**  Thank you.  All right.  Now, would you

9  direct the witness' attention to the area you wish to inquire.

10  **BY MR. DUFFY:**

11  **Q.**  If you look under Services to be Provided, the second

12  paragraph, the second sentence in that paragraph, would you

13  please read that?

14  **A.**  (Reading as follows:)

15              "The attorney who will be overseeing your

16              company's litigations and primary contact with

17              Prenda Law will be Brett Gibbs.  Of course, you can

18              always contact me as well."

19  **Q.**  So your primary contact, as pointed out, was Mike Lutz,

20  from November 2011.

21  **A.**  I have never seen this document before you handed it to me

22  today.  I never signed this document --

23  **Q.**  That wasn't my question.

24  **A.**  That is not -- this is not how it actually happened.

25  I don't know when this document was actually produced.  I don't

1    even know if this document is authentic, but I was never, as

2    I've portrayed here, I was never the lead counsel for

3    AF Holdings.

4    **Q.**    You said before, in your first affidavit, before you made

5    the deal with the Florida attorney, that you were -- that you

6    were the lead counsel nationally and you would advise and

7    instruct -- (audio noise) -- for people around the country,

8    though, right?

9    **A.**    I never said that I was lead counsel for AF Holdings --

10   **Q.**    But that's consistent with the interaction -- the

11   interaction that you described in your first affidavit, which

12   is --

13   **A.**    No, that is not.

14   **Q.**    -- provide guidance for other attorneys and writing briefs

15   for them?

16   **A.**    But that's completely different than what it says here.

17   **Q.**    Was the primary contact --

18              **THE COURT:**  All right, let's not engage in

19   conversation, here.  Let's proceed by question and answer, and

20   let us move on, counsel.  I think the Court is -- understands

21   your position regarding impeachment of this witness.  But let's

22   move on to another topic.

23              **MR. DUFFY:**  I just have one more thing, your Honor.

24   This is one of the points that defendants' counsel argued at

25   the beginning.

GIBBS - CROSS / DUFFY

1   **Q.**   I'm going to hand you a copy of the February 7th, 2013

2   order to show cause against you.

3            Which I don't know if this has been marked or not.

4   Has it been?

5            **MR. RANALLO:**  I'll take notice.

6            **MR. DUFFY:**  This will be -- this is the -- I can't

7   read the document number, because it's printed over, but it's

8   the Order to Show Cause Re: Sanctions for Rule 11 and Rule

9   (inaudible) violations.

10           **THE COURT:**  Okay, we -- all right.  This is -- all

11  right, let's --

12           **MR. RANALLO:**  Counsel made an issue --

13           **THE COURT:**  This is -- hold on.  We have now

14  Plaintiff's 8 in order, a document titled, "order to show

15  cause," in which case?

16           **MR. DUFFY:**  In the Central District of California

17  case, 27-CV-8333.

18           **THE COURT:**  Thank you.

19                          (Plaintiff's Exhibit 8

20                     marked for identification.)

21           **MR. DUFFY:**  The ECF docket number is illegible from

22  my copy.

23           **THE COURT:**  All right.

24           **MR. DUFFY:**  It's dated February 7th.

25           **THE COURT:**  Thank you, counsel.

1  BY MR. DUFFY:

2  Q.    And counsel suggested that the brief submitted today was

3  incorrect because we stated that there was not an allegation

4  against AF Holdings of copyright -- relating to a copyright

5  assignment, correct?  You recall that?

6            THE COURT:  Well, this is not something that this

7  witness is -- this is not something that this witness --

8  (simultaneous colloquy.)  Hold on.  I'm speaking.

9            This is not something that this witness was -- there

10  was not inquiry made as to this witness.  This was something

11  that counsel brought up during this opening statements.  So if

12  you wish to -- if you wish to discuss that, you can do that

13  after you're done with your inquiry with this witness.

14            MR. DUFFY:  Well, this is an order to show cause

15  issued to this witness.  I have just one question regarding it.

16            THE COURT:  Okay.

17  BY MR. DUFFY:

18  Q.    Pages 9 -- 9 through 11 states the conclusions, and I've

19  highlighted one of them.

20            Is there anything in that section suggesting that

21  AF Holdings had invalid copyright transfer, assignment

22  agreements?

23  A.    Do you want me to read it?  Is that --

24  Q.    Well, it's just more bullet points.  Is there something in

25  there suggesting that Ingenuity 13 had an improper copyright

GIBBS - CROSS / DUFFY

1  assignment agreement?  Is there anything in there -- this was

2  issued to you on February 7th.  You testified that you

3  remembered it.

4  **A.**   Are you talking about the part that you outlined with the

5  star?

6  **Q.**   I highlighted part of it, but is there any part of that

7  suggesting that AF Holdings had an improper copyright

8  assignment agreement?

9  **A.**   Not in this order that I see.

10  **Q.**   It does Ingenuity 13, correct?

11  **A.**   I believe so.

12  **Q.**   And Ingenuity 13 is not a party to this case.

13  **A.**   Yes, it's not.

14  **Q.**   One last thing.  When did you first meet Paul Hansmeier?

15  **A.**   I met Paul Hansmeier in law school.

16  **Q.**   What year was that?

17          **THE COURT:**  All right, counsel, just so that --

18  counsel -- (simultaneous colloquy) -- counsel, just so that the

19  record is clear, I am looking at the order from Judge Wright,

20  and I note that on page 3, under the heading of Findings of

21  Fact,

22              "1.  Steele, Hansmeier and Duffy, principals, are

23          attorneys with shattered law practices seeking easy

24          money.  They conspired to operate this enterprise

25          and formed the AF Holdings and Ingenuity 13

1                        entities, among other fungible entities, for the

2                        sole purpose of litigating copyright infringement

3                        lawsuits.  They created these entities to shield the

4                        principals from potential liability and to give an

5                        appearance of legitimacy."

6                        Proceed.

7                        **MR. DUFFY:**  And that is absolutely unsupported in

8     the record, but I was just referring to February 7th.

9     **Q.**   Was Mr. Hansmeier a roommate?

10    **A.**   He was.

11    **Q.**   So you've known him well for a long -- for at least close

12    to ten years, right?

13    **A.**   I -- well, I -- when I left law school, I went there for a

14    year, I transferred over to Hastings in San Francisco.

15    I finished out my law schooling, I took the bar over here, and

16    then --

17    **Q.**   I'll give you the benefit -- you've been his friend for a

18    substantial amount of time, correct?

19    **A.**   There was a four or five-year period when I didn't speak

20    with him --

21    **Q.**   But other than that, for the rest of the nine-year period,

22    you've been friends with him, and even roommates.  So you're

23    friends; it's not unusual for him to call you to talk to each

24    other on the telephone, correct?

25    **A.**   I mean, it's not unusual.  It's just the amount of

1   telephone calls that we --

2   **Q.**   How much have you talked to him in 2005, after you

3   transferred to law school, how many minutes?

4   **A.**   After I transferred?

5   **Q.**   Yeah.

6   **A.**   Roughly a total of zero.

7   **Q.**   And how many -- and up in 2011, in 2011, how many minutes

8   did you talk to him?

9   **A.**   Two thousand -- well, I know 2012, which was --

10   **Q.**   I'm asking about 2011.

11   **A.**   Well, 2011, probably about the same as 2012.

12           **MR. DUFFY:**   I don't have any further questions.

13           **THE COURT:**   All right, thank you.   It's now ten

14   after three.   Let me ask defense counsel, do you have further

15   evidence you wish to present?

16           **MR. RANALLO:**   Yeah, I mean, in order of importance,

17   I would like to introduce Mr. Cooper's testimony at the

18   March 11th hearing under 804(b).   I would also seek to --

19   I mean, to the extent that --

20           **THE COURT:**   Well, let me ask you this.   Let me ask

21   you this.   What is it that you'd like to present to the Court

22   this afternoon that's not contained in the affidavits or

23   documents that you've already presented in written form?

24           **MR. RANALLO:**   What I do have, I have Mr. Neville,

25   who presented two declarations that -- he would speak on many

1    of the same topics, but he could speak on the rebuttal that

2    Mr. Duffy provided this morning.

3           And so I mean, if you're willing to skip ahead to,

4    you know, present day and take the declarations themselves, we

5    can then just address what Mr. Duffy raised this morning.

6           **MR. DUFFY:**  I don't understand what -- what

7    declarations.

8           **MR. RANALLO:**  The declarations of Delvan Neville.

9           **MR. DUFFY:**  They're already in the record, your

10   Honor.  We've already submitted them.

11          **THE COURT:**  That's why I'm asking.  So what would

12   the witnesses testify to that would enlighten the Court now as

13   to the situation before it regarding these sanctions and/or the

14   judgment against AF Holdings?

15          **MR. RANALLO:**  Basically, two main points.  One I can

16   get in through documents.  We have a document from Comcast

17   indicating that one of the IP addresses identified by

18   Mr. Neville was conclusively tied to Steele Hansmeier, the law

19   firm, and then I believe there was also an issue in their

20   filing this morning about the hashtag for Popular Demand, and

21   I think Mr. Neville could explain the circumstances surrounding

22   that.

23          **THE COURT:**  All right.  For that limited purposes --

24   for those limited purposes, excuse me, why don't we go ahead

25   and take your next witness.

1          Do you have any cross -- do you have any redirect of

2    Mr. Gibbs?

3          **MR. RANALLO:**  Well, I did have one for Mr. Gibbs.

4    We will go ahead and mark this -- what number are we on?

5          **THE CLERK:**  H.  Our last one was G.

6          **MR. RANALLO:**  Okay, so it will be Defendant's

7    Exhibit H, it is from case number 3:11-cv-01956-EDL, and it's

8    entitled, "Notice of Firm Name Change."

9                    (Defendant's Exhibit H marked for

10                        identification)

11                  <u>**REDIRECT EXAMINATION**</u>

12   BY MR. RANALLO:

13   **Q.**  Could you take a look at the first sentence of that and

14   just read to me what it says?

15   **A.**  (Reading as follows:)

16              "Notice is hereby given that Plaintiff's

17              counsel...firm has changed names from Steele

18              Hansmeier...to Prenda Law...."  The Court will take

19              note that all other identifying information

20              associated with plaintiff's counsel...."

21   **Q.**  And just to clarify, that says that the firm changed their

22   name, is that correct?

23   **A.**  That's correct.

24   **Q.**  Okay.

25          **THE COURT:**  And Mr. Gibbs -- Mr. Gibbs, that was

1   your understanding, is that correct?

2                    **THE WITNESS:**  Yes --

3                    **THE COURT:**  Thank you.

4                    **THE WITNESS:**  -- that's -- (indiscernible).

5                    **THE COURT:**  Anything further from Mr. Gibbs?

6                    **MR. RANALLO:**  Nothing for Mr. Gibbs.

7                    **THE COURT:**  Counsel, Mr. Duffy?

8                    **MR. DUFFY:**  I don't have anything further.

9                    **THE COURT:**  Mr. Gibbs, you're excused.

10                    **THE WITNESS:**  Thank you, your Honor.

11                    **MR. RANALLO:**  The prior testimony, read -- the

12   March 11th transcript is voluminous, but it's already in the

13   record at 84 -- ECF 84-2.  I would seek to just admit

14   Mr. Cooper's portion of the testimony and cross-examine

15   thereof --

16                    **MR. DUFFY:**  I object, your Honor, first on the

17   grounds of authenticity, it's not an authentic document.  It's

18   not -- the transcript is not self-authenticating.

19                    And secondly, the -- apparently, the testimony was

20   given under circumstances where, contrary to counsel's belief,

21   Mr. Lutz and several other people were participating by phone,

22   again, had counsel in court during that hearing, but were not

23   allowed any opportunity to cross-examine Mr. Cooper, who's

24   given substantial evidence on questions about bias and other

25   matters that the plaintiff in this case was completely barred

1  from cross-examination on --

2          **THE COURT:**  This was -- this was -- this is a

3  transcript of testimony taken in open court?

4          **MR. RANALLO:**  Yes, on March 11th.

5          **THE COURT:**  All right.

6          **MR. RANALLO:**  On the initial order to show cause.

7          **MR. DUFFY:**  In which plaintiff was not given any

8  opportunity to cross-examine.

9          **MR. RANALLO:**  Mr. Cooper was cross-examined by

10  Mr. Gibbs' special counsel.

11          **MR. DUFFY:**  Mr. Gibbs is now averse to AF Holdings

12  and has been for some time.

13          **THE COURT:**  Let me ask -- well, let me ask this.

14  All right, this was -- this is a transcript of a proceeding in

15  an ancillary or in this matter?

16          **MR. DUFFY:**  In the matter in the Central District.

17  It was not in this matter.

18          **THE COURT:**  It's an ancillary -- this is before

19  Judge Wright, is that correct?

20          **MR. RANALLO:**  Right.

21          **MR. DUFFY:**  Yes.

22          **THE COURT:**  All right, and counsel, is this a copy

23  of the document that you retrieved from ECF?

24          **MR. RANALLO:**  Yes.

25          **THE COURT:**  All right.

1      **MR. DUFFY:**  ECF in the Central District, and

2   I believe that they attached it to a pleading here, but listed

3   in ECF in California -- in the Central District.

4          **THE COURT:**  All right.  Given the representations of

5   defense counsel as to where the item was retrieved, the Court

6   will take judicial notice of the document and move that in as

7   H.  Move on, counsel.

8          **MR. RANALLO:**  Thank you, your Honor.  I also have

9   the affidavit of Alan Cooper.  To the extent that the Court

10  accepts the March 11 testimony of Alan Cooper, it will be

11  redundant, or not the best evidence, but I believe it's

12  admissible under 807, and notice of it was given to Mr. Duffy

13  previously.

14         **MR. DUFFY:**  It's not admissible.  It's an affidavit,

15  your Honor.

16         **THE COURT:**  Has it been filed?

17         **MR. RANALLO:**  Yes, it was filed in this matter --

18         **THE COURT:**  In this matter?

19         **MR. RANALLO:**  -- briefly.

20         **THE COURT:**  In this particular matter, AF Holdings

21  versus Navasca.

22         **MR. RANALLO:**  Yes, it was filed.  It wasn't prepared

23  directly for it, so -- but it's a notarized affidavit,

24  discounting, basically, his involvement with Mr. Steele and

25  AF Holdings.

1          **THE COURT:**  All right, the Court will take

2     judicial --

3          **MR. DUFFY:**  It's an affidavit, your Honor.

4          **THE COURT:**  All right, the Court will take judicial

5     notice of it, mark it As defendant's -- G, H -- I in order.

6     All right, why don't you proceed, counsel.

7                    (Defendant's Exhibit I marked for

8                      identification)

9          **MR. RANALLO:**  All right, now, if we could just call

10    Mr. Neville quickly.

11         **THE COURT:**  How are we doing?  Are you okay with...?

12    We're going to go through everything before we finish, so we

13    will look at each item, see whether it's moved into evidence or

14    just used for impeachment, all right?

15         **THE CLERK:**  Okay.

16         **THE COURT:**  Okay.

17         **THE CLERK:**  Please raise your right hand.  Do you

18    solemnly swear or affirm that the testimony that you are about

19    to give in the matter now pending before this court shall be

20    the truth, the whole truth, and nothing but the truth, so help

21    you God?

22         **THE WITNESS:**  I do.

23                    ---o0o---

24      //                    //

25      //                    //

1    **DELVAN NEVILLE**,

2    called as a witness for the DEFENDANTS, having been duly sworn,

3    testified as follows:

4            **THE CLERK:**  Please state your full name and spell it

5    for the record.

6            **THE WITNESS:**  My name is Delvan Reed Neville,

7    D-E-L-V-A-N, R-E-E-D, N-E-V-I-L-L-E.

8            **THE COURT:**  Your witness, counsel.

9            **DIRECT EXAMINATION**

10   **BY MR. RANALLO:**

11   **Q.**   All right, Mr. Neville, to the extent we're trying to keep

12   this quickly -- quick as possible, give me just a brief rundown

13   on your initial findings in the declarations that you have

14   filed in this court, and then we'll just quickly go through --

15   (indiscernible).

16   **A.**   My investigation started in March of 2013, and the larger

17   declaration that's filed in this matter was originally filed in

18   *First Time Videos v. Oppold*, in Florida.  This proceeded and

19   then finished at the very end of May, and in it I found, on

20   monitoring the swarms associated with sharkmp4, as well as

21   other hashes that were associated with Prenda but not

22   associated with sharkmp4, that the -- the same peer who

23   appeared to be acting as a forensic monitoring agency doing

24   things that a regular peer would not do, appeared only on those

25   hashes associated with sharkmp4.

1          **THE COURT:**  I -- I'm sorry.  Mr. Neville,

2     Mr. Neville, I'm sorry.  Maybe we need to take it a little bit

3     slower.

4          You are who?  You are -- what is your relationship

5     to this case?  Are you an attorney?

6          **THE WITNESS:**  My apologies.  No, I'm a forensics

7     expert.  I own a company called Amaragh Associates, LLC.

8     I specialize in internet forensics, but I do provide other

9     technical advice.

10          **THE COURT:**  I'm over -- so I'm over 50.  You're

11     going to have to explain that to me.

12          **MR. DUFFY:**  I object to this witness.  All that --

13     (indiscernible) -- to his affidavit, as well.  There's been no

14     disclosure of this.  There's been no -- he was not qualified as

15     an expert, he's not disclosed, who's paid him, how much he was

16     paid or anything else.

17          He's called himself an expert.  There's been no --

18     anything proffered suggesting that he's an expert, certainly no

19     ruling of the Court that he's an expert with respect to

20     anything.  There's been no disclosure that complies with the

21     Federal Rules of Evidence, and if there's an expert report,

22     we've had no opportunity to depose the individual before he

23     presents his evidence, and he's now presenting new opinions

24     which have not been disclosed, which I have no idea what

25     they're going to be.

1    So I think that there's no -- there's absolutely no

2    foundational basis at all for this individual we've got

3    providing expert testimony.

4    **THE COURT:** Counsel, that's a good point. What's

5    your response?

6    **MR. RANALLO:** I would say that there's -- basically,

7    discovery here closed almost immediately, and so to the extent

8    that there was no expert witness exchanges, that's why.

9    Basically, I have his CV, and -- I mean, to the

10   extent that his -- much of his testimony, I guess to clarify,

11   is based on things he observed through the use of a particular

12   program. His observations are apart from expert testimony.

13   You know, there's not expert witness -- there's expert

14   testimony and lay testimony, and so to the extent this Court

15   doesn't want to consider him as an expert, I think there's

16   still much that he personally observed that is useful and much

17   of his declaration is, frankly, based upon notice.

18   **MR. DUFFY:** Your Honor, that's --

19   **THE COURT:** All right. To the extent that he

20   testifies from his own personal knowledge and it's relevant,

21   the Court will accept the testimony. However, Mr. Duffy has

22   made a good point. He is not qualified as an expert, CVs have

23   not been exchanged, he wasn't noted during the discovery

24   portion of this case, and so I will limit Mr. -- is it

25   Neville's -- testimony to that of a lay witness. Proceed.

1          **THE WITNESS:**  Yes, your Honor.  So proceeding,

2     describing the background here, so bit torrent monitoring is

3     connecting two swarms of individuals who are generally

4     exchanging files via the bit torrent protocol, and recording

5     what messages they are sending back and forth.

6          There's a couple of ways to do it.  One is actively

7     trying to get pieces for them.  The other one is exchanging all

8     the other accessory messages without actually offering new

9     pieces.  In this matter, as I was not contracted by the

10    copyright holder, I engaged in passive monitoring.

11         So I exchanged handshakes with what appeared to me

12    to be the 6881 peer, based on the -- they popped up in sharkmp4

13    files that were Prenda-associated, and they didn't appear in

14    any of the other related sorts, were redundant, were not

15    connected to Prenda 6881.

16         So this peer, despite me not asking for any pieces

17    of it, aggressively tended to offer me pieces, provided

18    accessory messages, like the *allowed_fast*, which is an

19    extension, it's not a regular bit torrent message, that

20    essentially means, "Here, have the file.  I don't care if

21    you're sharing that, I don't care if you have nothing.  Here,

22    have it."  The peers that I monitored doing this were four IPs

23    associated with the Mullvad VPN.  They're a VPN service based

24    in Sweden.

25         From this investigation, I then move on to, is there

1    any other association between this VPN, which is relatively

2    uncommon in bit torrent forums.  I mentioned in the declaration

3    how rare it was to actually see it in other swarms.

4            Comments were made on a couple of blogs that

5    specialize in what they would term copyright trolls.  One is

6    FightCopyrightTrolls.com, the other is DieTrollDie.com.

7            For some time there were comments made on there that

8    appeared to be coming from a Prenda insider, or pro-Prenda

9    stance.  I contacted the monitor of the blogs and acquired the

10   IP addresses that was used by individuals to make these

11   comments, and we found that these individuals who appeared to

12   be Prenda insiders were also using this relatively uncommon

13   Mullvad VPN.  They also used IP addresses that fit perfectly

14   with a Prenda insider.  They were coming either from Chicago,

15   from Minnesota, or from Florida, and one IP address in Las

16   Vegas, and there were some blogs that talked about them

17   operating in Las Vegas for a while.

18           And I'm trying to -- I know we're looking at that,

19   we don't have time to go through 50 pages of that declaration

20   on here.

21           So moving forward from those IP addresses that were

22   associated with that activity, GoDaddy had been subpoenaed for

23   a number of accounts that were owned by John Steele, although

24   in the actual records at various times Alan Cooper is listed as

25   the owner with John Steele's e-mail address.  In another

1    instance, John Steele is listed as the owner, but it's an

2    AlanCooper@gmail.com e-mail address.

3              But these GoDaddy accounts very recently, in the

4    *AF Holdings v. Patel* case in Georgia, they've been granted

5    discovery, and one of the recent filings included a number of

6    attachments that I believe was meant to establish that their

7    subpoenas were actually appropriate and accurate, and these

8    included GoDaddy records relating to John Steele, some of these

9    the same accounts, some of these new accounts --

10             **MR. DUFFY:**  May I direct, if I may, to the

11   characterization of the case, that nobody here is --

12   AF Holdings is involved, but no counsel here is involved in it,

13   and this individual's characterization of what a summary of

14   discovery motions in a case in George is.

15             **MR. RANALLO:**  I have the document he's speaking of.

16   That's the one I mentioned previously, that I would seek to

17   admit, identifying the particular IP address identified in his

18   declaration numerous times as a Steele Hansmeier IP address.

19             **THE COURT:**  And that document --

20             **MR. RANALLO:**  And I seek to admit as Exhibit J.

21             **THE COURT:**  And that document is what?

22             **MR. RANALLO:**  This is from the -- it's a business

23   record from Comcast, in response to a subpoena that basically,

24   the defendant in that case subpoenaed the identity of a

25   particular IP address, and Comcast sent him this in return,

1   sent along with the business records certification.

2           **THE COURT:**  All right, that's marked --

3           **MR. DUFFY:**  Can I object?  This is going very far

4   afield of what the way -- the way the opinion looks like.

5           **THE COURT:**  Well, I'm also concerned that it's

6   contained in the affidavit that's already moved into evidence.

7           **MR. RANALLO:**  So as far as what -- this document

8   that I'm holding is not in evidence so far.

9           **THE COURT:**  No, but what the witness is testifying

10  to.

11          **MR. RANALLO:**  Right, to some extent that is, and

12  again, we can try to keep that as tight as possible right now.

13          **THE COURT:**  All right, then mark the document as J

14  in order.

15          **MR. RANALLO:**  J.  Thank you.

16                      (Defendant's Exhibit J marked for

17                      identification)

18          **THE WITNESS:**  Shall I continue?

19          **THE COURT:**  Yeah, please.

20          **MR. RANALLO:**  Yes.

21          **THE COURT:**  But let's proceed by question and

22  answer, so we don't sort of ramble.  Counsel?

23  **BY MR. RANALLO:**

24  **Q.**   Did you have an opportunity to read Mr. Duffy's filing

25  from this morning?

NEVILLE - DIRECT / RANALLO

**A.**   I did.  I had the opportunity to read that after I got on

the plane.

**Q.**   And he makes some particular point about the hashtag for

Popular Demand, is that correct?

**A.**   Yes, he does.

**Q.**   And can you explain, as best you can, what his problem

with it is and what your response would be, to the best of your

ability?

**A.**   So the issue that was raised is that the hash in this case

that Mr. Navasca is accused of stealing this file from is

Popular Demand, same copyrighted work, but this hash is

associated with a user on Pirate Bay called fluxXxu, F-L-U-X,

capital X, X-U, and he objects because I present this as being

a sharkmp4-associated hash in my original declaration.

        The issue here, fluxXxu is one of many torrent

re-posters.  There are many other accounts on Pirate Bay that

you can look at -- for instance, checkm8, spelled with an 8,

c3porno is another example -- they take other torrents, they

re-post them, just change the filename, which allows them to

appear to have credit for it.

        In this instance, the file that was uploaded, or was

associated with Mr. FluxXxu, is exactly the same file size as

that associated with the original sharkmp4 upload, down to the

number of bytes, exactly the same file size.  The only

difference between the two that I can see -- because of course,

1    I'm not familiar with the downloadable files -- is that one is

2    named pd.abi and the other is PopularDemand.abi.

3            When a hash is generated for a torrent -- and I'm

4    happy to submit that the "torrents" designation is -- I'm not

5    thinking as an expert the top ops (phonetic) in the six

6    pages -- the big FO (phonetic) for the file is part of that.

7    If you read in the file, but it's otherwise the same file, you

8    make a new torrent from it, it will have a new infohash,

9    because the infohash is more than what's actually in the file,

10   it includes the naming of the files that are in there.

11           Sharkmp4 uploaded this file on August 11th in 2011,

12   I believe, whereas fluxXxu up loaded that same file, just a

13   different filename, on the 15th, four days after sharkmp4.

14           And I alluded to this in my original declaration,

15   that I intentionally took things that were sharkmp4, things

16   that were Prenda-related but not sharkmp4, and things that were

17   outside of both, to attempt to discern between 6881, sharkmp4,

18   and other users out there.

19           This one was one of the hashes I selected because

20   it's Prenda-associated, but wasn't the original one uploaded by

21   sharkmp4, and given the idea of a -- of exclusively looking at

22   sharkmp4 or do the LPs monitor some of the other works that

23   they may not have necessarily apparently supplied.

24   **Q.**    Thank you, and if I could just ask one more point.  As far

25   as the sharkmp4 user is concerned, I believe you -- trying to

1  phrase this in such a way that it can be answered solely on

2  personal knowledge -- to the extent that the sharkmp4 user --

3  let me ask this again --

4          **THE COURT:**  Well, counsel -- counsel, counsel --

5  counsel, I'm going to have to take a five-minute recess.  I was

6  supposed to attend a phone conference at 3:30.  I'm going to

7  have to excuse myself from that phone conference.  So I'm going

8  to take a five-minute recess.  Well reconvene at 3:35.  Thank

9  you.

10          **MR. RANALLO:**  Thank you, your Honor.

11              (Recess from 3:31 p.m. to 3:41 p.m.)

12          **THE COURT:**  Yeah, just for the record.

13          **THE CLERK:**  C12-2391, EMC and JV, AF Holdings, LLC

14  versus Doe.

15          **MR. RANALLO:**  Shall I continue?

16          **THE COURT:**  Please.

17  **BY MR. RANALLO:**

18  **Q.**   Before the break, we were just about to get into the

19  particular sharkmp4 user and what you've looked at recently.

20          Did you check recently whether sharkmp4 had ever

21  been issued DMCA notices regarding any of the films that were

22  sharing?

23  **A.**   I did, and I actually made a reduced search both for the

24  shark MP4 as well as the other hashes that were in my

25  (indiscernible) just basically so you can still find the page,

1    has there been a DMCA issued to go, or at least to make claim

2    that they've had one issued to them, yes.

3    **Q.**    Had any been issued for the sharkmp4 files?

4    **A.**    No, all the sharkmp4 hashes, no DMCA claims were filed.

5    **Q.**    And how long ago did you originally file your declaration

6    bringing this particular user that's sharing all the -- these

7    files?

8    **A.**    This declaration would be May 29th or 30th; not sure of

9    the date it made it onto the record.

10    **Q.**    So approximately three months ago?

11    **A.**    Right.

12    **Q.**    And it doesn't appear that AF Holdings has issued any

13    takedown notices with respect to any of them?

14    **A.**    Not at this time.

15    **Q.**    And you mentioned that you also did a similar search with

16    regard to the non-sharkmp4 films that were part of your

17    (indiscernible).

18    **A.**    I did, and all the ones that were not a sharkmp4 original

19    had that DMCA issued against them, on Google.

20    **Q.**    And so you were able to see it through Google, that the

21    ones not being shared by sharkmp4 had been taken down by the

22    owners.

23    **A.**    Correct.  I will point out that --

24           **MR. DUFFY:**  Objection to foundation and form of the

25    question.

1    **THE COURT:**  Sustained.

2    **BY MR. RANALLO:**

3    **Q.**    So as to the particular IP address identified in that

4    Comcast subpoena that we just identified as Exhibit J, that IP

5    is address is related to a particular website, is that true?

6    **A.**    Yes, it was associated with a website called

7    Naughty-Hotties.

8    **Q.**    And as far as the Ingenuity 13 works, what was -- was

9    there anything unique about the Naughty-Hotties website?

10    **A.**    Until this website, I could find no commercial operators

11    to acquire any of the Ingenuity 13 works available by sharkmp4

12    in 2011 or 2012, but this website, which was created in 2013,

13    first time that I saw it being available for sale.  And I was

14    able to confirm the other screenshots on the site, and those

15    posted by sharkmp4, to be one and the same works, and even the

16    names and the images they used on the site referenced the same

17    works.

18         **MR. RANALLO:**  And so -- well, without going into

19    your opinion, I guess we can't go much further than that.

20         I have no further questions for Mr. Neville, your

21    Honor.

22         **THE COURT:**  All right, thank you.

23    Cross-examination?

24         **MR. DUFFY:**  Yes.

25

NEVILLE - CROSS / DUFFY

### CROSS-EXAMINATION

**BY MR. DUFFY:**

**Q.**   Mr. Neville, how did you come to be involved in this case?

**A.**   This case specifically?

**Q.**   This we're hearing today.

**A.**   This case, I became involved after I noted that my initial declaration, which was filed in the Paul Oppold case, had been filed in this case.

**Q.**   How did you get involved in the Paul Oppold -- is that how it's pronounced, is that the correct --

**A.**   The Paul Oppold case.

**Q.**   The Paul Oppold case?

**A.**   I'm not that personally, so I can't testify to --

**Q.**   How did you come to be involved with that case?

**A.**   So I was contacted by Mr. Syfert in mid-March --

**Q.**   He's the defense attorney for the --

**A.**   Yes.

**Q.**   He's representing Paul Oppold.

**A.**   Yes.

**Q.**   Pornography defense bar, right?  He represents defendants in pornography infringement cases, right?

**A.**   Those are some of the cases he represents, to my knowledge.

**Q.**   Did you prepare -- did you prepare the report for that case exclusively?

NEVILLE - CROSS / DUFFY

1    **A.**    Yes, I prepared that case specifically, this -- this case,

2    specifically for that.

3    **Q.**    And were you paid for it?

4    **A.**    Yeah -- well, I have invoiced for it.

5    **Q.**    You sent an invoice or you received an invoice?

6    **A.**    I sent an invoice for the amount owed.

7    **Q.**    To whom --

8    **A.**    However --

9    **Q.**    -- did you send the invoice?

10   **A.**    I sent the invoice to Graham Syfert.

11   **Q.**    And what was the amount claimed on the invoice?

12   **A.**    $4,000.

13   **Q.**    How many hours work was that?

14   **A.**    So there are two portions on the invoice, and if you check

15   the record (indiscernible) -- with my initial declaration, and

16   it should be also in this case --

17   **Q.**    I understand.  How many hours were spent?

18   **A.**    Well, it was an odd memory, it was 28 and a fraction.

19   Early on when I talked to him, I gave him a hard cap of no more

20   than $4,000.  When the hours hit that point, I had already

21   agreed I wasn't going to go over that.  So it's not carried to

22   any further hours, but I still have a contract looking forward.

23   **Q.**    When you finish testifying in this case,

24   (indiscernible) -- in this case, in terms of this case?

25   **A.**    I was paid for a follow-up declaration that, until the

NEVILLE - CROSS / DUFFY

1   seven points that you raised were part of my first declaration,

2   yes.

3   **Q.**   And out on the nature trail, where do you live?

4   **A.**   I live in Corvallis, Oregon.

5   **Q.**   How did you get to have him pay for your travels here

6   today?

7   **A.**   I will be invoicing Mr. Navasca for that.

8   **Q.**   Okay.  What is a hashtag?

9   **A.**   In reference to this case --

10  **Q.**   Just, what is it, just generally?  What does the term

11  mean?

12  **A.**   There is --

13  **Q.**   Several times --

14  **A.**   -- a few general terms of it, and I'm trying to be

15  specific.  So "hashtag" is used on Twitter to refer to a way to

16  categorize a post.  They present the pound symbol, which

17  programmers also refer to as a "hash," and then a word.

18            In this case, a hashtag is also used to refer to an

19  infohash.  Usually we're talking about the insides associated

20  with a torrent, so there's actually a hashtag for every piece

21  within a torrent.

22  **Q.**   In your reports, where was the hash -- can you give me the

23  first few digits of the hashtag that you referenced in your....

24            Well, first of all, in your report, it's stated the

25  infohash values are, quote, "unique fingerprints for

1    identifying the torrent swarm and downloading the work,"

2    correct?  That's in your report.

3    **A.**    That is correct.

4    **Q.**    So it's a fingerprint -- you can think of it, if I can

5    think of it, as somebody who is literally a lay person on these

6    matters, I can think of as a fingerprint, accurately, correct?

7    **A.**    Pretty much.  It's possible to have more than one swarm

8    with the same hash, but it's not possible to have two hashes in

9    the same swarm, if that makes sense.

10   **Q.**    So what was the -- and a hashtag is a very lengthy series

11   of digits.  Do you know how many digits or numbers are in

12   there?

13   **A.**    I believe it's a 20-byte series.  It's 160 bits.

14   **Q.**    So how many digits did you put in your report, what the

15   hashtag number was?

16   **A.**    So I put those all in hex coding, so it's two characters

17   per byte, so it's 40 characters.

18   **Q.**    So was what it?  I mean, what did it start -- give me the

19   first two numbers.

20   **A.**    So there's two.  There's the 6F1, and there's the 96 --

21   I believe it's a 9 after that.

22   **Q.**    And you indicated that those make -- you indicated in your

23   report, you believe those belong to a user named what?  What

24   was the user name?  Sharkmp4, correct?

25   **A.**    Yes, most of those hashes are associated with sharkmp4.

NEVILLE - CROSS / DUFFY

1    **Q.**    And both of those hashes are associated with a specific

2    download at a specific time of a specific work, right?

3    **A.**    So ultimately the hashes are not specific to a time.  They

4    are both specific to a work, but they are not specific to the

5    same swarm.

6    **Q.**    Okay, so they're different swarms.  Just, they're

7    different -- they reference two different -- the two different

8    numbers reference two different acts of downloading, correct?

9    **A.**    They reference a minimum of two swarms, yes.

10   **Q.**    Okay, and a swarm is an act of down- -- is a -- in bit

11   torrent terms, how copyrighted materials are downloaded,

12   correct?

13   **A.**    A swarm is the collection of users at any given time that

14   are exchanging the file with that action.

15   **Q.**    You said there can't be the same province -- two hash

16   numbers -- the same -- the same hash number can't be involved

17   in two swarms, is that correct?

18   **A.**    That's correct.  Well, given you can have two hashes in

19   the same swarm, you can have one hash in more than one swarm.

20   I want to make that clear.  Because --

21   **Q.**    Tell me again, because honestly -- you can have -- okay,

22   tell me again.  I'm not understanding.

23   **A.**    Do you mind if I just explain?

24   **Q.**    No, you just repeat what you said, and I think I'm going

25   to --

NEVILLE - CROSS / DUFFY

1   **A.**   Okay.

2   **Q.**   -- I think I heard --

3         **THE COURT:**  All right, let's not have a discussion,

4   here.  Let's proceed by question and answer.

5         **MR. DUFFY:**  Yes, thank you, Judge.

6   **Q.**   Can there be two hashtag values in one swarm?

7   **A.**   No.

8   **Q.**   But the hashtag can be involved in more than one swarm.

9   **A.**   That is correct.

10  **Q.**   And you used -- to complete your report, that the

11  sharkmp4, that you're seeking to identify John Steele.  That

12  was your phrasing, right, that it could be him?

13  **A.**   I was careful to indicate while it does point to John

14  Steele, it is clearly a chance that it could be some other

15  agent who's logging in to use his search (inaudible)."

16  **Q.**   Do I need to use those, that it could be John Steele,

17  right?

18  **A.**   I'm quite sure I used that language, but I'm also quite

19  sure that I followed up with some conclusion to the point that

20  I'm not pointing only at John Steele, only that he is the most

21  likely candidate.

22  **Q.**   So it could be somebody else.  Who are the other

23  candidates?

24  **A.**   So the other candidates would be those who you would

25  expect to have access to his GoDaddy reference logging into the

NEVILLE - CROSS / DUFFY

1  accounts, all the IP addresses that were associated with Prenda

2  logging into this accounts.

3  So it's possible that it's Mark Lutz, for instance,

4  is what I would be suggest is the person, so he would have the

5  right to be distributing the logs, could even be given John

6  Steele's information and be possible that he is the one who

7  logged into GoDaddy to monitor.

8  However, when new evidence came up in the Patel case

9  in audio recordings, that pretty much solidified that it is

10  indeed John Steele who is logging into the accounts, who's

11  controlling that, because he's on the phone in nine instances,

12  five of the four, always logged into gear, using a variety of

13  (indiscernible).

14  **Q.**  I'll move to strike that.  There's no (indiscernible) that

15  I'm aware of, there's just nine addresses, so...

16  So you use two hashtag values, correct, in your

17  report?  You value two hashtag values.

18  **A.**  I've got 15 hash values in the initial investigation, if

19  that's what your question is.

20  **Q.**  Now, you've concluded that this person calling himself

21  sharkmp4 had -- was associated with a specific hashtag, right?

22  **A.**  He was associated with several hashtags.

23  **Q.**  That you include in your report, too?  Your report is

24  based on two -- you just told me that he used two different

25  hashtags.

1    **A.**    If we're talking about the hashtag that you had a

2    disagreement about whether or not it's associated with

3    sharkmp4, yes, both of those hashtags are associated with

4    sharkmp4.  One was uploaded to the (indiscernible) account,

5    peers providing the exact same file in an account that features

6    re-posting torrents that are dealt with other places, that are

7    really reading every post to the account.

8    **Q.**    What is the hashtag, hash value, hash, associated with the

9    swarm of filings for the file in this case?

10   **A.**    For the file in this case, the swarm was the 969 one.

11   **Q.**    Where is 969 to?

12   **A.**    If I had the table that (indiscernible) I could tell you.

13   I didn't memorize the --

14   **Q.**    Did you memorize the report?

15   **A.**    (Inaudible).

16            **MR. RANALLO:**  (Inaudible).

17            **THE COURT:**  All right, let me ask -- let me ask

18   counsel --

19            **THE WITNESS:**  -- hash, as well, that might be of --

20            **THE COURT:**  Where are we going with this?  Where are

21   we going with this?

22            **MR. DUFFY:**  Because the hashtag value in the

23   Complaint, the unique fingerprint number, is different from

24   what someone -- this -- this individual claims were associated

25   with the sharkmp4 and Mr. Steele.

1          **THE COURT:**  Why don't you ask him that.  Why don't

2     you ask him that.

3     **BY MR. DUFFY:**

4     **Q.**    Did you look at the plaintiff's Complaint in this case?

5     **A.**    I did.

6     **Q.**    Do you know what the -- the hashtag value was 610, hash

7     number, and it's about 40 digits, is that correct?

8     **A.**    That sounds familiar.

9     **Q.**    And your conclusion was that the person downloading was

10    the person named sharkmp4, correct?

11    **A.**    The person who was uploading the files --

12    **Q.**    Uploading the file.

13    **A.**    -- was sharkmp4.

14    **Q.**    If you take a look at this -- take a look at this

15    document, which I -- it's a downloading -- a page printed,

16    I believe, yesterday or today, from the Pirate Bay, that has

17    actually -- would you look at it, please?

18          **THE COURT:**  You're showing the witness Plaintiff's

19    Exhibit...?

20          **MR. DUFFY:**  Nine.

21          **THE COURT:**  Nine, thank you.  Which is...?

22          **MR. DUFFY:**  Which is a printout of the name of the

23    user with the hashtag listed in the Complaint in this case,

24    from a site called Pirate Bay.

25          **THE COURT:**  This is a hashtag printout.

1        (Plaintiff's Exhibit 9

2        marked for identification.)

3   BY MR. DUFFY:

4   Q.   What was that, hash, that, values associated with?

5   A.   This confirms my earlier testimony, fluxXxu, on

6   August 15th, uploaded the hashtag associated with this file.

7   It's an identical file size to a file uploaded by sharkmp4 four

8   days prior.

9   Q.   Your conclusion was that sharkmp4 was the person who did

10  it.

11  A.   I didn't do a search on every single hash that started

12  with sharkmp4.  There's a lot of them.  Only (indiscernible) --

13  to give him time.

14  Q.   The conclusion in your report is based on a different

15  hashtag than is in the Complaint.

16  A.   My conclusion is based on a number of hashtags, all

17  associated with sharkmp4 (indiscernible) 13.

18  Q.   Is that one of them?

19  A.   This hashtag is associated with sharkmp4.

20  Q.   Is it also associated with a different user?

21  A.   Yes, this hash is associated with a new user re-posting

22  sharkmp4 spots.

23  Q.   It's not sharkmp4.

24  A.   It's a point that 6881 might be uploading files besides --

25  Q.   Who -- where -- who is it associated with?  That's what

NEVILLE - CROSS / DUFFY

1   the point of my question is.  You've concluded that it was

2   sharkmp4 who uploaded the file.

3   **A.**    Yes, I -- I can --

4   **Q.**    And the point --

5   **A.**    -- sharkmp4 is one who uploaded the files.

6   **Q.**    According to that, it's a different user than the person

7   you're concluding might be John Steele.  It's a different name.

8   **A.**    According to this, another user posted a dot-porn file to

9   Pirate Bay.

10  **Q.**    And that's the -- and the hashtag, fingerprint, is the one

11  that's in this complaint in this case, right?

12  **A.**    Yes.

13  **Q.**    Okay.

14          **THE COURT:**  Let me ask the witness.  It seems to me

15  that we're talking about apples and oranges here.  Though I'm

16  not totally conversant in the art form known as hashtags, are

17  we talking about two different things here?

18          **THE WITNESS:**  So we're talking about two different

19  hashtags.  The way that the hash is generated is sensitive to

20  any change.  The only change apparent between these two files

21  is one is named PD.abi, and the other is named

22  PopularDemand.abi.  The files otherwise appear to be identical,

23  posted shortly after sharkmp4 posted the file.

24          It's entirely consistent with the way that the hash

25  is generated that merely changing the names of the files,

NEVILLE - CROSS / DUFFY

1  although it's a new hash, but as I mentioned earlier, they

2  refer to the same work.  We're talking about the same work

3  here, and it's same file that was originally uploaded by

4  sharkmp4, and then was re-posted four days later, by another

5  user, or at the very least, they posted the dot form of the

6  file.

7              THE COURT:  All right, thank you.

8  BY MR. DUFFY:

9  Q.   It's a different fingerprint associated with this swarm,

10  in this case, than the ones that are on sharkmp4, and you're

11  saying sharkmp4 is John Steele.

12  A.   It's a different file name.

13  Q.   Who is hashtag two?

14             THE COURT:  I'm a little bit concerned -- I'm a

15  little bit concerned what this line of questioning has to do

16  with the sanctions and/or -- sanctions motion against the

17  attorneys in this case, or a judgment against the plaintiff in

18  this case.  I think we need to stay focused on what's before

19  me.

20             MR. DUFFY:  I didn't understand what it had to do

21  with the award of attorneys' fees in the underlying case, but

22  it has, and this individual is claiming that Mr. Steele -- and

23  I don't -- he doesn't cite any outside laws that this is

24  illegal, that originally uploaded the file, and his conclusion

25  is based on a specific fingerprint that he says is Mr. Steele

1    and the fingerprint in this case belongs to somebody else.  So

2    he put in his -- his conclusion is incorrect, and misleading

3    the Court.

4              I don't understand what he has to -- what it has to

5    do with any of this either, but I -- it's something I have to

6    address because it's in the pleading.

7              THE COURT:  All right, why don't you proceed.

8              MR. DUFFY:  In any event, I don't have any further

9    questions.

10              THE COURT:  Any redirect, briefly?

11              MR. RANALLO:  Very briefly.

12                         REDIRECT EXAMINATION

13    BY MR. RANALLO:

14    Q.   The two files that we just discussed at length that have

15    different hashtags, you said those were precisely the same

16    size.

17    A.   Yes, that's -- it's actually -- if I could take a look at

18    the exhibit, I could tell you will the exact file size.

19    Q.   And if they were two different files containing different

20    content, you would expect the file sizes to be different,

21    correct?

22    A.   Yes.  Even if they were a rip of the same work, okay, was

23    done by a different individual, with slightly different

24    changes, they would have a different file size.

25    Q.   And so the fact that they were the identical file size

1    leads you to believe that -- what you testified earlier, that

2    it was originally posted by sharkmp4, and re-posted at this

3    site.

4    **A.**    Yes.

5              **MR. RANALLO:**  I have nothing further.

6              **MR. DUFFY:**  I just have a couple questions.

7                        **RECROSS-EXAMINATION**

8    **BY MR. DUFFY:**

9    **Q.**    That's solely relating now to the size of the file.

10   **A.**    Yes, it's related --

11   **Q.**    Even though the fingerprints are different.  The one you

12   call the fingerprint, the unique identifying thing -- that's

13   unique for every upload.

14   **A.**    It is unique for every torrent, yes.

15   **Q.**    Every torrent, yes.

16   **A.**    There are different file names, so it would be a different

17   hash.

18   **Q.**    Do you have any documents saying that these two

19   individuals are the same person, any coherent document that can

20   support your conclusion that this is the same person because of

21   the file sizes and so on?

22   **A.**    I don't believe I've never insinuated that fluxXxu is the

23   same person as sharkmp4.  I believe that fluxXxu is a re-pusher

24   of content, not an originator of content.

25   **Q.**    But in this complaint, flux -- whatever, the flux, or

1  whatever the thing is -- is the individual, you're not

2  asserting that that person is John Steele.  The person who

3  uploaded in connection with this case, you're asserting he

4  re-posted, it's not the same person?

5  **A.**   May I use an analogy to explain the situation?

6  **Q.**   No, just answer the question.

7          **THE COURT:**  No, allow the witness to answer.  No,

8  allow the witness to answer, please.  Go ahead.

9          **THE WITNESS:**  So this would be similar to objecting

10  to somebody referencing a file that appeared on recap and

11  saying that this isn't a file that's on Pacer.

12          This user, and there are many like it -- and I'm

13  happy to provide other examples of it afterwards in documents,

14  if you'd like -- reposts other users' content.  They're not

15  originators of content.  All you need is the dot-porn file, and

16  you can upload that file somewhere else.  You don't have to

17  have the original file with you.

18  **BY MR. DUFFY:**

19  **Q.**   But the defendant in this case participated in a swarm

20  with fluxXxu, right?  They were in the same swarm, correct?

21  **A.**   Yes.

22  **Q.**   And there's no evidence that sharkmp4 was in this swarm,

23  correct?

24  **A.**   The 6881 peer, who seems to be (indiscernible) sharkmp4,

25  using the formal that IPs, was uploading this file.

1    **Q.**   But you can't say it's the exact same individual --

2              **THE COURT:**  It's been asked and answered now two or

3    three times, in several different ways.

4              Anything further, counsel?

5              **MR. DUFFY:**  No.

6              **THE COURT:**  All right, is this witness excused?

7              **MR. RANALLO:**  I have nothing further.

8              **THE COURT:**  Counsel, is this witness excused?

9              **MR. DUFFY:**  Yes.

10             **THE COURT:**  Mr. Ranallo?

11             **MR. RANALLO:**  Oh, yes, I have nothing further.

12   I thought I answered that.

13             **THE COURT:**  All right.  You're excused.  Thank you.

14             **THE WITNESS:**  Thank you, your Honor.

15             **THE COURT:**  Do you have any other witnesses?

16             **MR. RANALLO:**  Not witnesses, no.

17             **THE COURT:**  All right.  What other evidence do you

18   have regarding the sanctions and/or judgment motion here?

19             **MR. RANALLO:**  Um, well, actually, if the Court is

20   interested, I would basically just offer my proof of mailing as

21   to the sanctions motions themselves, which was brought up

22   earlier this morning and corroborates my previous proof of

23   service filing in this case.

24             **MR. DUFFY:**  Just to clarify, I don't represent

25   either of those two individuals.  They're not parties to this

1    case, they haven't entered an appearance, and I don't know if

2    service by mail was appropriate to bring a nonparty, a

3    non-attorney, into a case, but I -- if I can clarify, I don't

4    represent either individual.

5         THE COURT:  All right.  Is that part of the record,

6    counsel, that this --

7         MR. RANALLO:  This is my -- the receipt is not.

8    I have a proof of service that I filed with, you know, the

9    standard proof of service at the end of a motion.  They say

10   they never received it and I have further proof of mailing, if

11   the Court is interested.

12        THE COURT:  All right, mark it as -- as

13   defendant's --

14        THE CLERK:  K.

15        THE COURT:  -- K, in order.

16                   (Defendant's Exhibit K marked for

17                    identification)

18        THE COURT:  All right, anything further on the part

19   of defendants in this matter?

20        MR. RANALLO:  No.

21        THE COURT:  All right.  Mr. Duffy, it's your -- your

22   show.

23        MR. DUFFY:  For what purpose, your Honor?  I can

24   address on the legal argument the counsel made in the beginning

25   if you'd like me to.  I mean, I don't know how --

1          **THE COURT:** It's your --

2          **MR. DUFFY:** I don't really have anything other than

3     what's set forth in the brief.  Counsel suggested that the

4     brief was incorrect, because it did not say that I had -- he

5     noted that there's no finding on the February 7th order to show

6     cause that AF Holdings' assignments were invalid, and that's

7     clear.  I established that.  I mean, if they said it's a

8     different entity ingenuity 13, but the statement is not a

9     centerpiece of the brief, but I want to point out that that is,

10    in fact, accurate.  He didn't say it was with respect to

11    Ingenuity 13.

12         **THE COURT:** Doesn't Judge Wright -- doesn't Judge

13    Wright discuss that rather succinctly in noting,

14              "The principals also obfuscate facts, especially

15              those concerning their operations, relationships and

16              financial interests.  The principals' web of

17              disinformation is so vast that the principals cannot

18              keep track.  Their explanations of their operations,

19              relationships and financial interests constantly

20              vary.  This makes it difficult for the Court to make

21              a concrete determination"?

22         **MR. DUFFY:** That's the February 7thth -- well, for

23    the specific finding in the Rule 11 order was with respect to

24    Ingenuity 13.  It's not a minor issue at work in the brief out

25    there.  I want to point out that it is factually accurate.

1    I mean, he does address the issue, but it's not specifically as

2    to AF Holdings, it's as to Ingenuity 13.

3           And as you point out in the brief, the proceedings

4    held, the Court asked a variety of collateral -- different

5    collateral estoppel issue-precluding in connection with that

6    case.

7           I mean, it is true, counsel made the point earlier

8    suggesting that Mr. Lutz is not available by telephone during

9    the March 11th hearing.  I know for a fact he was, and I was

10   sitting next to him and I was available by telephone, if we had

11   been given two business days' notice that the hearing would

12   occur, and Mr. Lutz is represented by counsel here -- not

13   Mr. Lutz -- AF Holdings is represented by counsel in the

14   courtroom, and the judge, after allowing counsel to state maybe

15   two sentences, only had her take a seat and she wouldn't allow

16   us to cross-examine.

17          The only person to cross-examine Mr. -- Mr. Cooper

18   was Brett Gibbs, and he only did it for the purposes of

19   establishing who Alan Cooper was, that AF Holdings had no

20   opportunity to cross-examine Mr. Cooper in connection with

21   that, or to take part in anything meaningful as far as that

22   hearing.

23          Also for the April 2nd hearing, Mr. Lutz was there,

24   too.  He was representing AF Holdings and Ingenuity 13 and was

25   given no opportunity, no opportunity whatsoever, to present

1    evidence or argument in connection with any of the matters,

2    except (inaudible), that the issues that counsel frivoled about

3    offense of common mutual collateral estoppel, there's not a

4    huge amount of case law in connection with that document,

5    but....

6         Now, we do cite case law from the Ninth Circuit, and

7    the fact is that the first proceeding has to have been not a

8    fundamental fairness statutes, in not allowing the plaintiff in

9    this case any opportunity to participate, even though he was in

10   the courtroom.  It was not fundamentally fair, and for other

11   reasons, the proceeding was not fundamentally fair, either.

12        And ruling on that -- the ruling on that doesn't

13   really have an impact on here.  I mean, here, Mr. Gibbs, in Los

14   Angeles, you know, said he was like being -- directing a

15   national organization of attorneys, and -- in summer, and to

16   have been secretary in March, it's not clear, though -- I guess

17   it is from his testimony today, whether he takes the position

18   here, but this is not -- it's different circumstances,

19   different case, different defendant.

20        The Court's two specific findings of misconduct

21   were, first of all, that Mr. Gibbs lied to the Court in the

22   March 2013 submittal that the Court requested in Early March,

23   and secondly, that he violated the Court's order dated

24   October 19th, 2012.  Those are the actual findings of attorney

25   misconduct, and none of those are issues in this case, and the

1    issue of the plaintiff --

2              **THE COURT:**  Counsel -- counsel -- counsel, Judge

3    Wright, I think, succinctly stated Mr. Gibbs' role in this as,

4              "Gibbs' behavior in the porno trolling collective

5              was controlled by several attorneys, under whom

6              other individuals also took their orders."

7              And I think -- if you succinctly state -- that

8    succinctly states what I understand Mr. Gibbs' role in this to

9    have been.

10             **MR. DUFFY:**  That's (indiscernible) testimony,

11   though.  The testimony of March 11th, we cited this in our

12   brief, that Mr. Pietz, the counsel's co-counsel, testified that

13   Mr. Gibbs was -- he claimed to have been -- had documents that

14   forced -- the documents to prove that Mr. Gibbs is a functional

15   chief executive officer of Prenda Law for all its operation.

16             And Jason Sweet, another member of the pornography

17   defense bar who was allowed to testify, er -- whatever -- makes

18   a statement at the hearing, said the same thing, that Mr. Gibbs

19   told him, in November 2012, that he was running -- that he was

20   running Prenda Law, that all the communications had to go

21   through him, that all settlement communications had to go with

22   him, and that's repeated over and over in the affidavit that --

23   for Mr. Lutz -- his co-counsel and from his opposing counsel in

24   connection with his role.

25             The judge's finding that Mr. Gibbs, or -- Mr. Gibbs'

1    claim, I should say, he literally testified on March 11th, that

2    he was basically a secretary, is completely at odds with the

3    facts.

4              **THE COURT:**  The Court found that,

5                   "Steele, Hansmeier and Duffy maintained full

6              control over the entire copyright litigation

7              operation.  Steele, Hansmeier and Duffy dictated the

8              strategy to employ in each case, ordered their hired

9              lawyers and witnesses to provide disinformation

10             about the cases and the nature of their operation

11             and possessed all financial interest in the outcome

12             of each case.  Steele, Hansmeier and Duffy ordered

13             Gibbs to commit the following acts before this

14             court:  File copyright infringement complaints based

15             on a single snapshot of internet activity, named

16             individuals as defendants based on a statistical

17             guess, and assert copyright assignment with a

18             fraudulent signature.  The principals, that is,

19             Steele, Hansmeier and Duffy, also instructed Gibbs

20             to prosecute these lawsuits only if they remained

21             profitable and to dismiss them otherwise."

22             **MR. DUFFY:**  And that's after -- then they were

23    subject to 13 separate appeals, it's very controversial, but

24    the fact is that that's completely -- those conclusions are not

25    supported by evidence in the record.

1          But in any event, the judge's ruling is what it is,

2     but, you know -- the fundamental aspect of attorney

3     responsibility in the United States is that a person signing a

4     document has to be responsible for the (indiscernible).  That's

5     the person who has the obligation to investigate.  If somebody

6     tells them Donald Duck is the client, he writes "Donald Duck"

7     on a form, that's not excusable.  There is an affirmative duty

8     placed on an attorney who signs any paper, or (indiscernible)

9     attorney who signs a paper, the local rules -- state rules call

10    up the person who signs the paper, local rules require people

11    to keep the paper, so they can establish that they properly --

12    that they properly did all they could do.

13         An attorney seeking to blame other people for things

14    that he filed goes completely odd -- jurisprudence, Rule 11 and

15    every applicable and analogous state law, that the obligation

16    and the last line of support on a person signing a complaint,

17    if he did not believe on a good faith basis he could do that,

18    is to conduct investigation.  If he's using fictitious names

19    and signing the same person as real, that's where the buck

20    should stop.  That's where the law requires it to stop.

21         **MR. RANALLO:**  If I could just note that in my

22    submission this morning, I do cite to a couple of places that

23    we indicated that it is appropriate to -- sanction resume --

24    excuse me -- sanctions (indiscernible) power in Section 1927 on

25    supervising attorneys though they're not specifically admitted

1   in that action.  I would just leave it at that.

2           **MR. DUFFY:**  I think the vast amount of case law is

3   to the contrary.  It's not transferable, it's not -- it's

4   not -- first of all, it's not submitted to the jurisdiction of

5   the Court, not otherwise appeared, it's not subject to Rule

6   1927 action sanctions.

7           **THE COURT:**  All right, thank you.  Why don't we go

8   through the evidence.  We'll start with defendant's.  Just,

9   what it is.

10          **THE CLERK:**  Defendant's -- Defense Exhibit A,

11  spreadsheet of document Paul Hansmeier.

12          **THE COURT:**  Is counsel moving that into evidence?

13          **MR. RANALLO:**  Yes.

14          **THE COURT:**  Objection?

15          **MR. DUFFY:**  I'm sorry, your Honor, I didn't hear,

16  what was that -- what was that?

17          **THE CLERK:**  Paul Hansmeier spreadsheet.

18          **MR. DUFFY:**  No, no objection.

19          **THE COURT:**  The document will come into evidence.

20                          (Defendant's Exhibit A

21                        received in evidence)

22          **THE CLERK:**  Defense Exhibit B, the entire

23  spreadsheet of John Steele.

24          **THE COURT:**  Moving that into evidence?

25          **MR. DUFFY:**  No objection.

1          THE COURT:  Counsel, are you moving that into

2    evidence?

3          MR. RANALLO:  No objection.

4          THE COURT:  B will come into evidence.

5                         (Defendant's Exhibit B

6                      received in evidence)

7          THE CLERK:  Exhibit C, certificate of authenticity.

8          THE COURT:  Are you moving that into evidence,

9    counsel?

10          MR. RANALLO:  Yes, your Honor.

11          THE COURT:  Objection?

12          MR. DUFFY:  No objection.

13          THE COURT:  C will come into evidence.

14                         (Defendant's Exhibit C

15                      received in evidence)

16          THE CLERK:  Exhibit D, audio recording of Alan

17    Cooper.

18          MR. RANALLO:  I would like to move that in evidence.

19          MR. DUFFY:  I have several objections to that,

20    including relevance, but your Honor overruled it.

21          THE COURT:  D comes into evidence.

22                         (Defendant's Exhibit D

23                      received in evidence)

24          THE CLERK:  Exhibit E, audio recording of Mark Lutz.

25          MR. RANALLO:  I'd like to admit that, just with the

qualification that it's someone identifying themselves as Mark

Lutz.

           **MR. DUFFY:**  I object.

           **THE COURT:**  All right, objection's overruled.

E will come into evidence.

           **THE CLERK:**  Exhibit F, Notice of Appeal, John

Steele, document number 156.

           **THE COURT:**  The Court will take judicial notice of

that.

           **THE CLERK:**  Exhibit G, Rule 24 (sic) report in case

number 11-3067 CW, docket number 26.

           **THE COURT:**  The Court will take judicial notice of

that.

           **THE CLERK:**  Exhibit H, notice of firm name change in

C11-01956, EDL.

           **THE COURT:**  The Court will take judicial notice of

that.

           **THE CLERK:**  Exhibit I, notarized affidavit.

           **MR. RANALLO:**  Move the exhibit, your Honor.

           **MR. DUFFY:**  Object.

           **THE COURT:**  Basis of the --

           **MR. DUFFY:**  On the grounds of hearsay.

           **THE COURT:**  Response?

           **MR. RANALLO:**  I would seek to admit it under the

residual exception; to the extent that Mr. Cooper testimony on

1  March 11th is admitted, I wouldn't seek to admit it at all.

2            **THE COURT:**  The Court will grant plaintiff's motion

3  and the exhibit will not come in.

4            **THE CLERK:**  Exhibit J, business record from Comcast.

5            **MR. RANALLO:**  Move to admit.

6            **MR. DUFFY:**  Object.

7            **THE COURT:**  I believe that was billed as a -- that

8  had a -- it was authenticated, is that correct?

9            **MR. RANALLO:**  Yes, it is.

10            **MR. DUFFY:**  That came from a record keeper or

11  something.

12            **THE COURT:**  All right, that will come in, over --

13            **MR. DUFFY:**  Had not seen it before.

14            **THE COURT:**  All right, that will come in, over

15  plaintiff's objection.

16                      (Defendant's Exhibit J

17                   received in evidence)

18            **THE CLERK:**  And Exhibit K, receipt of mailing.

19            **THE COURT:**  That will come in, also.

20                      (Defendant's Exhibit K

21                   received in evidence)

22            **MR. RANALLO:**  And also, your Honor, it wasn't

23  mentioned, but I sought to admit the prior testimony of Alan

24  Cooper, as well, on March 11th.

25            **THE COURT:**  I believe the Court took judicial notice

1    of that, did it not?

2              **MR. DUFFY:**  The Court indicated that it took

3    judicial notice.

4              **THE COURT:**  All right.

5              **THE CLERK:**  Is there an exhibit?

6              **THE COURT:**  Is there an exhibit number?  Do we

7    have --

8              **MR. RANALLO:**  Well, it was previously filed at 84-2

9    in this action.  I -- you know, I don't have a full copy of the

10   full transcript, I --

11             **THE COURT:**  It's part of this record.

12             **MR. RANALLO:**  It is part of this record at 84-2,

13   yes.

14             **THE COURT:**  All right, so the Court will take --

15   we'll mark that as Defendant's L, and that will come in.  The

16   Court's taking judicial notice.

17             **THE CLERK:**  I'm sorry, it is what?

18             **THE COURT:**  It is the testimony of Mr. Cooper

19   previously elicited in this matter.

20             **MR. RANALLO:**  No, actually, that's incorrect.  It

21   was the testimony of Mr. Cooper previously elicited in the

22   Central District of California, but previously filed on the

23   record in this matter.

24             **MR. DUFFY:**  It was filed, but it's never been

25   admitted as evidence, and I object because AF Holdings was

1    present and -- had an attorney present in court, but the Court

2    did not allow any cross-examination -- any meaningful

3    cross-examination of that witness.

4              **MR. RANALLO:**  Two points on that.  One AF Holdings

5    wasn't represented by Ms. Rosing at the time, AF Holdings was

6    represented by Mr. Gibbs; and 804(b) simply requires

7    cross-examination by someone basically with the same interest

8    in eliciting testimony.  I think it's very clear that

9    Mr. Gibbs, attorney at that point, would have preferred to be

10   able to discredit Mr. Cooper's testimony or prove that in some

11   way it was false.  They were simply unable to do so.

12             **MR. DUFFY:**  Miss -- AF Holdings was represented by

13   the Rosing Law Firm.  Mr. Gibbs, while he was having to

14   withdraw, was not -- did not -- he did not, under any -- he was

15   represented by separate counsel.  He did not make any attempt

16   to cross-examine, if it wasn't -- even if not for the fact that

17   he arguably committed extreme malpractice by not having done

18   that, but he took no attempt, and he was therefore, as counsel,

19   made no attempt to cross-examine the witness.

20             He had cut a deal with various defense attorneys

21   around the country to testify in their favor on other matters,

22   and every different ways, and there's absolutely no question

23   AF Holdings was not given any opportunity whatsoever to

24   meaningfully participate in the cross-examination of that

25   witness.

1          **MR. RANALLO:**  Again, under 804(b), it doesn't

2    require the same party.

3          **THE COURT:**  Over the objection of counsel, that will

4    come in.

5                      (Defendant's Exhibit L

6                    received in evidence)

7          **THE COURT:**  All right, any other defense exhibits?

8          **MR. RANALLO:**  No, your Honor.

9          **THE COURT:**  All right, why don't we go to

10   Plaintiff's exhibits.

11         **THE CLERK:**  Plaintiff's Exhibit 1, declaration in a

12   Florida case.

13         **THE COURT:**  Any objection?

14         **MR. DUFFY:**  Which declaration was that?

15         **MR. RANALLO:**  Declaration of who?

16         **MR. DUFFY:**  Brett Gibbs' declaration in a Florida

17   case.

18         **MR. RANALLO:**  No.

19         **THE COURT:**  That will come in.  Plaintiff's 1 is

20   moved into evidence.

21                    (Plaintiff's Exhibit 1

22                   received in evidence)

23         **THE CLERK:**  Number 2, counsel (inaudible) something,

24   and number they looks like an e-mail between Graham Syfert and

25   Andrew Waxler.  Is there a number 2?

1    **MR. DUFFY:**  Number 2 -- number 2 is the affidavit of

2    Steven James Goodhue.

3            **MR. RANALLO:**  I would object to the extent that it's

4    used for any of the matters here that --

5            **THE COURT:**  Well, is this -- these were impeachment

6    records, were they not?

7            **MR. DUFFY:**  They were.  Counsel had -- several

8    affidavits in this case appear elsewhere directly, but that

9    affidavit appears in a couple other filings this record, and in

10   this specific case --

11           **THE COURT:**  All right.

12           **MR. DUFFY:**  -- there as well.

13           **THE COURT:**  All right, it will come in.

14                        (Plaintiff's Exhibit 2

15                        received in evidence)

16           **THE CLERK:**  Exhibit 3 was an e-mail between Graham

17   Syfert and Andrew Waxler.

18           **THE COURT:**  But that was used for impeachment, was

19   it not, counsel?

20           **MR. DUFFY:**  Yes, but that --

21           **THE COURT:**  All right, thank you.  So that will not

22   come in.

23           **THE CLERK:**  Number 4 was an affidavit of Jack

24   Nazaire.

25           **MR. DUFFY:**  Move to admit.

1          **MR. RANALLO:** Again, I would object on the same

2     grounds.

3          **THE COURT:** All right, it will come in.

4                    (Plaintiff's Exhibit 4

5                    received in evidence)

6          **THE CLERK:** Number 5 is a stipulation between

7     Mr. Gibbs, document number 178 in the Central District, and

8     attorney --

9          **MR. DUFFY:** (Inaudible).

10         **THE COURT:** That's a filing in the Central District,

11    is that correct?

12         **MR. DUFFY:** Yes.

13         **THE COURT:** All right, the Court will take judicial

14    notice.

15         **THE CLERK:** Number 6 is a letter dated July 8th to

16    the State Bar of California.

17         **THE COURT:** And that was used for impeachment, is

18    that correct, counsel?

19         **MR. DUFFY:** Um, no, it's a -- the witness said he

20    had received the letter and was aware of its contents.

21         **MR. RANALLO:** I would --

22         **MR. DUFFY:** And so I'll move to admit it.  It's also

23    been in several -- several pleadings in this case, as

24    attachments, as well, at least two or three.

25         **MR. RANALLO:** It's unsworn, and I don't think

1    there's -- I don't think that's under any exception.

2            **THE COURT:**  What's the relevance?

3            **MR. DUFFY:**  That the -- that Mr. Gibbs breached his

4    duties to AF Holdings, and at the same time he was cutting

5    affidavits for the defendants in this case, he was also -- he

6    was also short-selling his own clients on deals to settle other

7    cases.  He was lowballing, he was saying, yeah, some of those

8    cases, where he used an affidavit and everybody was happy,

9    posted two people, Mr. Gibbs' affidavits.

10           **THE COURT:**  Defendant's objection is sustained.  The

11   item will not come in.  Next one.

12           **MR. RANALLO:**  Just as a point of fact, also, I don't

13   think Mr. Gibbs testified about a settlement --

14           **THE COURT:**  All right, let's -- we're not arguing

15   anymore.  We're just going over evidence.

16           **MR. DUFFY:**  It's on the record.

17           **THE CLERK:**  Engagement letter dated November 15th,

18   2011 between AF Holdings and Ingenuity 13.

19           **MR. DUFFY:**  (Indiscernible).

20           **THE COURT:**  All right, matter -- that will not come

21   in.

22           **THE CLERK:**  Number 8, Order to Show Cause Re:

23   Sanctions, in the Central District.

24           **THE COURT:**  The Court will take judicial notice of

25   that.

```
 1              THE CLERK:  And number 9, a printout of the name of

 2     user from a hashtag in this case.

 3              MR. DUFFY:  Move to admit.

 4              MR. RANALLO:  I object on authentication, as well as

 5     (indiscernible).

 6              THE COURT:  Well, I think your witness basically

 7     authenticated it during his testimony.  And that will come in.

 8                        (Plaintiff's Exhibit 9

 9                        received in evidence)

10              MR. DUFFY:  And also acknowledged it was relevant.

11              THE COURT:  Anything else?  All right, gentlemen,

12     I'll take it under submission.  I'll try to get a ruling out in

13     a couple of weeks.

14              MR. DUFFY:  Thank you very much, your Honor.

15              THE COURT:  Thank you.

16              MR. RANALLO:  And if I could go to -- I've gotten no

17     responses regarding the last two issues that you noticed up for

18     today as far as the mechanics of where the money went, and why

19     Mr. Hansmeier rather than Mr. Lutz appeared.

20              THE COURT:  All right.  I think that's --

21              MR. DUFFY:  (Indiscernible).  I'm sorry, I didn't

22     understand his question.

23              MR. RANALLO:  I'm sorry.  Why Mr. Lutz, er -- why

24     Mr. Hansmeier appeared as a 30(b)(6) deponent in lieu of

25     Mr. Lutz, and where the money went.
```

1          **THE COURT:**  All right, well, I have the -- whatever

2    documents I have before me, I'll use that in determining --

3    I'll make my ruling based on what I've heard today and the

4    papers that have been filed.  Thank you, counsel.

5          **MR. RANALLO:**  Thank you, your Honor.

6                                                        <u>4:23 p.m.</u>

7                          ---o0o---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4

5            I, Leo Mankiewicz, certify that the foregoing is a

6    true and correct transcript, to the best of my ability, of the

7    above pages of the official electronic sound recording provided

8    to me by the U.S. District Court, Northern District of

9    California, of the proceedings taken on the date and time

10   previously stated in the above matter.

11           I further certify that I am neither counsel for,

12   related to, nor employed by any of the parties to the action in

13   which this hearing was taken; and, further, that I am not

14   financially nor otherwise interested in the outcome of the

15   action.

16

17                                                    06/03/2018

18             Signature of Transcriber          Date

19

20

21

22

23

24

25